In re Ann H. LOKUTA, Judge of the
Court of Common Pleas, Eleventh
Judicial District, Luzerne County.

No. 3 JD 06.

Court of Judicial Discipline
of Pennsylvania.

Oct. 30, 2008.
Order Dec. 9, 2008.

Francis J. Puskas, II, Harrisburg, Deputy Chief Counsel, Judicial Conduct Board, for Judicial Conduct Board.

Louis J. Sinatra, Philadelphia, for Respondent.

Before MUSMANNO, P.J., and LAMB, SPRAGUE, P.J.E., and O'TOOLE, STREIB, BUCCI, and KURTZ, JJ.

OPINION BY Judge SPRAGUE.

AND NOW, this 30th day of October, 2008, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent,

That either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party,

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and, if so, issue an Order setting a date for such oral argument. If the Court determines not to entertain oral argument upon the objections, the Findings of Fact and Conclusions of Law shall become final and this Court will conduct a hearing on the issue of sanctions,

That, in the event objections are not filed within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court on November 27, 2006 against Ann H. Lokuta, Judge of the Court of Common Pleas of Luzerne County Pennsylvania (Respondent) consisting of six counts which charge Respondent as follows:

1. Failing to be patient, dignified and courteous to litigants, jurors, witnesses, lawyers, and others with whom she deals in her official capacity, and failing to require similar conduct of lawyers and of her staff, court officials, and others subject to

her direction and control, a violation of Canon 3A.(3) of the Code of Judicial Conduct (Count 1),

2. Conduct which brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 2),

3. Failing to dispose promptly of the business of the court, a violation of Canon 3A.(5) of the Code of Judicial Conduct (Count 3),

4. Failing to conduct herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary, a violation of Canon 2A. of the Code of Judicial Conduct (Count 4),

5. Failing to disqualify herself in a proceeding in which her impartiality might reasonably be questioned, including, but not limited to instances where she has a personal bias or prejudice concerning a party, a violation of Canon 3C.(1)(a) (Count 5),

6. Conduct which prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 6).

These charges arise out of conduct alleged to have begun soon after her election to the bench in 1992 and to have continued until the filing of this Complaint in November 2006.[1]

The Board presented 30 witnesses,[2] whose testimony was offered to establish the charges brought by the Board. The Respondent and her present tipstaff and secretary, Maureen Gushanas,[3] gave

lengthy testimony disputing the testimony of the Board's witnesses, declaring that the Board's witnesses are all lying, giving false testimony, and committing perjury, in furtherance of a conspiracy to hurt Respondent. Our resolution of this question obviously will be essential to the fact finding process in this case and will dictate our ultimate conclusions. We find that the Board's witnesses were credible, did not give false testimony, and did not commit perjury. We find, on the other hand, that Respondent's and Gushanas's insistence that each and every one of these witnesses gave false testimony and committed perjury is, to put it gently, far-fetched.

The Board and the Respondent have submitted stipulations as to some of the facts in the case pursuant to C.J.D.R.P. No. 502(D)(2). The Court accepted the pertinent stipulations and proceeded to trial.

As we make our findings of fact, we will discuss the efficacy of those facts in establishing the violations of the canons and of the constitution asserted by the Board and set out in the six Counts recited above.

Before doing so, we set down fundamental principles which direct us in our work.

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evi-

---

1. The record contains testimony that Respondent's conduct continued even after the Complaint was filed and "goes on to this day." (N.T. 573–76 Coll). See, also, N.T. 1200–03 Moran.

2. These witnesses included court reporters, court clerks, deputy sheriffs, lawyers, the court administrator and his deputy, the prothonotary, Respondent's secretaries, tipstaffs and law clerks and three president judges.

3. Maureen Gushanas has been Respondent's tipstaff or secretary since March 2001. She presently holds both positions.

dence. Parties appealing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Art. V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

> The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.... It is not necessary that the evidence be uncontradicted provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*In re Adoption of J.J.,* 511 Pa. 590, 515 A.2d 883, 886 (1986). *See, also, LaRocca's Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

Acting pursuant to C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case. The Panel, consisting of Conference Judge Sprague, Judge O'Toole, and Judge Streib conducted the trial on September 24, 2007 to September 28, 2007, December 10, 2007, December 12 to December 14, 2007 and January 14, 2008 to January 16, 2008. Findings of Fact were initially made by the Panel.

■ Since the Constitution requires that "all actions of the court ... shall require approval by a majority vote of the members of the court" (Pa. Const. Art. V, § 18(b)(4)) the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. Mindful of the reality, long jurisprudentially recognized, that assessments of credibility are best made by one who hears the witnesses testify and observes their demeanor, the Court is obliged to accord special deference to the Panel's Findings of Fact. The Supreme Court of Pennsylvania has addressed the subject as follows:

> As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as fact finder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the fact finder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted).

*Commonwealth Dept. of Transportation v. O'Connell,* 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). See, also, the observations of the United States Supreme Court in *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "... the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference'", and in *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness

that attaches to factual findings is stronger in some cases than in others." We also determine that this is a case where the presumption should be stronger rather than weaker because, in this case, credibility determinations were pivotal.

We preface this Opinion by stating that our findings hereinafter made are based on evidence which is, in all cases, clear and convincing.

## II. FINDINGS OF FACT AND DISCUSSION

The Court now makes its findings of fact; those which are stipulated are so designated.

### A. INTRODUCTORY

1. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania and Judicial Conduct Board Rule of Procedure 31(A)(3), promulgated by the Pennsylvania Supreme Court on March 20, 1995 (amended 1996), the Board is granted authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge, or justice of the peace, for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline. (Stipulated).

2. Since January 1992, the Respondent has served continuously to the present as a duly-elected Judge of the Court of Common Pleas serving the Eleventh Judicial District, Luzerne County, Pennsylvania. (Stipulated).

### B. RESPONDENT'S WORK HABITS

**Findings of Fact**

3. Theodore Krohn is 75 years old and has been a member of the Pennsylvania Bar since 1956. Krohn was employed in Respondent's office as senior law clerk during two periods: (1) from 1998/1999 to June 2002; and (2) from January 2003 to April 2003. During his employment with Respondent, Respondent referred to Krohn as her "Clarence Darrow." (N.T. 24–28 Krohn; N.T. 2430, 3015, 3179 Lokuta).

4. Nancy Violi is a lawyer who began working as an assistant district attorney in Luzerne County in 2001. She frequently appeared in that capacity before Respondent from 2001 to February 10, 2004 when, after a particularly bad experience in Respondent's court where Respondent had repeatedly badgered and rebuked her for reasons such as: for speaking too soon, for not speaking soon enough, for not looking at Respondent when she was answering Respondent's inquiry as to how many witnesses she had—having looked over at the witnesses to be sure she got the number right—and "after months and months of all the abuse [she] had taken," she reported this situation to the first assistant district attorney and thereafter she was not assigned to Respondent's courtroom. (N.T. 798, 810, 817–822 Violi).

5. Virginia Murtha–Cowley has been practicing law in Luzerne County since 1985, She worked as a public defender from 1987 until February 2007. Since then she has been employed by the Pennsylvania State Education Association. She had a friendly, social relationship with Respondent until Christmas time one year in the late 1990s when it ended in an unfriendly manner. She appeared frequently in Respondent's courtroom in her capacity as a public defender until 2003. After her personal relationship with Respondent ended, Respondent's treatment of her in the courtroom dramatically changed and was repeatedly personally humiliating and abusive to the point where Murtha–Cowley became concerned that Respondent's obvi-

ous animosity toward her was negatively affecting her clients; and, upon her request, she was no longer assigned to Respondent's courtroom. (N.T. 989–1005 Murtha–Cowley).

6. Ingrid Cronin is employed as an assistant federal public defender in Scranton, Pennsylvania. She was admitted to the bar in 1991. From 1992 through August 2004, she was employed as an assistant district attorney in Luzerne County. During the course of her employment as an assistant district attorney, Cronin appeared before Respondent at least once per week during the periods when Respondent was presiding over criminal cases. Cronin also, for a period of years, had a supervisory role in the district attorney's office which required her, among other things, to direct the daily assignments of the assistant district attorneys before the various judges. (N.T. 1033–38 Cronin).

7. Rebecca Ann Sammon is a 2004 law school graduate presently employed by the Commonwealth of Pennsylvania House of Representatives. While in law school, Sammon worked for Respondent as a law clerk/intern for two summers, from May through August 2002 and from May through July 2003. (N.T. 1235–38, 1287–88 Sammon).

8. Judith M. Flaherty is an attorney who was admitted to practice in Pennsylvania in January 1999. From April 1999 through March 2001 Ms. Flaherty worked for Respondent as a tipstaff/law clerk. (N.T. 1408–11 Flaherty).

9. Patrick J. Toole, Jr. has been a judge in the Court of Common Pleas of Luzerne County since 1978. He served as president judge of the county from 1991 to 1996 and was president judge when Respondent first came to the bench in 1992.

Judge Toole now serves as a senior judge in Luzerne County. (N.T. 240, 280 Toole).

10. Respondent was frequently late for court. (N.T. 39–45, 85 Krohn; N.T. 833 Violi; N.T. 1009–10 Murtha–Cowley; N.T. 1035, 1051–52 Cronin; N.T. 1267–68 Sammon, Exhibit R–643, p. 18; N.T. 1424–34 Flaherty).

11. During both time periods in which Krohn was employed by Respondent, Respondent was continually late for court sessions "from 20 minutes to possibly an hour or more," many times with a packed courtroom of attorneys. This was a recurring problem occurring "a number of times per week, some weeks more often than not." (N.T. 39–40 Krohn).

12. During both time periods in which Krohn was employed by Respondent, Respondent had people waiting in the courtroom for the business of court while she was talking with her staff in chambers and not working on judicial matters. On these occasions, Respondent instructed Krohn to tell those waiting that Respondent was engaged in legal research, or to tell them that Respondent had been delayed because of traffic problems or traffic accidents. (N.T. 41–45 Krohn).

13. Respondent was frequently absent from the courthouse during normal working days and hours. (N.T. 257–58 Toole; N.T. 1238 Sammon; N.T. 1424–29 Flaherty).

14. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follows occurred as described in the testimony at the times and with the frequency as related by the witnesses.

*Discussion*

■ We find the testimony of these witnesses on Respondent's work habits to be credible.[4] The question then is: does the

4. It is worth noting that Respondent did not

dispute this testimony. Respondent testified

conduct described by these witnesses constitute a violation of any of the constitutional or canonical provisions charged by the Board in Counts 1 through 6? In answering this question it is most important that we examine the testimony to determine:

1. Whether these absences were inconsequential, i.e., a few minutes—or not, and

2. Whether they were infrequent occurrences—or not.

Krohn answers both questions. As to the first he was asked:

Q. ... Approximately what kind of lateness are we talking about?

A. Anywhere from 20 minutes to possibly an hour or more.

As to the second he was asked:

Q. And how frequently?

And he answered:

A. I would say a number of times per week, some weeks more often than not. (N.T. 40).

Krohn also testified that this was "one of the constantly recurring problems" and that "it was on a weekly basis and continuing in such fashion" and that "the judge was continually late for court sessions, many times for a packed courtroom of attorneys." (N.T. 38–39). Krohn testified that this was Respondent's *modus operandi* during both periods of his employment as Respondent's senior law clerk, i.e., from 1998/1999 to June 2002 and from January to April 2003. Krohn also testified that Respondent was late for court on the last day he worked for her in April 2003. (N.T. 43, 85).

Nancy Violi testified:

A. There were numerous incidents when I was there for PFA court that Judge Lokuta would take the bench, and if she was late that morning, she would always take the bench and always make a comment that it was somebody else's fault. And many times she was making derogatory comments about Judge Conahan, and he was the reason why she couldn't get to the bench to be at her hearings on time. (N.T. 833).

Virginia Murtha–Cowley testified:

Q. What, if anything, have you observed about Judge Lokuta's punctuality in court?

. . . .

A. She has a tendency to be late.

The Court then asked:

Q. Excuse me, what does late mean?

She answered:

A. Well, we would be waiting 15, 20, a half hour. She would get on the bench, and then, you know, say she had many other things to take care of. That would be common. Or she would get on the bench and go on for another 10 minutes or more about how—what her workload is and how she is treated by the other judges and by the courts and on and on and on .... (N.T. 1009–10).

. . . .

Q. How frequently was that occurring?

---

for five days and her testimony fills over 1,600 pages of this record but she never denied the testimony of these witnesses. (The only testimony which might be regarded as an attempt to ameliorate the Board's evidence is Respondent's testimony that in PFA court the parties were scheduled to be present 30 minutes before the judge in order to give the parties and their attorneys an opportunity to resolve the disputes without the participation of the judge. (N.T. 2829–32). However, this is not what the Board's witnesses were testifying about).

. . . .

A. That was fairly frequently. (N.T. 1010).

Ingrid Cronin testified:

Q. What, if anything, can you tell the Court about Judge Lokuta's punctuality?

. . . .

A. It's my memory that the judge was very often late. And I can remember that the judge very—took many more breaks than I would have expected, long breaks.

. . . .

Q. Now, when you say late, can you tell the Court what you mean by that?

A. I think it would be fair to say that one could generally expect things to start at least half an hour after they were originally scheduled and could be more than that.

Q. And was that a frequent occurrence?

. . . .

A. Yes, that was a frequent occurrence. (N.T. 1051–52).

Rebecca Sammon, Respondent's legal intern, testified:

Q. Now, how frequently had Judge Lokuta been at her office during that first summer?

A. Not—Definitely not like 9:00 to 5:00 Monday through Friday. It would be sometimes she'd only come in once a week. Sometimes, you know, I know she went on vacation. But there were times where I would only see her once a week, if that.

Q. During the second summer that you worked for her, how frequently was she at the office?

A. More often. . . . (N.T. 1241).

Q. What, if anything, can you tell the Court about Judge Lokuta—Judge Lokuta's punctuality in coming to court?

. . . .

And I would be referring to both. And you can separate them if you want, summer of 2002, summer of 2003.

A. She was late a lot. . . . (N.T. 1267).

The Court:

Q. The question is, what can you tell about Judge Lokuta being late. I assume since you said she rarely showed up the first time you're talking about the second season.

A. Mostly, yes. But the times that she did come I remember one particular instance when she had a civil trial. She would frequently show up—she would show up about a half hour late. And often she wouldn't get there until 10:30, noon. She was frequently late. (N.T. 1268).

Judith Flaherty, Respondent's law clerk/tipstaff, testified:

Q. What can you tell the Court, if anything, about Judge Lokuta's punctuality in the court?

. . . .

A. What would happen is normally if she didn't have court a lot of the times she wouldn't come in until later in the day if court wasn't scheduled, usually in the afternoon maybe come in for a couple hours and do work and then leave. . . . So what would normally happen is when we got assigned a case, normally we'd call her to let her know because usually she wasn't in. . . .

Q. Where was Judge Lokuta?

A. She was home.

. . . .

A. From the conversations, she was at home in Dupont.

JUDGE SPRAGUE: Conversations that you had had on occasions with Judge Lokuta?

A. Myself or Susan. Usually Susan would get the call, and Susan was her secretary.

JUDGE SPRAGUE: But did you on occasion speak directly with Judge Lokuta?

A. A few times I had.

JUDGE SPRAGUE: And she was home?

A. She was home.

. . . .

Q. Were there times, if any, where you had to call Judge Lokuta to wake her up in the afternoon to come into the office?

MR. SINATRA: Objection, Your Honor.

JUDGE SPRAGUE: Overruled.

A. There would be times that I had to call her to let her know, like I said, about the criminal trial, and we hadn't heard about—you know, heard from her. And I could tell she had just—it sounded like she had just woken up.

Q. What made you think that? You can tell the Court.

A. Well, the way your voice sounds, you know, like groggy, a groggy voice, you know, someone who had just, you know, woken up from a sleep. You know, you can tell like when your talking voice isn't clear.

Q. And how often would that occur?

. . . .

MR. SINATRA: Objection to the form of the question.

JUDGE SPRAGUE: Excuse me, that objection is sustained. The witness has not been able to say definitely that she woke her up. She gave her

conclusion from the way in which Judge Lokuta spoke that sounded like somebody who had woken up. She never said, in fact, she woke her up. So the question is, how many times did you call her in mid-afternoon to get her to come to court?

Q. Right. How frequently would you have to call her in the afternoon to get Judge Lokuta to come into court?

. . . .

A. Well, most of the time it was Susan that would call her. But it was usually every criminal matter that we had. And usually around late morning or around noon, you know, when we knew for sure, Susan would call her. There's a few occasions that I had to actually call the judge. Sometimes she would call in. But most of the times it was Susan calling her to let her know. Sometimes I called her. (N.T. 1424–29).

Judge Toole testified about an incident which occurred in 1994 or 1995 when he was president judge:

Q. Do you recall an incident where you called Judge Lokuta's chambers and she was not there?

A. I recall a number of times I called she wasn't there. The one you're probably talking about is, and again, I'd have to find, because they are all memorandums back and forth about it, she was assigned a trial for that particular day. Early that morning that case was settled. I sent another case to her courtroom to be tried. Later that morning I inquired and I was told that—

. . . .

A. I was informed by the court administrator that the case that I had assigned to Judge Lokuta that day

was continued until 1:30. I went down, or I called, I apologize. I called the office and I asked to speak to the judge. I was told she was unavailable. I asked the secretary if she was there or out of the building. And I said, I want to know, is she there. And finally the secretary said to me—

A. —that, no, she was not in the building. I was concerned, because, one, I was given no notice that she was not going to be present that morning for an assignment. Then, if I recall correctly, I might have said please have her call me. And my recollection is, I received no call and I think that was that case. (N.T. 257–58).

■ As stated earlier, the Board's witnesses are credible and their testimony is clear and convincing to establish that this Respondent was habitually and egregiously late for court and frequently was not in the courthouse at work when she should have been. We find that this evidence establishes a violation of Canon 3A.(3) of the Code of Judicial Conduct as charged in Count 1 of the Complaint.

Canon 3A.(3) provides:

Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity, and should require similar conduct of lawyers, and of their staff, court officials, and others subject to their direction and control.

Respondent's custom of arriving 15, 20 minutes, or a half hour or an hour or more late for scheduled court sessions is the quintessential discourtesy to litigants, jurors, witnesses, and lawyers. When it is commonplace, as here, it takes on the character of arrogance and disrespect for the judicial system itself, as well, of course, disrespect for those who, bidden by the court to be in court at a time chosen by the court, wait, sometimes in a "packed courtroom," for the arrival of the judge.

■ These considerations lead us to a contemporaneous finding that this conduct is such that brings the judicial office into disrepute which subjects Respondent to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

In *In re Trkula*, 699 A.2d 3, 7 (Pa.Ct. Jud.Disc.1997), this Court (referring to our opinion in *In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996)) said:

... this Court noted that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute.

In *In re Cicchetti*, 697 A.2d 297, 312, *aff'd*, 560 Pa. 183, 743 A.2d 431, 444–45 (2000), this Court noted that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

We note that for most of the occupants of the benches in this Respondent's courtroom—the litigants, the jurors and the witnesses—this is a once-in-a-lifetime experience, their only exposure to the judicial system; and what they take away will be based largely, if not predominantly, on the conduct of the judge.

In *Smith* we said that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*Smith, supra,* at 1239; *see also, In re Harrington,* 877 A.2d 570, 576 (Pa.Ct.Jud. Disc.2005), *aff'd,* 587 Pa. 407, 899 A.2d 1120 (2006); *In re McCarthy,* 828 A.2d 25, 29 (Pa.Ct.Jud.Disc.2003); *In re Zoller,* 792 A.2d 34, 38 (Pa.Ct.Jud.Disc.2001); *In re Strock,* 727 A.2d 653, 657 (Pa.Ct.Jud.Disc. 1998); and *In re Trkula,* 699 A.2d at 7.

Certainly the reasonable expectations of the public would include the expectation that the judicial officer act with the same respect for the court as those members of the public did by obeying the court's scheduling order; would include the expectation that the judicial officer would act with consideration for the time and schedules of the hard working people who crowd her courtroom; and would include the expectation that a judicial officer would conduct herself with the same deference and consideration for others as is taught in the schools and in the homes of Luzerne County. Respondent's conduct described in this record is the kind of conduct which gives the judicial office itself and courts in general a "bad name."

We conclude that the conduct of Respondent was so extreme as to bring the judicial office into disrepute.

## C. *CONDUCT IN COURTROOM*

### *Findings of Fact*

15. Angela Sallemi is presently employed by the United States District Court for the Middle District of Pennsylvania in Scranton, Pennsylvania. From 1985 to September 25, 2006 she worked as a court reporter in the Court of Common Pleas of Luzerne County, Pennsylvania. She was assigned to Respondent's courtroom for a week every four to six weeks. (N.T. 711–13 Sallemi).

16. Lisa L. Tratthen has been employed as a court reporter by the Court of Common Pleas of Luzerne County, Penn-sylvania for the last 15 years. She is generally assigned to Respondent's courtroom for one week every other month. (N.T. 750–52 Tratthen).

17. Daniel J. Coll has been employed as a court reporter by the Court of Common Pleas of Luzerne County, Pennsylvania for 30 years, for the last eight years he has been deputy chief court reporter. He has been assigned to Respondent's courtroom approximately 80 times. (N.T. 556–57 Coll).

18. Ruth Wasiluk has been employed as a court reporter by the Court of Common Pleas of Luzerne County, Pennsylvania since 1976. She has been chief court reporter since 1990. She has been assigned to Respondent's courtroom as a court reporter approximately 50 times. As chief court reporter her duties include assigning the court reporters to the judges. (N.T. 774–76 Wasiluk).

19. William T. Sharkey has been the court administrator for the Court of Common Pleas of Luzerne County, Pennsylvania for the last ten years. As court administrator he is responsible for the overall supervision of the entire court system. (N.T. 531 Sharkey).

20. Donna Miscavage is employed in the prothonotary's office of the Court of Common Pleas of Luzerne County, Pennsylvania. She has been employed there since 2000. From 2000 to 2006 she worked as a court clerk. Since 2006 she has been responsible for the transmittal of appealed cases to the appellate courts. Her duties as court clerk included swearing in the witnesses, assisting attorneys with picking the juries, taking the verdict, recording the verdict in the prothonotary's office, filling in for the tipstaff in handling the juries and keeping track of exhibits. During the period 2000–2006 she was assigned to Respondent's courtroom one week a

month maybe more. (N.T. 1075–77 Miscavage).

21. Maura Cusick has been employed as a court clerk in the Luzerne County prothonotary's office since 2001. Her duties require her to sit in the courtroom in close proximity to the presiding judge. She was the court clerk in Respondent's courtroom from two to four days per month. (N.T. 1147–48 Cusick).

22. Jill Moran has been the prothonotary in Luzerne County since January 2002. Ms. Moran also practices as a private attorney. As prothonotary, she is responsible for the assignment of court clerks to the various courtrooms. (N.T. 1184–86 Moran).

23. Anna V. Torres has been employed as a deputy sheriff by the Luzerne County sheriff's department for six years. (N.T. 915–16 Torres).

24. James Patrick Joyce has been employed as a deputy sheriff by the Luzerne County sheriffs department since February 2001. (N.T. 941–42 Joyce).

25. Barry L. Stankus was the sheriff of Luzerne County from 2000 to the end of 2007. (N.T. 957–58 Stankus; 3035–36 Lokuta).

26. Cynthia L. Rachilla is a court reporter employed by the Luzerne County court. She has held that position for 22 years. (N.T. 626 Rachilla).

27. Selyne Youngclaus has been practicing as an attorney in the Commonwealth of Pennsylvania for 25 years. Her law practice consists primarily of criminal and domestic relations matters. Youngclaus also holds two positions in Wyoming County, one as the public defender for juvenile cases (since 2004) and the other as a divorce master (since 1989). From April 2002 until June 2003, Youngclaus worked as Respondent's part-time law clerk. From that date to November 2003, when she resigned, she was Respondent's full time law clerk. Youngclaus was a personal friend of Respondent's from 1985 until she resigned her position. (N.T. 1319–27 Youngclaus).

28. Susan Moyer was employed by Respondent from February 18, 2005 to May 17, 2005. Sometimes she acted as Respondent's tipstaff and sometimes as her secretary. (N.T. 1364 Moyer).

29. Susan Weber is employed by the orphans' court of Luzerne County. She worked as Respondent's executive secretary from 1996 through December 2001 and then again, from September 2002 through March 2004. (N.T. 1461–62, 1470–71 Weber).

30. Girard J. Mecadon has been a practicing attorney in the Commonwealth of Pennsylvania since 1991. He is currently employed as a solo practitioner and serves as a part-time public defender and as a solicitor in Buck Township, Luzerne County. From January 2002 through April 2002, Mecadon worked as Respondent's part-time or junior law clerk. (N.T. 868–69 Mecadon).

31. Respondent was impatient, undignified and discourteous to court personnel including:

Court reporters (N.T. 50, 154–55 Krohn; N.T. 557–59, 566–69 Coll; N.T. 713–22 Sallemi; N.T. 752–66 Tratthen; N.T. 779–81, 787–788 Wasiluk);

Court administration (N.T. 535–39 Sharkey);

Court clerks (prothonotary's office) (N.T. 575 Coll; N.T. 828–29 Violi; N.T. 1078–95 Miscavage; N.T. 1149–61 Cusick; N.T. 1198–1203 Moran);

Deputy sheriffs (N.T. 75–77 Krohn; N.T. 916–31 Torres; N.T. 966–68 Stankus; N.T. 1088–89 Miscavage);

Attorneys (N.T. 85–86, 159–61 Krohn; N.T. 560–64, 571–72 Coll; N.T. 641–48 Rachilla; N.T. 785–86 Wasiluk; N.T. 800–26 Violi; Exhibit R–643, pp. 18–20 Sammon; N.T. 1001–09 Murtha–Cowley; N.T. 1035–41 Cronin; N.T. 1086 Miscavage; N.T. 1192–96 Moran; N.T. 1337–40, 1343–46 Youngclaus; N.T. 1464–68 Weber);

Everybody in the courtroom including witnesses, victims, parties, probation officers (N.T. 154–55 Krohn; N.T. 557–58 Coll; N.T. 828–36 Violi; N.T. 1042–45 Cronin; N.T. 1078–95 Miscavage).

32. Respondent's conduct in the courtroom created a tense and stressful atmosphere in her courtroom and had a serious negative effect on the ability of court personnel and attorneys to properly perform their duties. In addition, Respondent's conduct made it difficult for the various judicial support offices of the Luzerne County Court of Common Pleas, as well as for the office of the district attorney, to staff her courtroom. In addition, Respondent's treatment of the deputy sheriffs interfered with the performance of their duties and was so rude and upsetting that the sheriff had to rotate them out of Respondent's courtroom every hour or hour and a half. (N.T. 558–59, 561–62 Coll; N.T. 641–48 Rachilla; N.T. 721–22 Sallemi; N.T. 752, 754–56, 760–64 Tratthen; N.T. 787–88 Wasiluk; N.T. 799–803 Violi; N.T. 918–22, 929–31 Torres; N.T. 950–53 Joyce; N.T. 966–71 Stankus; N.T. 996 Murtha–Cowley; N.T. 1035–36, 1038–41, 1057–58 Cronin; N.T. 1079–80, 1087–98 Miscavage; N.T. 1186–90 Moran).

33. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follows occurred as described in the testimony at the times and with the frequency as related by the witnesses.

*Discussion*

We set down here samples of the testimony which leads us to make Findings of Fact Nos. 31 and 32.

Theodore Krohn, Respondent's senior law clerk testified:

A. ... And what caused this movement from one judge to the other personality, I'm not competent to say. I'm not a psychiatrist or a psychologist. All I can tell you, is I witnessed those very abrupt, cataclysmic mood changes. And I use the word cataclysmic because that's what they were.

Q. How frequent were these mood changes?

A. They became more frequent during my second period with the judge in that I believe that was one of the contributing reasons to my wanting to leave. I came back because I had hoped that I could be of some meaningful use, but apparently that was not the case.

. . . .

Q. Was there anything that precipitated these kinds of mood changes?

A. It could have been the personality of the attorneys involved in certain cases. Could have been anything. They just happened. That's all I know.

Q. And when they happened, what were the characteristics of her behavior?

. . . .

A. She became extremely combative. She became somewhat irrational.

Q. And who was this directed at?

A. It could be directed at anybody within the immediate area, the deputy sheriffs, the court stenographers, the court staff, counsel who were present in the courtroom.

The court administrator's office was the brunt of a great deal of this. So.

Q. Could you explain what you mean by that, when they were the brunt of it? For example. Can you give a specific example?

. . . .

A. Well, I've already indicated that she would come down hard on the sheriff's deputies. She would come down hard on the court stenographers. She would come down hard on whoever happened to be within the area. . . . (N.T. 153–55).

Daniel Coll, deputy chief court reporter for eight years, court reporter for 30 years, testified:

Q. How does Judge Lokuta conduct herself on the bench?

. . . .

A. It depends because she's two people. On a good day, she will be fine. She's always stern. Always she does demand respect and such things. On a bad day, whatever you do is always wrong.

You can do the same procedure you did yesterday, but today it is wrong. So you never know what to expect when you walk into her courtroom, how she will treat you, how she will treat counsel or the parties. And so that is what makes it difficult when you are assigned to Judge Lokuta.

Q. Do you have a problem doing your job in her courtroom?

. . . .

A. I am able to accomplish my job while in her courtroom but it is with great consternation at times. She makes it very difficult in that she speaks incredibly fast. She has a very high vocabulary which she uses constantly, sometimes as a weapon against parties.

. . . .

Q. Can you explain that?

A. Especially when she asks a defendant or a party what their educational background is, and they should mention that they dropped out of school when they were in ninth grade.

Immediately, her vocabulary will go way past the college level. She just talks to these people in such a manner and at such a rapid rate of speed, they are like a deer caught in your headlights. They don't understand what she is saying. She could start talking French to these people, and it would make just as much sense to them. (N.T. 557–59).

He also testified:

A. Exactly what occurred was we were standing at sidebar. There was a sidebar conference. I take my machine off the tripod. Now the machines have the paper tray which is deeper than the machine. So if I try to set it flat, the machine is at an angle such as this.

The judge would keep a box of tissues on the bench that I would slide underneath in front of my machine to raise it at an angle that I could write. This one instance she said I need a tissue. So I lifted my machine. I pushed her the box of tissues.

Keeping her eyes on me, she grabbed the box of tissues and slid them to the opposite end of the bench, flipped to counsel and said continue counsel.

I stood back and said I can't write like this. She said well, what do you suggest? And I looked down at the other end of the box of tissues.

And at that point in time, I looked back at her and she says why don't you kneel at my feet as they all do? Some of the girls would take their machines, drop it as low as possible, put it down by her feet and kneel on the top step.

That was the first time I knew that now she is going for me. . . .

. . . .

Then she tells us every word I speak when I enter the courtroom is to be taken down. From the moment I walk into this courtroom, every word is to be taken down. Because with the other judges, you don't take anything down until the case is called in front of you. Then you begin to make the record.

The judge would come out and start making statements to the general audience about I'm sorry for the delay, ladies and gentlemen, her burgeoning personal schedule and things being thrust upon her at the eleventh hour.

I wasn't taking this down because I was not used to taking this down, this kind of stuff. And her tipstaff at that time Maureen Gushanas, he is not taking this down I heard her say to the Judge.

She looks down at me and says you are not taking this down? Every word I speak is to be taken down. Fine. So from then on, I start taking down everything she says from start to finish.

Several weeks later, I'm with her again.

MR. SINATRA: Can we have a year again? Can we have a year for the first instance?

A. I would probably say 2005—2004, 2005.

JUDGE SPRAGUE: Go ahead.

A. A couple of weeks later, we are in court. She has PFA Court, then followed by—or Summary Court then followed by Motions Court. I'm taking—PFA Court finishes. I am taking down—she is just talking to the lawyers that are there now for Motions Court apologizing for the delay and blah, blah, blah as usual.

She looks down at me and says why are you taking this down? There is no case before us. Why are you taking this down? And that is what I mean. You cannot win in her courtroom. You cannot please her. What you did yesterday is not good today. It is a whim. (N.T. 566–69).

Under questioning by the Court Mr. Coll testified:

JUDGE SPRAGUE: And taking up the other areas, what can you describe to the Court in terms of conduct towards lawyers in the courtroom? And again, if you can give examples, state approximately when.

A. All right. Let's say maybe 2003, maybe even earlier than that, 2002, back when she did have Civil Court, there was a civil oral argument that counsel came in for.

. . . .

A. She notified counsel that they have seven minutes to present their oral arguments to her, having 3.5 minutes apiece. I had never heard that rule before.

So they start to try to get in as much of their argument as possible in that 3.5 minutes. And she stops counsel dead and says counsel, I cannot possibly write that fast due to my thoracic outlet syndrome, and goes on with the explanation of the nerves and tingling in her hands.

She looks at her watch and says you now have 1 minute and 15 seconds to conclude your argument. So he starts to continue his argument. It's one I think instance of putting counsel in a difficult spot.

. . . .

JUDGE SPRAGUE: Just stick to what you observed and recount it as faithfully as you can without your own views about it. You gave an illustration. Give some more if there are any and approximately when.

A. Okay. Throughout her tenure, she demands copies of exhibits. If counsel should pull an exhibit from his folder, he has to have a copy for the Court, opposing counsel, the witness and the record.

And if he doesn't have the appropriate amount of copies, this Court will have to recess until you complete that task. And she will recess the case for 15, 20 minutes while he has to find a photocopier now and start making all of these copies.

She won't allow counsel to share a copy of the exhibit and stand there with the witness. She demands all of these extra copies.

There are just so many instances throughout her tenure. It is difficult to just pull them out. (N.T. 571–73).

Counsel then inquired about Respondent's treatment of deputy sheriffs and court clerks:

BY MR. PUSKAS:

Q. Can you tell the Court anything about your observations of Judge Lokuta's treatment of Sheriffs in her courtroom?

. . . .

A. She would direct the exact position in which she wanted a sheriff to stand or sit. Sheriff, I want you to take two steps forward. Now take one to the left. And you, Sheriff, I want you to take two steps back and one to the right. And Sheriff, I want you seated right there in that seat by the door. . . .

. . . .

BY MR. PUSKAS:

Q. Mr. Coll, could you tell the Court what you observed about Judge Lokuta's treatment of Court Clerks?

A. Just that she is very demanding of them. A Court Clerk is usually—especially in PFA Court, they get the petition. They have to put the seal on it.

. . . .

A. And she may hand—she would be trying to hand the clerk another document. The clerk is busy doing what they are doing, and she will chastise them. I want one eye on me at all times so you can always take these documents when I try to hand them to you. That is one instance with the clerks that I have seen.

JUDGE SPRAGUE: Is this in open court?

A. Oh, yes.

JUDGE SPRAGUE:—in front of whoever is in the courtroom?

A. Yes, Judge.

JUDGE SPRAGUE: And what is the frequency of that kind of comment?

A. Again, it depends on the clerk. If she does not like the clerk, she will be criticized often. That is all I can say.

JUDGE SPRAGUE: This went from when to when that you would see—

A. This goes on to this day. (N.T. 573–76).

Angela Sallemi, court reporter in Luzerne County for 23 years, testified that between 2004 and 2006:

A. I was made to feel very uncomfortable in her courtroom. The reason for that is because I never knew when I was going to be embarrassed or put on the spot.

The one particular or a couple particular occasions when I was swearing a witness in Judge Lokuta's courtroom, just as I was sworn in here, I asked the witness to spell her name, and it's just something that I routinely do in other courtrooms. And when I finished, the Judge looked down at me glaringly and in a harsh tone said I swear the witnesses in my courtroom, and I mean I was embarrassed momentarily for myself and also for the Judge because when things like this occur, there are other people in the courtroom, and you can kind of see like little snickers and rolls of the eyes like, okay, it's that kind of day.

. . . .

Q. Can you tell the Court about these moods? What do you mean by that, these moods that you've referenced?

. . . .

A. Well, the randomness of her moods, you know, there will be times in the courtroom when she is very kind and solicitous to witnesses and attorneys. And then in a moment's time, her moods become demeaning, demanding, and that's what I mean by her moodiness.

Q. Are there things that precipitate that mood change?

. . . .

A. It could be anything or it could be nothing. It could be as little as— you know, there may be lawyers or litigants in the back of the courtroom making too much noise or

looking at her in a way that she thinks is not appropriate or it could be something that we can't even determine. The other difficulty— did you want me to go on about the difficulties? (N.T. 714–16).

Lisa Tratthen, court reporter in Luzerne County for 15 years, testified:

Q. And are you able as a court reporter to effectively carry out your court reporting duties in Judge Lokuta's courtroom?

A. Yes and no.

Q. Could you explain that?

A. I'll do my best. The courtroom atmosphere itself is very uncomfortable for myself. Then once we get into any kind of testimony or any kind of hearings that we might have, on occasion—

. . . .

Q. Why is it uncomfortable?

. . . .

A. It's very difficult to do your job when every time you turn around you're stopped from trying to do your job, and the example that I have is in the mid–1990s I decided that I had had enough of trying to figure out what was in my notes that were sloppy because the tempo in the courtroom is very, very fast. So I decided that I would stop anybody including Judge Lokuta that were speaking too fast. So I attempted to go into the courtroom that day and stop whenever I felt necessary.

. . . .

Q. Now, you had mentioned something about your notes being sloppy. Can you explain what you're talking about there? What was the prob-

lem with your notes that—you're leading to an incident.

A. Quite frankly, it is—Judge Lokuta speaks way too fast, and so I stopped her and asked her to slow down.

Q. How did you ask her to slow down?

A. I just simply said could you please slow down, you know, at one instance. There was another one that day where I said, you know, could you repeat something that she might have been reading, and then she proceeded to speak even faster to the point where by the time I finished and I was able to go downstairs, I went to my boss, I closed her door, and I broke into tears quite frankly and said, you know—

MR. SINATRA: I'm going to object to the hearsay.

JUDGE SPRAGUE: Overruled. This is not hearsay. She is relating what she said.

A. I said, you know, I can't do this anymore. It's too difficult. Just don't put me back there pretty much, and then the very next day I had to go back up to the courtroom. Same time frame the very next day. And before court I was invited into chambers area by her tipstaff, and I was offered cappuccino so I could keep up with her.

I found that very upsetting because I was only trying to do my job....

. . . .

Q. Have you had problems in Judge Lokuta's courtroom with her policies or protocols on how you should do your work?

A. Yes.

Q. Can you explain that?

. . . .

A. 2005, we had a directive in our office from Judge Lokuta that we were to not rise when she came into the courtroom. That we were to stay seated in our seats and take down whatever she started saying the minute she came out of her chambers.

So I went into court. Stayed seated even though everybody rose and started writing the minute she came out of her chambers. And when she got to the bench and realized I was writing, I was told this isn't on the record and why aren't you standing, something to that effect. So she had already taken her seat, so I stayed in my seat at that point. (N.T. 752–61).

Ruth Wasiluk, chief court reporter, testified:

Q. You had made a statement earlier in your testimony that when I asked you about whether you experienced difficulties in the courtroom you said it depended, and I want you to explain what you meant by that?

. . . .

A. It depends on her attitude which can change so quickly. One minute she can be congenial. One minute later she is ranting, raving, chastising attorneys for really no reason at all. Maybe the attorney didn't have a copy of an exhibit. He may have been an out-of-town attorney. He didn't know her protocol. She would chastise him for not having a copy of an exhibit and then go right back into being congenial. There is just no—she is all over the place as far as attitude goes.

. . . .

Q. Can you tell the Court when you use the word chastising, can you describe the tone, the manner, the

volume when Judge Lokuta does this?

A. Volume, extremely high, extremely high. Her voice goes up in octaves at times and at a very, very rapid pace, extremely rapid pace.

Q. What about her physical bearing when she is sitting at the bench, speaking from the bench at this high volume?

A. She is like very frustrated. She seemed to be very frustrated. Just ranting and raving. I do not try to look at her too much when she—when I'm in her courtroom reporting because sometimes if you do, she wants to know what you are looking at if you happen to look up at her, so I do not try to look at her.

Q. What do you mean? Does she question you?

A. What are you looking at, why are you looking at me. So I don't even try to pay attention to her as far as looking at her.

. . . .

Q. When you've been in Judge Lokuta's courtroom, have you observed her treatment of attorneys?

A. Yes, I have.

Q. Can you tell the Court any incidents that you observed?

A. I sure can.

. . . .

A. Attorney Mark Singer who was an Assistant District Attorney at the time was handling guilty pleas for the District Attorney's Office, She was doing guilty pleas at the time. We had a case where a man was pleading in front of the bench. Attorney Singer did not have his file in front of him at the time. He had it on a table that was behind him.

She asked him a question concerning the case. He said he did not—he would have to retrieve the file to obtain that information. She chastised him for not having the file in front of him in a very loud, loud voice and told him to retrieve the file. He turned around to retrieve the file, at which point he was chastised for turning his back on the Judge. He then, again, faced her and back peddled into the table to retrieve the file literally with his hands behind him trying to find the file.

He did find the file, picked the file up, opened the file, at which point he was chastised for opening the file because he was not directed to open the file. He was only told to retrieve the file.

Q. As chief court reporter, what can you tell the Court about the effect Judge Lokuta has had on your group of people?

MR. SINATRA: I'm going to object to that.

JUDGE SPRAGUE: Overruled. She is the chief court reporter, as I understand it, and it was developed that her reporters report to her.

MR. PUSKUS: Yes. I believe she said that in the beginning, Your Honor.

A. Any time that a court reporter comes down from court that has been sitting with the Judge, they are very upset. They are very tense. They're very tense in the morning before they have to go up not knowing what is going to happen. Are they going to get chastised for something, what's her demeanor going to be like. When they come down, they are upset, just tense and nervous all the time,

all the time. It's a stressful situation.

Q. What can you—have you observed anyone crying when they come down from court?

A. Absolutely. Absolutely. Three reporters that I can just name right off the top of my head have come down crying.

Q. And who would they be?

A. Lisa Tratthen, Kimberly Klesh, Rosemary Schwalm.

Q. Have you had any problems in running your department because of these difficulties with Judge Lokuta?

A. Yes, because nobody wants to go with her. It's very, very difficult to get somebody who really wants to sit with the judge and work. Naturally, they have to go, but it is so difficult to get somebody to really want to go. I try to cover as much as possible because I do understand the tension and I try to alleviate that as much as possible, as does Dan Coll. (N.T. 779–88).

Nancy Violi, assistant district attorney, testified:

A. So in the beginning when I had these PFA hearings, I had no problems with Judge Lokuta. She was fine. She treated me just like every other judge treated me in the county, but that all kind of changed one day. There was a civil hearing that was being conducted.

Q. Could you put a time frame on that, to the best of your recollection?

A. To the best of my recollection, I would have to say maybe end of 2002 to 2003, sometime around there. As an ADA—

. . . .

As an ADA, I only take part in the indirect criminal complaint hearings, so the civil PFA hearings I have no part in obviously because they are civil. And on this particular day, there was a civil PFA hearing that was being conducted. . . .

. . . .

And Judge Lokuta had asked me at one point to get involved in that hearing on behalf of the parents of the minor child. I knew that that wasn't appropriate for me to do, and I told the judge that I couldn't do that. She ordered me to do it again, and, again, I said, judge, I can't do that. This is a civil hearing. I'm here on behalf of the District Attorney's Office. I have no place in this, and it was very, very uncomfortable.

I don't even know how to describe it. The tension, you could have cut it with a knife in that room. It was very obvious that she was extremely upset with me for not doing this, and I wasn't doing it to upset her. I just knew that it was inappropriate for me to do.

From that day forward, things became very different between Judge Lokuta and I. And on a regular basis, anytime I would appear in front of her for PFAs, it was like I was walking into that courtroom as a target for her. There was just constant attacks. She was trying to belittle me, make it look as though I couldn't perform my duties as an ADA.

MR. SINATRA: I'm going to object again, Your Honor, and ask that it be stricken.

JUDGE SPRAGUE: Motion denied.

Q. Could you please, so the Court understands, explain the tone, the volume, the manner in which she addressed you? You were starting

with this incident about getting involved in a civil matter.

A. She just—she glared at me. It was—I could feel her eyes just penetrating right through me. She was very abrupt. She was loud. These are all things that I know when you read a transcript they don't really come through because all you're reading are just words on a page, but the way that she looks at you, she—the tone of voice that she uses, she is loud.

She is—actually, on one occasion she hunched over at me from her bench. She actually put her hands on the bench and hunched over at me when she was scolding me for something. These are all things that you don't see by reading a transcript. (N.T. 800–03).

She further testified:

Q. Could you tell the Court during the course of those two matters that you had, those two ICCs, was there some.... Do you recall specific things?

A. I do. I remember she kept cutting me off several times when I was trying to explain myself. I think maybe with the first hearing, a question had arisen as to how many witnesses the Commonwealth had.

When she asked me that, I just—because I had had all my witnesses standing to—I believe it was my right. I quickly looked over to my right to ensure that I was telling her the correct number of witnesses. As soon as I did that, she scolded me for turning away from her and said, you are to look at me when you are talking to me, and I was just trying to see how many witnesses I had. So there was that incident.

Oh, gosh. I know it's in the transcript, but she cut me off several times when I was trying to explain myself.

Q. Did you make personal notes of this matter?

A. I actually did. Things had gotten just so out of hand with the way I was being treated by her that I didn't even know what to expect, so I actually started taking notes of all kind of crazy things that were happening just because it was so bizarre, I couldn't believe it was happening myself. (N.T. 817–18).

And, Violi continued:

A. At that point I actually went and got my boss, First Assistant District Attorney Jackie Carroll because she didn't know about all the problems that I had been having with Judge Lokuta. I had never told her about that.

. . . .

JUDGE SPRAGUE: You don't have to repeat it. After you told the First Assistant your problems, what occurred?

A. At that point I think just everything kind of overwhelmed me after months and months of all the abuse that I had taken and I actually broke down into tears when I was talking to her about it.

JUDGE SPRAGUE: Then what happened?

. . . .

JUDGE SPRAGUE: . . . Was it then that you no longer went in front of Judge Lokuta?

A. Yes, Your Honor.

JUDGE SPRAGUE: Any further questions?

MR. PUSKAS: Yes.

Q. What can you tell the Court about your observations as an Assistant DA in Judge Lokuta's courtroom about her treatment of other attorneys?

. . . .

A. There were numerous attorneys that were treated just as poorly as I was. They would be scolded for just very little things that really wouldn't even draw anyone else's attention. (N.T. 820–23).

Violi was questioned about Respondent's treatment of other court personnel:

Q. Did you have an opportunity while you were an Assistant District Attorney in Judge Lokuta's courtroom to observe how she treated other court personnel?

A. Yes. I recall an incident with the clerk who was at PFA hearings one day.

Q. When would that have been? The year?

A. I believe this was again when we were in the main courthouse, so 2003 to the very beginning of 2004.

. . . .

A. And we were up at the bench getting ready to have the witnesses sworn in, and as the clerk was getting ready to swear them in, the Judge yelled at the clerk for taking too long to swear the witnesses in. And they literally had just been up at the bench maybe a second or two.

Q. Have you had the opportunity to hear Judge Lokuta—

JUDGE SPRAGUE: Excuse me. Could I ask one question, when you related an incident like you just did and your experiences with Judge Lokuta, was this a special incident or was this kind of thing repetitive? I mean maybe different people. I'm trying to get an idea. You can't relate each and every incident. I'm trying to get an idea picture in the courtroom.

A. It was definitely repetitive. I mean it seemed as though—there were occasional days where there would be no incidents, but they were kind of few and far between.

For the most part, there was always something, and a lot of times it was directed at me, but there were times when it was directed at me, but there were times when it was directed at other people. Somebody was always getting hammered by Judge Lokuta is what it seemed like. (N.T. 831–32).

The Court inquired of Ms. Violi:

JUDGE SPRAGUE: I have one question. I heard you talk about your observations of Judge Lokuta and the treatment of court reporters and others, and I understand the use of the word master to those under 18, but in terms of the public, to whatever extent the public was in the courtroom or the parties as opposed to the attorneys to the litigation, can you describe Judge Lokuta's treatment of them?

A. Yes, I can, Your Honor.

JUDGE SPRAGUE: Would you, please.

A. There were numerous occasions where—

. . . .

A. There were numerous occasions where she would kind of speak, I would say, above their level of understanding. And to be quite honest, there were many times that some of the words that Judge Lokuta used even I had a hard time understanding. . . .

. . . .

A. And there were other times where I observed her being curt with certain witnesses, victims, Defendants. If they spoke maybe out of turn and she didn't want them to speak yet until she was done completing whatever her colloquy was or whatever her thought was, she would be curt with them and tell them this is not your time to speak, wait until this Jurist is done speaking.

JUDGE SPRAGUE: The manner of speaking as you are talking about, is the manner of speaking in a courteous mariner or in an arrogant manner?

A. I would definitely say arrogant.

JUDGE SPRAGUE: All right. Cross-examine. (N.T. 834–36).

Donna Miscavage, one of the court clerks, testified as to how it was in Respondent's courtroom whenever she was assigned there in the years 2000 to 2006 as follows:

Q. I believe my question was, what is it like working in Judge Lokuta's courtroom?

. . . .

A. What is it like. Its anxiety filled every day. If you were assigned with her that week, come Monday morning you were filled with anxiety. You didn't know what was going to happen in her courtroom that day. All of the court clerks constantly fought over—

. . . .

JUDGE SPRAGUE: Relate what you observed and what you participated in and your feelings.

A. Okay. You would go in, and, like I said, you would sit there. You would wait for her to come out on the bench not knowing what sort of mood she was in that day. And then more likely than not, she ex-ploded. Every single day there was some kind of tirade.

. . . .

Q. I had asked you what you meant when you said she came in and exploded. Can you specifically explain what you mean by that?

. . . .

A. It would depend. Certain things, different things, different people, different noises that went on in her courtroom just rattled her and just would make her start going off. And you never knew when it was going to happen, you know, throughout the proceeding. You'd be sitting there, call a witness. Everything would be going along, and then something would happen, like I said, whether it would be a witness, a noise, something someone said. And you can see her just building and building to finally where she would just explode. And then after that, it all went downhill, and that's the way it went from there on into the end of the proceeding.

Q. When you say explode, what precisely would she do?

. . . .

A. She would start yelling, whether at—She would just get agitated, very agitated, very easily. If a witness was on the stand and she couldn't hear them whatever, she'd say can you speak up and that. And if she had to ask a second time or a third time, you could just see her building. And then from then on, she picked on every little thing.

Q. What was her tone and manner when you mentioned she was yelling? What was her tone and manner and volume?

A. Very loud, talked very fast, not very nice.

JUDGE SPRAGUE: Can you illustrate? Become an actress here.

A. She would constantly complain about having no microphones in her courtroom and she couldn't hear and that. And a witness would be on the stand, and she'd say, madame, can you speak up, I can't hear you. And then it would go on for a little bit, and she'd say, madame, madame, please could you speak up, there's no microphone in this courtroom, I cannot hear you, please, why don't you sit forward, sit forward so we can hear you better. And this was every day every proceeding this was her manner.

Q. What did you observe about the physical effect on the persons to whom she was speaking if there was a witness on the stand?

. . . .

A. You just had to feel sorry for people. They felt very intimidated. You can see—

. . . .

JUDGE SPRAGUE: What did you observe in terms of the physical reaction, if any, by witnesses to what you have described?

A. Sometimes they would just turn red. They would try to do what she was asking them to do. But she would keep repeating. You know, if they thought they were speaking up after she asked them to, you know, they became embarrassed. They would get nervous, lose their train of thought because she just kept picking and picking, and you could see them shake, visibly shake.

. . . .

Q. Ms. Miscavage, you also mentioned in your testimony mood, Judge Lokuta's mood. What did you observe about Judge Lokuta's mood?

. . . .

A. It changed a lot. She would go from, like I said, you would start out, and maybe she would be in an okay mood. She wouldn't be yelling or anything. And then it would change in an instant. She would go from a good mood to a bad mood. You know, mainly when she went to a bad mood it stayed like that.

But, you know, if she took a break, whatever, she'd come out composed again, and we'd start over, and she'd be okay. But then she'd go right back to being in a bad mood, yelling, picking, nitpicking at everything that went on in the courtroom.

Q. And how frequently did you observe this behavior?

. . . .

A. Very frequently, almost daily.

. . . .

Q. What, if anything, have you observed about Judge Lokuta's treatment of attorneys in her courtroom when you've been there?

. . . .

MR. SINATRA: May we have a time—

JUDGE SPRAGUE: Let her start her answer. Part of the question was and give us the time frame to the best of your ability, Counsel.

A. It's difficult to give a time frame because it happened consistently. Six years I spent in her courtroom and it was almost on a daily basis. She was not very nice to attorneys, especially attorneys who were from out of county.

Q. Now, when you say not very nice, that doesn't mean much to the Court, if you can explain more precisely what you mean.

JUDGE SPRAGUE: Give some illustrations.

A. The way they labeled the exhibits or if they didn't have copies of the exhibits for her, if they stood when she wanted them to stand, if they— I mean, if they stood when she wanted them to sit. If they were sitting, she wanted them to stand, if they didn't speak up, you know, come up to the bench, no, sit back at the tables, their arguments and that. Just, you know, she found fault with almost everything.

BY MR. PUSKAS:

Q. Did you personally have difficulty doing your duties as a court clerk in her courtroom?

. . . .

A. Yes.

Q. Can you explain why?

A. Because feeling the anxiety and, you know, never knowing when there was going to be an outburst or whatever. Myself personally I just went in and tried to do my job to the best of my ability, go in, get it done, get out and—But there was always an outburst, never knew who it was going to be directed at, was it going to be me, was it going to be someone else and just try my best to do my job right so it wasn't me.

Q. If you can put into words, what, if anything, was the atmosphere in the courtroom?

. . . .

A. Very tense, very—just a very tense-filled atmosphere. Everybody walked in, and there was just tension. And you would sit, and then you would just wait for her to come out on the bench. And no one could relax. There was just no relaxing. You went in, and you were just high strung and, you know, wait until she came out, took the bench, and then proceedings started and then, okay, let's see what's going to happen.

Q. What, if anything, did you observe about Judge Lokuta's treatment of sheriffs?

. . . .

A. She was never happy with sheriffs. There was either too many sheriffs in her courtroom, too little sheriffs, you know, too few sheriffs in her courtroom. She was never happy where they stood. Them, too, if they were standing, if they were sitting, she just wasn't happy. She wanted to change it. If they were standing, she wanted them to sit. If they were sitting, she got annoyed and wanted them to stand. And then she would tell them where to stand within the courtroom. She wasn't happy ever where they were within her courtroom. If they moved, you know, if they rattled keys, whatever they—it annoyed her. It annoyed her. And she would stop proceedings and ask them if they had a problem. (N.T. 1079–89).

Maura Cusick, another of the court clerks, testified:

Q. And from the number of times you've been in Judge Lokuta's courtroom, have you had an opportunity to observe how she conducts herself on the bench?

A. Absolutely.

Q. And based on your observations of Judge Lokuta from the times that

you've been in her courtroom, what is it like working in her courtroom?

. . . .

A. Well, I compare it to the movie the Wizard of Oz. You never know whether you're going to get the good judge or you're going to get the wicked judge.

Q. And can you explain that?

A. Well, on any given day the meaning and demeanor will change in a second for the slightest reason, could be papers rustling in front of the attorneys, someone in the back of the courtroom whispering to the other person, my chair squeaking which I can't help.

Q. Did you have an incident involving your chair?

A. Absolutely.

Q. Can you tell the Court about that. And if you can, put a time period on that to the best of your recollection.

A. I'd say approximately about a year and a half ago, something like that.

Q. 2005 or '06?

A. Correct, yes.

Q. And what happened?

A. Well, the chair squeaked and—at the slightest movement, and every time I stood up to hand the judge an exhibit from the attorney, it would make a noise. And I was chastised for that.

Q. Well, what did Judge Lokuta—

A. Ms. Cusick, are you going to apologize. And I was just taken aback. I didn't know I was supposed to apologize for what reason. I couldn't help but—

Q. What did you do?

A. I apologized. And I said to myself, I don't know if anybody heard me, I think the chair needs WD–40.

Q. And what was the tone, volume, or manner in which Judge Lokuta chastised you about the squeaking chair?

. . . .

A. Oh, just really rude, really rude. And just the look in her face was just ready to—looking down at you so condescendingly, just makes you so scared and so nervous.

Q. Can you tell the Court about any other specific incidents that happened to you while you were in Judge Lokuta's courtroom?

A. Oh, absolutely.

Q. Okay. Please do. And if you can, put a time frame on them.

. . . .

A. Well, since I've been a court clerk, this is ongoing. Specific instance of swearing in a witness, I was told to swear in the witness, stood up in the middle of the oath, the judge started talking over me to the attorney. I stopped and I stood and I waited. And it went on for quite some time. And I remained standing. I was told to sit down and move so I can see this attorney. And that just— You just start shaking. I've been in there in PFA court where I have—

MR. SINATRA: Can we have a time for that first incident?

A. I would say about year, year and a half, something like that.

MR. SINATRA: Thank you.

JUDGE SPRAGUE: Go ahead.

A. I've been in PFA court where I have sworn in the witnesses, and then the judge has taken a sidebar to speak with the attorneys and then will continue. And I will say to the parties you've already been sworn. Judge told me, no, they've not, or if they have, swear them

again. So I did swear the woman again. And then it was the gentleman's turn. I decided I better swear him again, too. And I was yelled at because he had already been sworn, things of that nature.

Q. Was there an incident involving you and a cough drop?

A. Absolutely. I had a horrible cold and a horrible cough, and I came to work because we were very short-handed. And it was my week with Judge Lokuta. I was coughing severely. And I did put a lozenge in my mouth to try and suppress the cough. I swore in the witness, and I had the cough drop in my mouth, but it was not helping.

And the judge asked me if I had a problem, and I apologized and said, I'm sorry, Your Honor, but I have a severe cold, well, what do you have in your mouth. I said, a lozenge, get it out, get it out of your mouth.

And there is a rule there are no drinking or any kind of candy in the courtroom. But I felt if I put this in my mouth to suppress the cough and be able to swear the witness. After I swore the witness, I still kept coughing, so I excused myself from the courtroom. I walked out into the hallway trying to stop this coughing jag.

I believe it was on a break Your Honor asked me to relieve myself and get another person over there to relieve me. I explained to the judge we were swamped, there was court everywhere, everybody was busy. She asked me where my boss was, Jill Moran. She wanted Jill Moran, Esquire to come in and replace me.

. . . .

Q. And were there other incidents that you observed when you worked for Judge Lokuta?

A. Absolutely.

Q. Could you tell the Court—

A. Absolutely.

Q. —and if possible, put a time frame on that.

A. Okay. I would say about, oh, a year or so ago the end of the court day I was—

. . . .

A. I was standing up at the end of the court day to retrieve all my belongings from the bench. I have the dispo sheets I write and everything. I was starting to stand up. I was startled because something poked me in the back. And I just turned around. I was like—And it was two—a couple files, and the judge said, clerk, clerk, take these back with you when you leave which I have no problem with. That's fine. But I was just startled that I felt this jabbing in my back.

Q. And what was Lokuta's tone, volume, and manner when she did this?

. . . .

A. On that particular incident agitated, agitated, clerk, clerk, take these with you when you go. (N.T. 1149–56).

Cusick's cross-examination on the cough drop incident was as follows:

Q. Now, let's go back to the clear protocol in the cough drop thing. It is one of the judge's items of protocol that she doesn't want people chewing gum or coming there with candy or cough drops in their mouth, correct?

A. Correct. But this was a special incident. I thought I was helping matters and helping myself and the court proceedings by trying to sup-

press my cough to the point where I left so that the judge and anyone else in that courtroom could hear that witness and I would not be disrupting court by coughing. I took myself out of the situation and went into the hallway out of respect.

Q. So you left the courtroom. Were the court proceedings still ongoing when you left?

A. Yes.

Q. And as I understand it from your testimony, the only response from the judge when you walked out of court was to say that your boss should have another person replace you, correct?

A. She asked me I should go over to the prothonotary's office and get another court clerk.

Q. And you were ill?

A. And she was very nasty about it, very admonishing me.

. . . .

Q. I heard your testimony on direct examination, madame, but I have a right to ask you these questions, and I want to ask you this—

. . . .

Q. When you walked out of the courtroom while the proceedings were going on, the judge's only response was to say to you, we need another clerk, have your boss send in another clerk, correct?

A. No. She told me she wanted another court clerk over there, and I explained there was no one else to send over. Court that week was very busy. All our court clerks were with other judges. Then I was told to get Jill Moran, Esquire over there to relieve me, where's your boss. She wanted to know very, very nastily. (N.T. 1174–76).

Prothonotary, Jill Moran, testified about her experience appearing before Respondent as an attorney:

Q. Can you tell the Court about from your personal observations of being in Judge Lokuta's courtroom how does Judge Lokuta conduct herself on the bench?

. . . .

A. Well, appearing before the judge as an attorney I know prior to the time of course I was always very nervous going in which I think was fairly typical because you didn't know what to expect. And that was really kind of the theme. To go into the judge's courtroom you never knew what type of personality she would have that day.

. . . .

Q. What do you mean by what type of personality she would have that day?

A. You just didn't know what type of mood she would be in that day. If she would—Sometimes you felt like you had a target on your back and that she was just looking to yell at you or to really berate you and embarrass you in front of your colleagues. And so you never knew. It was just—You're very cautious in going in because you didn't know what to expect.

I've been in her courtroom where she has demanded from attorneys appearing before her that they provide their attorney identification number to her before she'll hear anything from them. And I've seen attorneys scrambling for attorney identification numbers and trying to provide that and attorneys who had been before her before but requesting that. I've heard her yelling at people from click-

ing their pens or writing too loudly that she could hear it, from talking.

. . . .

JUDGE SPRAGUE: Overruled. You can proceed, and to the extent you can place times on it, please do so.

A. Sure, Your Honor. And I can tell you that this—the last time I was before the judge was this year, this calendar year, and so within perhaps the last six months or so. And it's consistent, I mean, it's always— You know, that has never changed. To hear her yell at attorneys when you're in there or to hear her stop proceedings or leave the bench and not know when she was going to be back on the bench, to hear her laughing and talking behind the closed doors of the chambers and really not know what was going on. (N.T. 1192–95).

On cross-examination on this point, Ms. Moran was asked:

Q. My question was, do you recall testifying that one of the problems that you have is that when the judge from time to time adjourns the courtroom you've heard her laughing? That's a problem for you, correct?

A. It's not a problem for me, Mr. Sinatra. It's not—

Q. Okay.

A. —appropriate—

Q. Then let's go on to the other—

JUDGE SPRAGUE: Mr. Sinatra, please let the witness finish her answer before you go on to your next question.

MR. SINATRA: Well, her answer was it's not a problem for her.

JUDGE SPRAGUE: She was still talking, sir, and you then interrupted her. And whether you like what

you're hearing or not, give the witness the courtesy of finishing her response just like I try to maintain your right to finish your question without interruption.

MR. SINATRA: Thank you, Your Honor. I kind of did like what she was saying.

BY MR. SINATRA:

Q. Had you finished your answer?

A. I believe I had. And I just said I was finishing and saying that it's not appropriate behavior. It's not a matter of whether I personally have a problem with it. It's just disrespectful and inappropriate behavior.

Q. Which part, the laughing or the talking?

A. Actually the fact that the judge will leave the bench and you'll have no idea when she will come back, if at all.

Q. So the laughing is not inappropriate?

A. No. It is inappropriate, Mr. Sinatra. I don't know how much clearer I can be. It's a matter of respect on both sides. (N.T. 1209–11).

Ms. Moran was questioned further regarding Respondent's treatment of attorneys in her courtroom:

Q. What, if anything, did you observe as the precipitating reason for her yelling at attorneys?

A. I've heard yelling from things as handing an exhibit or piece of paper, not handing it to the appropriate person, not handing it to perhaps the clerk or perhaps the stenographer. And you would not know which person you were supposed to hand it to. I've heard her reprimanding attorneys for speaking too quickly, speaking too

slowly, speaking too softly. And it's not just can you please raise your voice, can you please repeat that. It is—It's screaming.

JUDGE SPRAGUE: Can you illustrate? I know it's not you speaking, but for us, we need to have examples if you're able to do so.

A. It's in terms of, Counselor, you need to speak more slowly, this is ridiculous, I can't take notes. You're going too fast. Don't hand that exhibit to her, hand it to this person. You should know better. Just it's that tone of voice.

I mean, the transcripts that I have read just in the course of my practice can never convey the tone of voice that is used. It is a demeaning, berating, angry tone of voice. And I can't possibly do it justice. It's just not my personality. But that's how I would describe that. (N.T. 1195–96).

Ms. Moran also testified about her experience as prothonotary in assigning court clerks to Respondent's courtroom:

Q. How do you assign clerks to various courtrooms in the court system?

A. Well, when I took office in 2002, I noticed that there was a schedule of court clerks that was kept by one of the other employees in the office. And they had basically a schedule for all of the judges in the courthouse, and then they had a separate schedule that they called special judge. And I didn't understand what that was when I took office. And I asked someone right away, I said, well, what does this mean, what does special judge or special J mean, and they said, well, that's special judge—

MR. SINATRA: I'm going to object to the hearsay declaration.

JUDGE SPRAGUE: Overruled.

A. Special judge they told me was for Judge Lokuta's—for any matter that was being heard before Judge Lokuta because the court clerks found that—

JUDGE SPRAGUE: Not because. You were told the identification for the special judge is Judge Lokuta. Is that correct?

A. Yes, Your Honor.

JUDGE SPRAGUE: Proceed, Counsel.

Q. And what was the difference between this special J scheduling and the other scheduling?

. . . .

A. The court clerks generally would agree among themselves as to what hearing or what trial they were going to go to for the day, and they would do it in order of seniority. The person with the most seniority would choose where she wanted to go. And they are mostly females who serve as court clerks in our office.

The list that was kept for Judge Lokuta's courtroom was something that one person would be designated for one week to serve as the clerk because otherwise the most senior employee would always opt to not be her clerk. So they had to make sure to be fair that someone would take a rotation with the judge for one week.

Q. And did you follow that particular practice when you took over as prothonotary?

A. When I took over, I told them I didn't think it was appropriate to distinguish between the judges or among the judges and I didn't like the designation of designating someone as a special judge. And they said there was no other way

that they could agree to do it. They agreed to change the name on the list to rotation court which is what they now call it. But among themselves, they said that that was how they had to do it.

MR. SINATRA: I'm going to object to the hearsay.

JUDGE SPRAGUE: Overruled. She's just describing the procedure that was set up.

. . . .

Q. Ms. Moran, as prothonotary of Luzerne County, in your administrative capacity what, if any, problems did your office experience in dealing with Judge Lokuta's courtroom?

A. Well, it was difficult in a lot of ways especially when it came to court clerks because, again, if you have a situation where the clerks really don't want to go to a certain judge's courtroom, it does make it difficult if one of them is assigned to be in front of Judge Lokuta for a week and if she gets sick or wants to go on vacation and no one else wants to take that position. And they would end up bartering among themselves, well, if I'm out today, I'll take two turns with Judge Lokuta next time to make up for it.

And it just made it extremely difficult. We never knew how long they would be over there when they were sent over to Judge Lokuta's courtroom. We didn't know—I didn't know if they'd be thrown out of the courtroom. And that happened a few times that the clerks were sent back to my office and there was a request for another clerk to be sent over . . . .

. . . .

Q. In your capacity as prothonotary, have you been able to communicate with Judge Lokuta about any difficulties with your clerks in her courtroom?

A. Originally when I first took office, we would speak, I mean usually via telephone. The judge would call me. She'd identify that she was on the phone—Usually her secretary or clerk would call and say the judge wanted to speak to me. The judge would get on the phone. She'd identify who was in the room with her. There were usually—It was usually the judge and someone else who was on the phone on speakerphone, and it would be me on the other end of the phone.

And she would request—sometimes request something, request that a certain clerk not be returned to her courtroom or a certain assignment be made. And in the beginning that's how we communicated. And we would try to accommodate the best we could. We were very short staffed with court clerks, but we would try to do it. And in the beginning that was the line of communication.

It's deteriorated over the years that I've been in office, and now I'd say the only communication we have is through memos.

Q. And when you say it's deteriorated, why has it deteriorated?

A. I really could only—could only guess why it has deteriorated . . . . (N.T. 1186–98).

Ingrid Cronin, who was an assistant district attorney in Luzerne County from 1992 to 2004, testified that when Respondent was hearing criminal cases she was in her courtroom "once a week at least" (N.T. 1034). She was asked what it was like working in her courtroom, and she answered:

A. Specifically the judge never treated me in a way that I considered to be a problem personally. I certainly can tell you that the court proceedings were often long and drawn out, that there were many recesses, that you often had to wait a long time for things to get underway. There was an element of tension. Many people felt—

. . . .

A. I observed people expressing anxiety while either performing their duties or waiting for their turn.

. . . .

Q. What was different about Judge Lokuta's courtroom from your other assignments?

. . . .

A. No other courtroom had that underlying sense of tension. I had no other—Assistant DAs never came to me on any regular basis about anybody else to say don't put me in front of that person, it makes me anxious, it makes me—. . . . (N.T. 1035–41).

Ms. Cronin's responsibilities as an assistant district attorney included making assignments of the assistant district attorneys to courtrooms and Board counsel inquired:

Q. Right. And did you have a particular protocol for Judge Lokuta's courtroom?

. . . .

A. I had no particular protocol for assigning people to a specific judge. Certainly if a conflict came or if somebody would tell me that they were very anxious or if somebody had a particular reason why they couldn't do something such as picking up a child or a medical appointment, we would—I would make whatever adjustments I could to make people's lives a little easier if I could.

Q. Was there anything unusual you did in handling the assignment to Judge Lokuta's courtroom?

A. I can tell the Court that the attorneys in the office would have considered the short straw to draw Judge Lokuta. It took longer than anybody else. There was a sense of anxiety. Nobody wanted to go. (N.T. 1038–39).

William Sharkey, court administrator of Luzerne County for the last ten years, testified about the difficulties his office had in its dealings with Respondent:

Q. How long have you been certified in that position?

A. Ten years, going on eleven.

Q. And as part of your position, what are your duties?

A. Overall supervision of the entire Court system.

Q. And that entails what?

A. Criminal, civil, domestic. And I have oversight over our Domestic Relations, Adult Probation and Juvenile Probation.

Q. And as part of that position, do you interact with other judicial chambers?

A. Everyday.

Q. Is that a necessary part of your function?

A. Absolutely.

. . . .

Q. Since you have been serving as Court Administrator, have you had interaction with Judge Lokuta's office?

A. Yes, I have.

Q. What kind of interaction have you had?

A. Originally good. At some point, things changed. They became somewhat confrontational.

Q. What caused that?

. . . .

A. She just always seemed to have a problem with my office, the girls in my office.

. . . .

Q. And in your capacity as Court Administrator, did you have any problems with Judge Lokuta?

A. Yes, every time—

. . . .

Q. Could you explain what those problems were?

. . . .

A. It seemed that any time we did scheduling, Judge Lokuta had a problem with our scheduling. She was the only Judge we had that type of problem with.

Q. When you say problems with the scheduling, what specifically do you mean? Can you give an example?

A. It just seemed anything we did was wrong.

Q. Did you speak with Judge Lokuta personally about those problems?

. . . .

A. No.

Q. Who did you speak with about these problems with Judge Lokuta?

. . . .

A. The President Judge.

Q. What prompted you to speak with the President Judge?

. . . .

A. Just on a daily basis, it got to the point where I would go back to my office, and my girls were sometimes reduced to tears.

. . . .

Q. Mr. Sharkey, were complaints made to you by your staff?

A. Yes.

Q. And you made those aware to President Judge?

. . . .

A. Yes I did.

Q. As a result of that, was there a change made in how matters were scheduled by Judge Lokuta concerning her Court?

A. Yes. (N.T. 531–38).

Virginia Murtha–Cowley was an attorney who worked in the public defender's office from 1987 to February 2007. Mrs. Murtha–Cowley testified that she had a friendly, social relationship with the Respondent for a little over a year in the late 1990s. She testified that during that period one Beth Boris was serving as Respondent's law clerk and that the two also had a personal relationship which soured in the late 1990s. (N.T. 992). After Respondent and Beth Boris "split their professional and personal relationship" (N.T. 1015) Mrs. Murtha–Cowley testified that:

A. I went—I was invited to a party at Beth Boris's home, a Christmas party. I went to that Christmas party. And literally the next day the relationship I had with the judge changed. And how I know this is that the day before—

. . . .

A. The day before I went to this party she was talking about how she had bought a present for my daughter.

JUDGE SPRAGUE: Who is the she?

A. The judge. Judge was talking about how she had bought a present for my daughter for Christmas. I went to the party, and then there was just no contact.

. . . .

Q. And what is—What was it like for you working in Judge Lokuta's courtroom after this time period when you mentioned this Christmas party?

MR. SINATRA: Objection.

JUDGE SPRAGUE: Overruled.

A. It became very, very difficult for me. My—My fear was—

. . . .

JUDGE SPRAGUE: I take it from what the witness is saying that this is what commenced and occurred after having been at that party that she spoke about. She can't quite pin the time except to say she believes it was sometime in the late 1990s. That's when as a result of the change these things occurred. Is that correct?

A. That's correct.

JUDGE SPRAGUE: Proceed.

A. Well, I went from having my case called first to having my case called last.

Q. And what would that mean for you in terms of your daily work?

A. Well, that made it very difficult for us to schedule in the public defender's office because there were four full-time employees and eight or nine judges plus at that time magistrates, 18 magistrates that we had to cover.

So if we would look at our schedule and I would see that I had, you know, one PFA, in theory I should be out of that court in no longer than an hour and be able to then be assigned elsewhere. But that would then—That changed.

So I could no longer guarantee to either my supervisor or any of my other colleagues that I would be available for the whole day. I mean, PFA court started at, you know, maybe 9:00, 9:30, 10:00. There was no guarantee that I would get out of there at any—You know, it could be well into the afternoon.

Sentences changed. And I can't give you a specific case. But my— Attitudes towards my clients changed.

MR. SINATRA: I'm going to object to attitudes towards her clients changed.

JUDGE SPRAGUE: I don't know what you mean when you said your attitude changed.

A. No, her attitude, the judge's attitude.

JUDGE SPRAGUE: Well, you have to be specific. Even if you can't remember a specific case, give examples of what you're talking about. When you said sentences changed, what did you mean by that?

A. Well, sentences seemed harsher to me after that. Her manner with my clients—She loved—loves to use, you know, big words, and that would be more evident so that I would kind of have to translate for the average public defender client what she meant.

Her distaste for me was obvious in the fact that if there was one incident where I had to turn around just to— Counsel tables are here. We would stand kind of there. And I had to turn around and look in my file and, you know, get something. I don't remember what exactly I was doing. And I was chastised for turning my back on the courtroom which—

. . . .

Q. Can you put a time frame on this incident?

A. It was after that party. I would say that it was early 2000. You know,

she said very specifically, don't turn your back on this jurist.

Q. What was her tone, manner, and physical bearing when she said that to you?

A. Her tone was harsh. Her manner was, you know, leaning forward pointing her finger. It was chastising.

Q. Her volume?

A. Yeah, oh, loud.

Q. Were you intending to be disrespectful?

A. No. With—Traditionally with public defender appearances in court we don't just have one case. We have a multitude of cases. And we're trying to kind of gather our files. And I would say that happens constantly that we have to turn, look through our papers, you know, to move onto the next case or the next issue or whatever. So I certainly was not attempting to be disrespectful.

. . . .

Q. Are there other specific instances you can relate to the Court, and if you can put a time frame on them, please do so, about Judge Lokuta's treatment of you post this Christmas party?

A. I would say it was maybe about a year later.

. . . .

Q. When you say a year later, are you talking 2001?

A. I would say early 2000, yes. I was in court. PFAs are divided into both the criminal aspect and the civil aspect. From the public defender's office, we would only represent them on the criminal aspect of the charge. I had represented an individual on the criminal aspect.

That portion of the case was over, and I sat down.

And Judge Lokuta from the bench said, Attorney Murtha—she never acknowledged my marriage name, but that's neither here nor there—Attorney Murtha, why are you sitting down. I said, well, my aspect of the case is over. You sit down when this jurist tells you to sit down. So I stood up.

And you know, everyone—People are looking at you. And I stood there. And of course that case was over. The next case was called, and I wasn't quite sure what to do. I was given a very I thought specific directive that I was not to sit down until she told me to sit down. So I remained standing.

And you know, then she realized that I was standing into the next case and chastised me, why are you standing, well, you told me to stand. I mean, I didn't quite know what to do, at which point she said, well, now you're just being ridiculous, and I sat down.

JUDGE SPRAGUE: And I take it this was said in open court?

A. Yes, you know, yes, open court, I mean my clients, everyone.

JUDGE SPRAGUE: Did this kind of conduct happen frequently?

A. Yes.

JUDGE SPRAGUE: You're giving an illustration. You're saying that that was just one of—that's illustrative of the kind of things.

A. Correct. (N.T. 993–1002).

██ We find that Respondent's conduct described in the testimony set out above is clear and convincing evidence of violation of:

1. Canon 3A.(3) of the Code of Judicial Conduct as charged in Count 1;

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2;

3. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper administration of justice as charged in Count 6; and

4. Canon 3B.(1) of the Code of Judicial Conduct.[5]

We will discuss these findings in the order they are listed above.

1. Canon 3A.(3) provides:

Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity, and should require similar conduct of lawyers, and of their staff, court officials, and others subject to their direction and control.

The testimony set out in the Discussion above so clearly establishes such astonishing, recurrent violations of Canon 3A.(3) that anything we might say about it would be superfluous. The excerpts recited above provide only a sample of the testimony of witness after witness, of men and women, some employed by Respondent, some employed at various other jobs in the courthouse, some employed elsewhere, describing incident after incident, occurring continually, repeatedly and unpredictably, none having any relation to the high standard imposed by Canon 3A.(3) of the Code of Judicial Conduct.

We find it useful to consider the words these witnesses used to describe Judge Lokuta's attitude and demeanor towards those with whom she came into contact in the course of the everyday business of her judicial office. Here are some of them:

| | |
|---|---|
| venom | (N.T. 152 Krohn) |
| combative, irrational | (N.T. 154 Krohn) |
| hostile | (N.T. 160 Krohn) |
| agitated, in your face | (N.T. 199 Kostelaba) |
| very agitated and loud | (N.T. 204 Kostelaba) |
| aggressive, rash | (N.T. 213 Kostelaba) |
| curt, brusque, sharp | (N.T. 562 Coll) |
| witch, diabolical | (N.T. 600 Coll) |
| curt, loud | (N.T. 647 Rachilla) |
| demeaning, demanding | (N.T. 716 Sallemi) |
| very harsh | (N.T. 719 Sallemi) |
| short and curt | (N.T. 763 Tratthen) |
| ranting, raving, chastising attorneys for no reason at all | (N.T. 780 Wasiluk) |
| loud, demeaning, not good | (N.T. 789 Wasiluk) |
| condescending | (N.T. 828 Violi) |
| curt | (N.T. 835 Violi) |
| arrogant | (N.T. 836 Violi) |
| condescending, curt | (N.T. 863 Violi) |
| disrespectful | (N.T. 917, 931 Torres) |
| shoo me to another area of the courtroom | (N.T. 917 Torres) |
| intimidating | (N.T. 931, 934, 939 Torres) |
| harsh, loud | (N.T. 998 Murtha–Cowley) |
| unapproachable, vindictive[6] | (N.T. 1003 Murtha–Cowley) |
| horrendous [treated probation officer as a whipping boy] | (N.T. 1044 Cronin) |
| angry, intense and accusatory [over a minor matter] | (N.T. 1045 Cronin) |
| rude, really rude | (N.T 1151 Cusick) |
| discourtesies and rudeness | (N.T. 1161 Cusick) |
| very nasty | (N.T. 1175 Cusick) |
| tense, loud, abrasive, cruel, angry | (N.T. 1239 Sammon) |
| terrible, cruel-based things | (N.T. 1246 Sammon) |
| loud, abrasive, cruel | (N.T. 1248 Sammon) |
| very abrasive, in my face, very volatile—unkind | (N.T. 1252 Sammon) |
| out of control, abrasive, cruel, just completely out of proportion | (N.T. 1259 Sammon) |
| brutal | (N.T. 1262 Sammon) |
| oppressive and inescapable | (N.T. 1329 Youngclaus) |
| very demeaning | (N.T. 1330 Youngclaus) |

5. In its Complaint the Board did not charge a violation of this Canon.

6. We see this quality as characteristic of Respondent's make up, as characteristic of her reaction to perceived rebuffs, slights and disagreements. Overt demonstrations of this characteristic are seen in her treatment of attorneys Murtha–Cowley and Violi before— as compared with after—Respondent became disaffected with each. (N.T. 1003 Murtha–Cowley; N.T. 800–03 Violi). See also the testimony of Rebecca Sammon (Exhibit R–643, pp. 33–34), Susan Weber (N.T. 1464, 1467–68), Cynthia Rachilla (N.T. 628–31), Anna Torres (N.T. 934–48, Exhibit R–545, pp. 3–5), Michael Kostelaba (N.T. 211–13).

| very unkind | (N.T. 1341 Youngclaus) |
| demeaning, over the edge, angry | (N.T. 1342 Youngclaus) |
| very mean, very condescending, nasty | (N.T. 1367 Moyer) |
| very mean, very condescending, very frantic, dark, evil | (N.T. 1372 Moyer) |
| demeaning, belittling, intimidating | (N.T. 1468 Weber) |
| abuse was so intense and relentless and persistent | (N.T. 1473 Weber) |
| extremely condescending, sarcastic | (N.T. 1478 Weber) |
| very agitated, very loud, very demeaning | (N.T. 1498 Weber) |
| cruel | (N.T. 1514 Weber) |

Thus, we come to our conclusion that Respondent's conduct constitutes a violation of Canon 3A.(3) of the Code of Judicial Conduct. We do not come to this conclusion unmindful that all judges do not come to their office with the same allotment of equanimity—some have a lower threshold of intolerance than others; but, whatever their idiosyncratic predispositions, in the conduct of their judicial duties there is no place for discourtesy.

2. As noted above, we hold that the same conduct is such that brings the judicial office into disrepute.

The cases cited earlier, i.e., *In re Smith*, *In re Cicchetti* and *In re Trkula* govern our consideration of the conduct discussed in this Section II C. Our determination of whether this conduct has brought the judicial office itself into disrepute we make upon examination of this conduct to see if it is so extreme as to have effected that outcome. Review of this record leaves no doubt that it has.

In addition to all of the specific examples of Respondent's conduct which fill this record, we point out that we consider the adjectives used by the Board's 30 witnesses to describe Respondent's conduct as important to our determination. We must bear in mind that the proceedings in Respondent's courtroom were not video-taped,[7] so perfect replications are not available. The best the Board can do, therefore, is to ask the witnesses to describe Respondent's demeanor, her tone of voice, her appearance, whether her manner was seemly or unseemly, decorous or indecorous, civil or uncivil.

The choice of adjectives made by those witnesses in responding to those questions paint a picture of a judge whose behavior was entirely antithetical to standards of common decency as well as to the standards set out in the Code of Judicial Conduct. In our view her behavior qualifies as scandalous; it certainly is such that brings the judicial office into disrepute

3. As noted above, we hold that the testimony set out in the Discussion above is such that prejudices the proper administration of justice.

This Court has addressed the question of what is required to establish that any particular conduct is such that prejudices the proper administration of justice.

In *In re Smith*, 687 A.2d 1229 (Pa.Ct. Jud.Disc.1996) this Court held that:

We therefore adopt the following standard to determine the elements which constitute the proper administration of justice. The administration of justice encompasses all work of the courts of common pleas which aid in the systematic operation and normal functions of the court system. Conduct which prejudices the proper administration of justice ... is conduct which obstructs or interferes with those activities which enable the systematic operation of the courts. The term "systematic operation" encompasses not only the procedures adopted by courts which aid in functioning, but also the standards of conduct expected of judicial officers in the performance of the work of the courts. Hence, when a

---

7. Nor were the goings on in chambers.

judicial officer's conduct departs from the standard expected of judges and has the effect of obstructing or interfering with the systematic operation or normal functions of the court, his conduct will have affected the proper administration of the courts.

*Id.* at 1237.

In the record in this case witness after witness relates how Respondent's conduct in the courtroom seriously impaired their ability to perform the everyday duties of their jobs—court reporters, court clerks, "private" attorneys, as well as assistant district attorneys and public defenders, and deputy sheriffs. All of these court officers are in the courtroom because each has an essential function in the administration of justice. Their ability to function was so severely affected by Respondent's ill-treatment of them and by her volatile and unpredictable behavior in her courtroom that they developed an aversion to assignment to her courtroom. It was not infrequent that some were reduced to tears. Many begged that they not be sent to Respondent's courtroom. Special protocols had to be put in place by the prothonotary and the court reporters (N.T. 788, 1186–89) for assignments to Respondent's courtroom. Attorneys had to be taken off assignments to Respondent's courtroom by the district attorney's office. (N.T. 821–22, 1038–39). The primary function of the court administrator is assignment and scheduling of cases for all of the judges. Because of Respondent's unrelenting complaints and never-ending difficulties in scheduling Respondent's cases, this function was taken away from the court administrator's office and shifted to Respondent who then scheduled her own cases—a radical departure from the established organization and system in place in Luzerne County. (N.T. 466–68 Conahan; N.T.

532–38 Sharkey; N.T. 579–84 Coll, Board Exhibit 7; N.T. 663–64 Rachilla, Board Exhibit 10; N.T. 729–30 Sallemi, Board Exhibit 12; N.T. 988–89, Board Exhibit 13; N.T. 1196–97 Moran; N.T. 2783–84, 2833, 3240 Lokuta). In Respondent's courtroom the sheriff's department had its own problems. Because of Respondent's demands the sheriff was required to depart from his normal protocol in place throughout the courthouse. For example, when the judge ordered someone to prison, it was the sheriff's custom to hold that person in the courtroom until the end of the day when they were then taken to prison with any other prisoners. However, Respondent required the deputies to remove anyone sentenced to prison immediately. The sheriffs and his deputies viewed this as increasing the security risks in the courtroom. The Respondent viewed the sheriff's preferred protocol as more dangerous than hers. We think the Respondent has a point; for it is not unreasonable to consider it more dangerous to require a defendant, who has just been sentenced to incarceration, to remain in the courtroom until the end of the day, than removing him from the courtroom as soon as the sentence is imposed. In any event, the subject is debatable and we believe deference must be given to the preference of the presiding judge for it is he (she) who is ultimately responsible for what happens in his (her) courtroom. Even if we were to decide that the sheriff's plan was safer, which we decline to do, Respondent's insistence on her plan would not constitute a violation of any precept of the Code of Judicial Conduct or of the Constitution. However, Respondent habitually interfered with the deputies in the performance of their duties [8] and, because of Respondent's rude and unpredictable behavior, the sheriff had to rotate his deputies out of

8. N.T. 952–53 Joyce; N.T. 966–71 Stankus; N.T. 918–20 Torres.

her courtroom every hour to hour and a half.[9]

It is hard to imagine conduct more congruent with that defined in *Smith* as constituting conduct which prejudices the proper administration of justice; certainly Respondent's conduct "ha[d] the effect of obstructing or interfering with the systematic operation or normal functions of the court." And, consequently, "ha[s] affected the proper administration of the courts." *Id.*

4. Canon 3B.(1) of the Code of Judicial Conduct, in pertinent part, provides:

Judges should diligently discharge their administrative responsibilities, maintain professional competence in judicial administration, *and facilitate the performance of the administrative responsibilities of other judges and court officials* (emphasis added).

The evidence referred to above establishes violation of this Canon—on a continuing basis. The conduct described, far from facilitating the work of other judges and court officials, had the opposite effect. "Facilitate" means to help along, make less difficult, expedite; the conduct described accomplished the opposite: it hindered, obstructed and made more difficult the administrative responsibilities of other judges and court officials, particularly those working in her courtroom and the offices of the court administrator and prothonotary and of the president judge.

■ We are aware that Respondent had not been charged with a violation of Canon 3B(1). Any suggestion, however, that this may derogate Respondent's right to due process does not hold for, as the Supreme Court held in *In the Matter of Glancey,* 518 Pa. 276, 542 A.2d 1350 (1988) and in *In the Matter of Cunningham,* 517 Pa. 417, 538 A.2d 473 (1988), and as we held recently in *In re Harrington,* 877 A.2d 570, 575 (Pa.Ct.Jud.Disc.2005), and *In re Berkhimer,* 877 A.2d 579, 597–98 (Pa.Ct.Jud.Disc. 2005), the Board's focus on one rule and this Court's finding violation of another is not prejudicial because the underlying conduct is the same and the Respondent has been advised of what that was from the beginning of these proceedings.

## D. CONDUCT IN CHAMBERS

### Findings of Fact

34. Respondent was impatient, undignified and discourteous to her staff with whom she dealt in her official capacity, including law clerks, legal interns, tipstaffs, and secretaries.

35. Respondent's conduct created a tense and stressful atmosphere in her chambers and had a serious negative effect on the ability of members of her staff to properly perform their duties.

36. Respondent isolated herself and her office from the other court departments, including the prothonotary, the court administrator as well as the president judges of Luzerne County. In dealing with the court departments and the president judges, Respondent was ever-aggrieved and confrontational. Communications between her office and the other departments and president judges Respondent would permit only by written memorandum or if a "witness" was present.

37. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follows occurred as described in the testimony at the times and with the frequency as related by the witnesses.

9. N.T. 966–68 Stankus.

*Discussion*

■ We set down here samples of the testimony which leads us to make Findings of Fact Nos. 34–36.

Girard Mecadon, Respondent's law clerk from January 2002 to April 2002, was asked:

Q. And can you tell the Court how Judge Lokuta treated you as an employee?

A. Well, I mean it was hard to gauge it because it was like—it was kind of like a Jekyll and Hyde type situation. Sometimes, you know, it would be fine, and other times it would just be—it would just be like a blow-up right from the get-go depending on the day.

 . . . .

A. She . . . basically was critical of me because, you know, either I did open the door or I didn't open the door, I can't remember what it was now.

BY MR. PUSKAS:

Q. Do you remember specifically what she would have said?

A. Well, like I said, basically would be you were supposed to know to do this or to do that, you didn't do that. Sometimes it would be, you know, if she was in a bad mood, she might call me Sonny Boy or something like that or just something to sound degrading more like as if I wasn't qualified . . .

 . . . .

Q. Mr. Mecadon, you had just testified about an incident of opening the door and you mentioned that attorneys are there. Can you describe the—I want you to be precise about it, the circumstances in which this happened?

Q. Where did it take place?

A. This specific incident occurred at Penn Place after the Judge had relocated there.

Q. Where in Penn Place?

A. In her chambers.

 . . . .

Q. How many people were—I'm not asking—if you can't remember the names of the attorneys, but I'm asking you how many attorneys were there?

A. There would have been at least the plaintiff's attorney, defense attorney, the Judge, myself, possibly Mr. Krohn. . . .

 . . . .

Q. So they are coming in for a meeting in chambers you are showing them in?

A. Yes.

Q. And what precisely happens?

 . . . .

A. Like I said, it would depend on the day. I mean one day—we had these for several days in a row, and the one day the door was supposed to be closed and the other day I had it open. And when it was opened, then I got—I went to close it, and then I got yelled at for closing it which the day before was how she wanted it, so I couldn't figure out what she wanted. And then, you know, she would just criticize me openly in front of the other attorneys.

JUDGE SPRAGUE: When she said yelled at you, she criticized you in front of the other attorneys, can you tell us what she said and what she said in yelling at you and the manner?

 . . . .

A. So, basically, what would happen is if I did—

JUDGE SPRAGUE: Relate what it is that she said and the circumstances and the manner and tone. Have you done that?

A. I told you this yesterday. You closed the door. Today I closed the door. Now, by doing what I did yesterday, I'm getting yelled at because I'm doing the same thing, but yet she wanted me to do the opposite thing, and I'm trying to do what I had done the previous day, but I'm getting yelled at for the door being opened or the door being closed.

There is other people in the room listening to this, hearing her going on about the door being open when it should have been closed when the day before it was what she wanted me to do.

JUDGE SPRAGUE: When you said that she was critical of you, what do you mean? Walk me through that more generally.

. . . .

A. Well, she would—when I didn't do what she wanted me to do, basically, I would be called incompetent or stupid or like a name like Sonny Boy like I wasn't experienced enough to work for her. That's the kind of comments that—

JUDGE SPRAGUE: Would she call you stupid?

A. At one point I believe she asked me how I could have passed the bar exam.

JUDGE SPRAGUE: The question was you used the word stupid. In following it up, did she call you stupid?

A. Yes. There were times that happened.

JUDGE SPRAGUE: Did she at times say that you were incompetent?

A. I would say, Judge, that she—when she asked me how I could have passed the bar exam, I would take that as being called incompetent.

JUDGE SPRAGUE: Did these things occur during the three-month period?

A. Yes, sir.

JUDGE SPRAGUE: Continue, Counsel.

BY MR. PUSKAS:

Q. What tone, volume, and manner did Judge Lokuta have about her when she was making these comments to you?

A. Very loud and direct, and it would be like I told you to do this, this is what you were supposed to do, you didn't do it the way I wanted you to do. It was always like very—it didn't matter if it was a trivial thing or a very important thing to the Judge. She always seemed to always have a very high intensity in her tone of voice, whatever it was that she was explaining or critical about.

Q. How frequently did this type of activity occur while you worked there during the three-month period?

A. Well, it really wasn't a question of if the Judge was going to be in a good mood or not. It was more of a question of how long it was going to take the Judge before something happened where she would be in a bad mood and become critical of whoever was there.

. . . .

JUDGE SPRAGUE: The question is a simple question. Did Judge Lokuta's treatment of you have anything to do with you leaving?

A. Yes. I mean it definitely exacerbated the situation, and I couldn't seem to—no matter what I tried to do to please her, I couldn't seem to make her happy, and it was starting to affect my own practice, and I needed to get out because it was just getting to be overwhelming.

BY MR. PUSKAS:

Q. Mr. Mecadon, you mentioned in your testimony that Maureen Gushanas and Judge Lokuta would argue?

A. Uh-huh.

Q. You testified I believe that the Judge would back down. How often would arguments occur between Judge Lokuta and Maureen Gushanas?

A. It would be really hard to count every one. There were arguments daily in the office, and Maureen was the tipstaff, so she was always there. Andrea was the second. She was always there. I was a part-time clerk, so I wasn't always part of the arguments, but I would say that at least two or three times a week. It was a problem with somebody or something or the Court Administration. There was always a problem with something.

Q. Where would these arguments occur?

A. Normally it would be in chambers or could be in the antechamber or I—I don't remember her ever yelling at Maureen in open court, but, you know, I've seen her do that to other attorneys.

. . . .

BY MR. PUSKAS:

Q. Mr. Mecadon, my question was what can you tell the Court about the tone, the volume, and the manner of these arguments between Judge Lokuta and Maureen Gushanas?

A. The tone was—I mean her volume level always escalated. She would—

JUDGE SPRAGUE: Who is her?

A. I'm sorry. When the Judge would argue, it would start out with—she would say something like she would just—the next word would automatically—things would get louder, more intense, and just nastier as it went on. It was like a build-up, and it would just be like automatic to the next level, and Maureen usually kind of matched her volume for volume if she argued with her.

BY MR. PUSKAS:

Q. When they were arguing, were they in one particular area of the chamber or were they moving about?

A. It really didn't matter. It could be—there was no set place where they would argue. It would be anywhere.

Q. How did this affect the office?

A. It was very upsetting. Just even if I wasn't involved in it, just to have to hear what was going on and just be a part of it, it just didn't sit well with me. I didn't like having to deal with that all the time, and it was very hard to do any work when there was always some type of turmoil or argument going on. (N.T. 869–909).

Donna Miscavage testified that, while serving as a court clerk she had occasion to witness incidents between Respondent and her tipstaff, Maureen Gushanas and she testified as follows:

Q. What, if anything, did you hear or observe between Judge Lokuta and Maureen Gushanas?

A. Just loud voices. I never—I never stayed around to hear what they were saying. It was embarrassing. You would walk down the little hallway, knock on chambers door. And, I mean, they'd be screaming in there, having a screaming match. I would turn around and walk right back out. I didn't want any part of that. I didn't, you know—

Q. And did you recognize—

A. —I didn't want them—

Q. —their voices?

A. Oh yes, yes. I didn't want them to think that I was standing outside the door listening to them because that's how it would be interpreted.

Q. Why would you have been going to that door at that time?

A. To take the disposition sheets back. When we sat in a hearing in her courtroom, you would have to fill out a disposition sheet, what happened with the proceedings. And she would get a copy of that when you were done. So we would be taking her blue copies back over to her chambers for her after the proceedings.

Q. What kind of door is on that chamber that you would have been knocking on?

A. A wooden door, a solid wooden door. And when you would knock, it would be open that much, and it would just open it a little bit, and you'd hand your papers through, and then you would go. But you would—You know, before you would even knock sometimes, you would just hear the screaming in there. And, like I said, I wouldn't even knock. I would turn around and go back to the office.

Q. And did this occur more than once?

A. Yes, it did.

Q. How frequently?

MR. SINATRA: Objection to the form of the question.

JUDGE SPRAGUE: Overruled.

A. It's hard to say. I—Me personally it wasn't every day. It wasn't every week. It was, you know, maybe one month and then, you know, in a couple weeks or the next month I would hear it again. Or, you know, it was like infrequent, but it happened more than one time. (N.T. 1090–92).

Maura Cusick testified:

Q. Did you hear or observe any interaction between Judge Lokuta and her tipstaff—her then tipstaff, Maureen Gushanas—

A. I believe she was the secretary at that time, yes.

Q. —that was disturbing to you?

A. This was fairly recent. I would say within a year, year or so.

Q. Pardon me. Let me finish first.

A. Oh, I'm sorry.

Q. Did you observe or hear any interaction between Judge Lokuta and Maureen Gushanas while you were working as a clerk in her courtroom—

A. Yes, I did.

. . . .

Q. —that you found disturbing?

A. Absolutely.

Q. Can you please tell the Court what that was—

A. Yes.

Q. —and please put a time period on it if you can?

A. I'd say about a year ago. I was still in the courtroom after proceedings were done because now the procedure is in miscellaneous court we'll

have several files. They could be from 7 cases up to 30. You don't know. And at the end of the day my job is to take these files back to my office, the prothonotary.

What we have laying on—There's a table by the chambers' door, and there are slips of paper there that match the case number with the file. And I hook them both up. I look. I sign my name that I see the file, I'm taking it with me. And then I leave those paperwork on the table for either Maureen or whomever from her office to collect them.

Well, I was the only one in the courtroom. I was still doing my job. And I heard screaming from the judge's chambers. I heard Maureen Gushanas calling the judge—

MR. SINATRA: I'm going to object to statements made by somebody—

JUDGE SPRAGUE: Overruled.

MR. SINATRA: If I may finish, Your Honor.—other than the Respondent.

JUDGE SPRAGUE: Overruled. Proceed.

A. I observed—I'm sorry. I overheard Maureen Gushanas screaming at the judge calling her a fucking bitch, fucking bastard, if you ever embarrass me in front of an attorney, I'll kill you.

And then I heard the judge start yelling back, and I was too frightened that they would come in—out of the court chambers, see me, and know I'd overheard them. I ran out of there. I was too frightened. I left my purse in there, left the files, left my work in the middle of it, stayed away for approximately a half an hour until I composed myself and went back in. And when I did, I finished my work, took my purse. I did not hear anything at that point in time. But I was

so frightened and shaken by what I heard. I just walked out. I literally ran out.

Q. And you recognized those voices as Judge Lokuta and Maureen Gushanas?

A. Absolutely. (N.T.I 157–60).

Rebecca Sammon, legal intern for Respondent during the summers of 2002 and 2003, testified:

A . . . . then about five minutes later the judge came in, and she was screaming at me. And she was like, you look like a tramp, you look—that's really low cut, that's completely inappropriate.

And, I mean, I don't dress inappropriately. That's not who I am. That's not—You know, I don't dress inappropriately. I'm very aware of what I wear. And, you know, my mom is super conservative. She usually makes me when I leave the house look overdressed for a nun.

So I was very upset, and I started to cry. I mean, that's not related to my work. That's not related to anything I'm doing. That's a personal attack on me when I felt—

MR. SINATRA: I'm going to object to—

JUDGE SPRAGUE: We understand how it affected you. Continue with the next instance.

BY MR. PUSKAS:

Q. Before I move on to that, can you for the record describe the tone and volume and manner of Judge Lokuta when she was saying that to you?

A. Very abrasive, in my face, very volatile, you know, demonstrative in her actions and, you know, abrasive, cruel, unkind.

Q. Can you relate to the Court any other incidents that happened during that summer?

. . . .

A. There was another incident where— She and Maureen Gushanas would fight a lot and I—There was one particular day where she had Maureen doing some copying. Maureen was at the copier, and I don't know what Maureen was copying because the judge had instructed Maureen to copy it herself. And Maureen whatever it was she was visibly upset by it. And the judge kept buzzing her and screaming out to her and yelling at her, and it was, you know, a very tense environment and a very tense atmosphere.

And, you know, I like Maureen. I didn't want to see her upset. And it was, you know, it was a really bad situation. And, you know, this kept going on with buzzing back and forth and the intercom ringing. And it was just constant. It was over probably a period of a half an hour.

And then Maureen apparently had typed up a request for vacation time, and she asked the judge if she could have like vacation for a week, and the judge denied it. And Maureen came out, you know, really, really upset kind of stomping a little bit and just very upset. And the two of them screamed back and forth and bickered back and forth for awhile, and then Maureen all of a sudden screamed really loud—

MR. SINATRA: I'm going to object to the auditory declarations.

JUDGE SPRAGUE: This is in the presence of the judge and you?

A. Yes. It was in the presence of myself, the judge, Susan Weber, and Selyne Youngclaus.

JUDGE SPRAGUE: Overruled. Proceed.

A. And she was, you know, yelling and stomping her feet, and she screamed at the top of her lungs, just because I'm not sleeping with you anymore, Judge. And I was completely taken aback by that. I had no idea anything like that was going on. I—You know, I—Maybe I'm naive. I'm from Duryea, Pennsylvania, small town. I didn't pick up on anything like that. I knew they hung out a lot. I just thought they were friends. So I was just, whoa. And, you know, I was just completely freaked out by that. And, you know, what they do in their own personal life is their own business, but when it affects my ability—

MR. SINATRA: I'm going to object to the—

JUDGE SPRAGUE: Just stick to what occurred. What did the judge say or respond to—

A. And she just—They just kept screaming back and forth at each other.

BY MR. PUSKAS:

Q. Do you remember specifically anything the judge said?

A. Not really, just lots of screaming back and forth. I know that she denied the vacation, and I know that it was—You know, there were insults flying back and forth. So that was one incident. And then there was one more.

. . . .

Q. Can you tell the Court about any other incidents while you were working there?

A. There is one more that I think was—that really, really bothered me.

....

A. Again, this is in the summer of 2003. I had come in, in the morning, and Susan was probably typing something. Maureen was in the judge's chamber. And I answered the phone. And it was somebody from poison control, and they said we had just received a call from this number about a child who swallowed bleach....

....

A. So I quick, you know, knocked on the judge's chamber and kind of walk—You know, I just knocked quick and walked in, and I said, Judge, there's a call from poison control, is Daniel here, they said a little child swallowed bleach. And she screamed at me. She's like, it's Your Honor, don't you disrespect me. And I was just like, I don't think judge—

First of all, I don't think judge is a disrespectful term. I think that most judges would agree that the word judge is not disrespectful....

....

Q. Could you describe her tone, volume, and manner when she was screaming at you?

A. Out of control, abrasive, cruel, and just completely out of proportion.

Q. What effect did that have on you at that moment?

A. I was just completely upset. First I was upset that she screamed at me. And second I was upset that someone would have that little disregard of the possibility of a little boy hurting himself or, you know, even if it wasn't Daniel another lit-

tle boy somewhere or another little child. I was just mortified and upset.

I mean, I lost my cool. I did start crying. I'm not used to being spoken to that way. I'm not used to, you know, dealing with people like that.... (N.T. 1251–60).

Rebecca Sammon further testified.

Q. What was it like working for Judge Lokuta?

A. It was tense at times. She wasn't there very often. I don't know—I know that she has some health problems, so I wasn't aware of whether it was sick time. Or at that point I had never worked for another judge before, so I wasn't aware of whether or not that was procedure or protocol for a judge when they're not, you know, seated or on the bench whether they come in on the days off or what. I had never, you know, worked for a judge before.

But the atmosphere could be rather tense when she was there. But it was never directed—I can honestly say it was never directed really towards me that first year.

Q. And did you work Monday through Friday?

A. Yes.

Q. And now you just stated that it wasn't directed at you that first year.

A. Yes.

Q. What can you tell the Court about that?

A. Sometimes she would be very tense and abrasive and I would say cruel to her secretary. It was Andrea Fogelman at that time. She had only—She was there the first summer. It was tense. It was—She

could be abrasive. She could be cruel. She would often compare Andrea to another secretary that she had, Susan Weber, and say, you know, how great Susan was and how horrible Andrea was. And it would be tense. There would be a lot of bickering back and forth. It was just a rather tense environment sometimes.

Q. Well, what was the tone, volume, and manner in which Judge Lokuta addressed Andrea?

A. Loud, abrasive, angry.

Q. And what, if any, circumstances brought that about?

A. It could be anything sometimes. It could be a colon instead of a period, or it could be the wrong font or the wrong color paper. It could be—It would be anything. It would never be something, you know, what I would consider monumental.

. . . .

Q. What, if anything, did you observe about Judge Lokuta's treatment during the summer of 2003 of other personnel in her office?

A. She was brutal. She treated Susan Weber worse than—She was horrible to that woman.

Q. And can you give examples of what you observed?

JUDGE SPRAGUE: Other than what you have said.

A. Okay. She would just—She would call her stupid. She would, you know, talk down to her. She would say that she was the dumbest secretary she'd ever seen. She would—You know, I think she would kind of—At this point it was both she and Maureen, and she would kind of encourage Maureen I think to—

Like she would nudge her on to be mean to Susan.

And, I mean, Susan as far as I could see was a competent secretary and would work really hard. And it would be just the smallest error would set her off. And one minute she'd give a directive to do something one way, and the directive would be complied with, and then a moment later she would say, this isn't what I asked you to do when it was precisely what she asked.

And her demeanor would change on a dime. Like one minute she would be as nice as pie, and the next minute she would be just this cruel, cruel person.

Q. Now, you just mentioned in your testimony that—

MR. SINATRA: I'm going to object to the characterizations that aren't responsive.

JUDGE SPRAGUE: Overruled.

BY MR. PUSKAS:

Q. —that Judge Lokuta nudged Maureen on. Could you explain that?

A. She would encourage Maureen to—She would kind of like when Maureen would attack Susan or say nasty and inappropriate things to Susan like she was the stupidest secretary she ever saw, she would kind of—You know, the two of them—

JUDGE SPRAGUE: You're talking about various females, so don't use she.

A. I'm sorry, sir.

JUDGE SPRAGUE: I don't know which one you're talking about.

A. Okay. I'm sorry. The judge would encourage Maureen Gushanas to—When the two of them would be bickering back and forth or when

Susan would say—Maureen would say something to Susan like you're the dumbest secretary I've ever seen, the judge would do nothing to stop it, and she would more or less join in. The two—The judge and Maureen would kind of double team Susan. And it was—I don't know if there was an external conflict between them or—

. . . .

BY MR. PUSKAS:

Q. How frequently did this, what you're describing double teaming, occur?

. . . .

A. Pretty constantly. . . .

. . . .

Q. What did Judge Lokuta's treatment of you—What effect did Judge Lokuta's treatment of you have?

. . . .

A. I was just—I would cry every day when I got home from work. I just—I felt like there were knots in my stomach constantly. When I would go to work in the morning, it would be as if, you know, which Judge Lokuta is it going to be today. And it was just constant. It was like you were sitting on pins all the time like wondering if, you know, you did the slightest action what would happen to you. It was just a constant—I just felt like I had knots in my stomach all the time. I was just—

JUDGE SPRAGUE: Okay, next question. (N.T. 1238–66).

Selyne Youngclaus, Respondent's part-time law clerk from April 9, 2002 to June 3, 2003 and her full-time law clerk from June 3, 2003 to November 3, 2003, testified about the state of affairs in Respondent's chambers as follows:

Q. During the time that you worked for Judge Lokuta, can you tell this Court what it was like working in her office?

. . . .

A. There were good days, and there were bad days.

BY MR. PUSKAS:

Q. Can you explain them?

A. There were days—I don't know what the Court has heard pervious to my coming here. But with respect to her tipstaff, Maureen Gushanas, if she and Maureen were going okay and were not arguing, we would have a good day. We would get through the cases. Things would be fine. If they weren't having a good day or something occurred before I came into the chamber that morning, it would not be a good day. There would be arguments. It would be hostile, just not a good day.

. . . .

Q. And can you describe how—what, if anything, these arguments—what effect these arguments had on the— on getting the Court's work done in that office?

A. It was very distracting. It was very difficult—I'm her law clerk. I'm sitting in the comer of her chamber. There was a table set up in the corner of her chamber. I would sit there. You've got the normal flow of traffic coming in and out, you know, asking the judge questions, doing whatever. And then you would have continuous arguments. I'm trying to focus and concentrate, do my research, write opinions, do whatever the judge wanted me to do. I have in the back of my head this banter be-

tween her and Susan Weber, her and at one point Andrea Fogelman was there when I was there, her and Rebecca Sammon, her and Maureen.

When things would get extremely bad or the arguments would escalate, then on top of the yelling and screaming, there would be a constant intercom buzzing for either Maureen or Susan or Rebecca or whoever to come into the chambers.

They would no sooner come into the chambers, the judge would tell them to do something. And before they got back to their desk, she was buzzing them again to ask them if it was going on. It was very difficult for me because I guess I need to have quiet to be able to focus and get my work done.

Q. How long did this kind of buzzing, coming in the chamber, going out, and being buzzed go on in a typical situation?

A. She would probably buzz maybe, I don't know, continuously maybe 5 or 10 minutes to the point where it was—we just left the door open because they were running back and forth between the antechamber to the chamber.

Q. Now, do you remember any specific incidents of Judge Lokuta and Maureen Gushanas arguing in her office when you were there?

A. Unfortunately, yes.

Q. Can you tell the Court about those?

MR. SINATRA: Objection. It's beyond the statute.

JUDGE SPRAGUE: Overruled.

BY MR. PUSKAS:

Q. You can answer the question.

A. I cannot tell you the date. I was sitting in—at my corner table, and

Maureen came—Maureen had made a request for a period of vacation. I don't know the paperwork on the other end, but the end result was that the judge denied her request as untimely, or some excuse was given. I don't know what it was. Maureen found out that the judge denied her request for a vacation.

The judge is sitting at her desk in her chamber, and I'm at the corner table, and Maureen bursts into the judge's chamber and screams, I know why you denied my request for a vacation, it's because last night I told you I wouldn't sleep with you anymore.

. . . .

Q. Can you describe the tone, volume—the tone and volume of this argument going back and forth?

A. It was heated. They were—Maureen came in and screamed. It was a volatile situation as far as I was concerned. I didn't—I didn't want to be there. I didn't want to hear it.

. . . .

Q. During your time in Judge Lokuta's office, were you able to observe how she treated other staff persons?

. . . .

A. Yes.

. . . .

A. I was there when Andrea Fogelman was her secretary for a period of time. That was when I first got there, and the judge was in Park Place. I recall an incident where the judge told—the judge came out of her chamber, came out to the antechamber where Andrea was. The judge told Andrea to do something, I don't remember what, and Andrea said, yes, sir—or, yes,

Judge. And the judge went back in her chambers. And then she comes back out a few seconds later and says, that's Your Honor to me.

Q. And do you recall her tone, volume, or manner when she came back out to Andrea Fogelman?

A. Demeaning. She was agitated. And I thought maybe I was missing something. I mean, she said, yes, Judge. But that wasn't good enough.

. . . .

Q. What did you observe about her treatment of Susan Weber?

A. I can—I've thought about this at length. I can only describe it as oppressive. It was a continuous beating down of someone, oppressive and inescapable.

JUDGE SPRAGUE: And what?

A. Inescapable. There was no—There was no right answer. There was nothing—Susan couldn't do anything right. It was just a constant berating. I don't know how else to describe it.

BY MR. PUSKAS:

Q. And what kind of tone, volume, and manner did Judge Lokuta exhibit toward Susan Weber?

A. Very demeaning, very—She would raise her voice to her at times. She would—I would be there for a lot of the exchanges because the judge always wanted to have someone else there. I can't say that she ever called her stupid, but she would say, why can't you understand what I'm asking you to do or what's the—do you have a problem, is there something preventing you from understanding what I want you to do. (N.T. 1322–30).

Called by the Board in rebuttal, Selyne Youngclaus was asked to address certain testimony Maureen Gushanas had given regarding her relationship with Respondent. Ms. Youngclaus's testimony was:

Q. Ms. Youngclaus, out of your presence, Maureen Gushanas testified in these proceedings that she did not tell another coworker that she had an injury to her arm or leg or that Judge Lokuta had punched her, hit her. She also denied that she ever called another coworker at night, crying and complaining that Judge Lokuta pushed her down the stairs; that the two of them fought and that Judge Lokuta had her up against the wall.

I'm going to read specific testimony from Maureen Gushanas provided at trial and then ask you questions.

A. Okay.

Q. This is referring to the trial transcript for December 12th, 2007, Page 2105, starting at the top.

Q. "QUESTION: In fact, isn't it true that you have told people in the office, your coworkers, that Judge Lokuta has punched you?

. . . .

A. "ANSWER: No, I have not. That is not true.

BY MR. PUSKAS:

Q. "QUESTION: In fact, haven't you called another coworker at night, crying and complaining and saying that Judge Lokuta pushed you down the stairs, you fought with her and she had you up against a wall?

A. "ANSWER: No, Counselor, I never did. I am twice her size. Remember, I weigh 185.

Q. "QUESTION: Isn't it true that you told another coworker that

you had an injury to your arm or leg, that Judge Lokuta punched or hit you?

A. "ANSWER: No, that is not true."

. . . .

BY MR. PUSKAS:

Q. Do you agree with that testimony?

A. No.

Q. What is your response to that?

A. Maureen Gushanas constantly called me. I would pick up the phone and she would already be crying. She would call me during the evenings. She would call me almost every Saturday morning until it got to the point that the phone calls were so numerous, that I stopped taking the phone calls. I just left her messages on the answering machine. I just couldn't deal with it anymore.

She would call. She would be crying. She would—she told me about an incident when she and Annie had a physical altercation, that Annie pushed her down the steps. I don't know if it was at Annie's house, Maureen's house, that I don't know. She told me she injured either her arm or her leg. I'm not sure which it was.

She told me about another incident when they had a fight about something. I don't know what it was about. That Annie pushed her up against the wall and somehow had her—her arm across her—her neck and (demonstrating), I don't know, was holding her shoulders back against the wall, was the impression I got from her.

. . . .

Q. And, specifically, I read you some testimony. I had asked Maureen a question, "Isn't it true"—this would

be starting on Page 2105, Line 24— "Isn't it true that you told another coworker that you had an injury to your arm or leg, that Judge Lokuta punched or hit you?"

"No, that is not true."

What is your specific response to that?

A. That she lied. She did tell me that. She would call—she would be crying. She would be crying. And I guess I believed her, because she was crying so hard when she was telling me this. (N.T. 3528–33).

Also called in rebuttal, Ted Krohn was asked about the same testimony of Maureen Gushanas, he was asked:

Q. Mr. Krohn, out of your presence, Maureen Gushanas testified in these proceedings that she did not tell another coworker that Judge Lokuta had punched or hit her.

I'm going to read you some specific testimony from Maureen Gushanas during these proceedings and then I will ask you questions.

A. Yes, sir.

Q. All right. I'm referring to the trial transcript for December 12th, 2007, specifically Page 2104—or, pardon me, 2105, starting at Line 1. This is my question to Maureen Gushanas.

"In fact, isn't it true that you have told people in the office, your coworkers, that Judge Lokuta has punched you?"

. . . .

"No, I have not. That is not true."

. . . .

BY MR. PUSKAS:

Q. Hearing that testimony read here today in Court, do you agree with that testimony?

. . . .

A. Absolutely not.

BY MR. PUSKAS:

Q. What is your response?

A. My response is that it's an outright lie.

Q. Can you tell the Court what you know about that specific area that we are rebutting?

A. I recall being in chambers one morning with the judge's secretary, Susan Weber, awaiting the arrival of the judge. Maureen Gushanas arrived sometime before the judge arrived, I believe took off her sweater. Held out, I believe it was her left arm, pointed to some bruises and said, if she ever hits me again, she's going to be very, very sorry.

And I was sitting there. I looked at Maureen and I looked at Susan, and I made no comment whatsoever.

I recall that very distinctly, without any question or hesitation whatsoever.

. . . .

JUDGE SPRAGUE: Wait a minute. I have a question. There's a lot of "shes" in this world. Who is the "she" that was referred to?

THE WITNESS: Judge, there was no question in my mind that she was referring to—

MR. SINATRA: I'm going to object.

THE WITNESS:—Judge Lokuta because she had also complained of similar events, indicating the judge by name, in the past. This was not an isolated incident. (N.T. 3579–83).

Susan Moyer worked in Respondent's chambers as a tipstaff and secretary from February 18, 2005 to May 17, 2005 and she testified of that experience as follows:

Q. And from your time working in Judge Lokuta's office, did you have an opportunity to observe how she conducts herself on the bench?

A. Yes, I did a few times. When I worked there, she wasn't on the bench a whole lot.

Q. Did you have an opportunity from the time you worked there to observe how she conducts herself in the chambers?

A. Yes, I did.

Q. How did she treat you?

A. She was very mean to me, very condescending. Both she and her secretary, Maureen, were very, very mean to me, condescending, nasty. She told me—She would not let me help her with her robe on, put her robe on because she said I had cat hair, which I did not. You know, I take—I would take pride in my appearance prior to going to work. I did not go to work with cat hair or any kind of hair or any kind of dirt on my clothing.

. . . .

Q. Can you tell the Court what happened after you finished helping Judge Lokuta with her robe?

A. We went into the courtroom. I said, all rise, county court is now in session and went into the courtroom. And when we came back in, she started disciplining me telling me she was so embarrassed, she never heard county court in all her life and if I didn't wise up I wasn't going to have a job for long. In the afternoon we had motions court.

Q. Could you explain to the Court the tone, the volume, and the manner in which Judge Lokuta spoke to you?

A. Judge Lokuta was very condescending, very frantic, very nasty, dark, evil. She would look at me with such hatred in her eyes that I would

become totally petrified, frightened. She told me if I didn't know what I was doing, it's not that hard, that I wasn't going to work out. (N.T. 1366–72).

. . . .

BY MR. PUSKAS:

Q. What happened after that?

A. I believe motions—I may be getting messed up. Motions—

Q. Just take your time.

A. Motions were in the afternoon. They were always a fiasco. Nothing was ever right.

Q. Well, hold on. We'll take this slowly. Were there other incidents while you worked for Judge Lokuta that you can tell the Court about regarding her treatment of you?

A. Oh, yes. Oftentimes she would talk too quickly for me to understand, and I would look at her, and she'd look at me and say, is there something wrong with you, did you ever have any head injuries that would cause you not to understand what people are asking of you.

Q. In what manner would she speak to you, her tone, her volume?

A. It would be loud, and it would be condescending and in a disciplinary way and belittling. She asked me that on numerous occasions.

. . . .

Q. When Judge Lokuta would give you an assignment, how much time would transpire before you got another assignment?

A. I would get one assignment, and a few minutes later I would get another assignment, and I wouldn't be finished with the first one. For example, she might want an article out of the paper and—But she wouldn't want it just out of the paper. She would want it put onto another paper because she kept all of the incidents involving her or any of the other judges in binders.

Sometimes I would need to make a copy on a copy because the first page would say something, and then it would be continued on another page. And I would be in the process of doing that, and she'd ask me to make copies for her or something.

And one day I was doing some work, and she came out with papers, and she said to me—She went to the copy machine. She made copies. And she said, this is your job, but I don't know if you're able to do it, if you're smart enough or—it wasn't smart enough—but if you're intelligent enough to know how to make copies. (N.T. 1382–85).

Susan Weber was Respondent's executive secretary from 1996 to 2001 and then again from September 2002 to March 2004, she testified about her experience working in Respondent's chambers as follows:

Q. . . . Why did you leave Judge Lokuta's employ?

A. After the judge's retention, it was very tense in chambers, and I really felt that I couldn't take that atmosphere every single day. So I decided to try and get a job in law in a private law firm.

Q. When you say tense during that first period, what do you mean by that?

. . . .

A. There was a lot of fighting going on in chambers, a lot of arguing back and forth between Judge Lokuta and Maureen Gushanas, and then it would spill over onto me. It just became every day was problematic. Everything that you went to do it

was a problem. And there was tension, and there was fighting. And I really just couldn't take it. And I thought I really have to get out of here. It was too much.

BY MR. PUSKAS:

Q. So you left?

A. Yes, I did.

Q. And when you left, did you provide a letter of resignation?

A. Yes, I did.

Q. And what did you express to Judge Lokuta as your reason for leaving?

A. That I felt that I needed to get into a different area of law in order to further my future goals.

Q. Did that encapsulate your entire reason for leaving?

A. No, it didn't.

Q. Why did you write the letter that way?

A. Because I felt that the judge would be very vindictive and she would come after me. And, in fact, even with that letter stated the way it was, she did.[10] When I worked for Eugene Sperazza which was—

. . . .

A. The attorney I worked for had asked for a continuance of a pretrial conference, and I had called Judge Lokuta's chambers in order to, you know, make that provision for him. And I was told that—

MR. SINATRA: I'm going to object to what she was—

JUDGE SPRAGUE: Overruled, This leads to a conversation, as I understand it, that you had with Judge Lokuta.

A. With Judge Lokuta, correct.

JUDGE SPRAGUE: You can tell the background. Go ahead.

A. And so I was trying to make this arrangement for the continuance of the pretrial conference. And I called and spoke to her law clerk, Ted Krohn, and he said that he didn't think that it would be a problem. I relayed that information to my boss, and his problem was that he had a disposition—deposition, I'm sorry, that he had to attend in Scranton, and he couldn't make it, he would like to reschedule. We thought that it was taken care of.

Well, the day of the conference I received a phone call from Judge Lokuta's chambers asking where he was, and I stated that he was in a deposition in Scranton. And I was told that I needed to get in touch with him and get him to Judge Lokuta's chambers immediately.

What happened after that is that Judge Lokuta called me at the office where I was working at and was screaming and yelling at me over the phone. Everybody could—The girls sitting next to me could hear the whole conversation. And it was very embarrassing, very uncomfortable.

BY MR. PUSKUS:

Q. What did she say?

A. She said, how dare you call my chambers and ask for a continuance, you know that's not procedure, how could you do this, you've got to get your attorney to my conference. And she just went on and on and on.

JUDGE SPRAGUE: Could you sort of illustrate, it's not you, but could you illustrate the manner and tone of the judge on that phone call?

10. See n. 6, *supra.*

Q. That's a little difficult, but she—

JUDGE SPRAGUE: Do your best.

A. When Judge Lokuta would get angry, she would use a very strong, loud voice. And how dare you is what she would say, very emphatically, and it's just very demeaning and belittling and intimidating.

JUDGE SPRAGUE: Continue.

A. Oh, so the outcome was that Gene, Eugene, had to leave his deposition in Scranton, get his paralegal, go over to the courthouse, and sit in chambers with Judge Lokuta. When they got—And I was getting very nervous about this sitting back in my office. This was a new job. I was trying to turn over a new leaf. And when Eugene and his paralegal came back into the office, they just shook their head and said, well—

MR SINATRA: I'm going to object to—

JUDGE SPRAGUE: You can't relate what they said. Did you have any further conversation with Judge Lokuta on this matter?

A. No, sir, I did not.

BY MR. PUSKAS:

Q. And did it come about that you went to work for Judge Lokuta a second time?

A. Yes.

Q. How did that happen?

A. I was approached by Maureen Gushanas. She called me at home, and she said that the judge was looking for a secretary, that Andrea Fogelman was going to be leaving. And she said I think that she would be very receptive to your coming back to work. She said that on several occasions she wished that Susan Weber was back at work with her.

So I was very hesitant. I said, I don't know, Maureen, you know, it was pretty tense, it was pretty bad before I left. And she said, well, think about it, you know, sleep on it and we'll talk some more. So we talked some more. And I had just purchased an old house, needed a lot of fixing up.

MR. SINATRA: I'm going to object to the stream of consciousness.

JUDGE SPRAGUE. Overruled. She's relating why she—her considerations for going back to work for the judge.

A. Correct, yes. And the amount of money I was making was much less than what I made at Judge Lokuta's. So, as I said, I had this new responsibility, and I had really hoped that after Judge no longer had Ted Krohn, Mike Kostelaba had left, I had left, I thought maybe she's—maybe she's seeing that this is not the way to treat your staff, maybe she'll turn over a new leaf, maybe we can make things okay.

And I even talked to her on the phone. We had a conversation on the phone. And she said, I think that, you know, things will be fine and that we're just going to handle things differently this time. So I had every optimism about the whole situation that things might be better this time. And I was willing to give it a second try.

Q. So you went back?

A. So I went back.

Q. And how long did you stay with her this second time?

. . . .

A. Okay. The second stint I believe came to about 15 or 16 months because it was September of 2002 to

March of 2004. So I think that works out to about 16 months, something like that.

BY MR. PUSKAS:

Q. And how did your employment come to an end there?

A. My employment came to an end because quite frankly I had just—I couldn't take it anymore.

Q. Did you—You quit?

A. I did. I handed in my resignation, and I wrote her a note and said that I cannot take your abusive behavior any longer, and I handed her my keys. And I said, I just can't take it, this is what you want anyway, and I walked out.

Q. And, thereafter, did you file a complaint with the Judicial Complaint Board?

A. Yes, I did.

Q. Is that the complaint that you filed with the Judicial Conduct Board?

A. Yes, it is.

Q. And when did you file that?

A. I filed that in April of 2004.

. . . .

Q. Why did you file that complaint with the Judicial Conduct Board?

MR. SINATRA: I'm going to object, Your Honor.

JUDGE SPRAGUE: Overruled.

A. I filed the complaint because it was so unbearable. Excuse me. I couldn't imagine anybody else having to go through that. It was something that changed my life forever because the abuse was so intense and relentless and persistent. And I knew that it was not just me, that it extended to other people as well. And I felt that somebody needed to know. I didn't know what would come of the complaint, but I felt that I had to let somebody know exactly what was going on in that chambers.

. . . .

Q. What can you tell the Court about Judge Lokuta's treatment of you?

. . . .

A. For the first six months that I was back from September to January, it really wasn't that bad. It was somewhat bearable. She would have her bad days but never directed at me. It wasn't anything that you couldn't handle at the end of the day.

After January, shortly after Mort Gordon left, her treatment of me every day was one that I couldn't walk across the room that it wasn't right. Nothing I did was correct. And it wasn't that you were just scolded or reprimanded. You were screamed at for it. You were told you were stupid no matter what you attempted during the day.

And she would give you—The pattern that became the norm was that she would give you a task. She would wait 10 minutes. She'd give you another task, wait another 10 minutes, give you another one. And in the meantime, she's buzzing you, she's interrupting you. And then she'd come in and she'd start screaming for the results from the first task which you didn't have any time to complete obviously.

And this would keep occurring over and over and over again. And she would just badger you. It was relentless. And it wasn't just for that period of time. It went on throughout the whole day.

Q. How did that make you feel?

A. Horrible, stupid, nervous. I couldn't focus on anything because I just kept worrying when is she going to start yelling at me again, what is the next thing I'm going to do that is going to be a mistake. It made you make mistakes because you couldn't focus. You were just waiting for the next hit.

Q. What was her tone, volume, and manner when she was addressing you?

A. Her tone was extremely condescending, sarcastic at times. Her volume if she was really angry at you was screeching. And if you went—If you would try to defend yourself, you were insubordinate, and you would get screamed at for that. If I didn't say anything, she screamed at me that I was passive aggressive. There was no way to handle the situation. It was unbearable.

Can you give the Court some specific examples of incidents that occurred between you and Judge Lokuta that—You've generally described her treatment of you, but can you give some specific examples of her treatment of you?

MR. SINATRA: Your Honor, may we have the witness relate the time period first as we have been doing?

JUDGE SPRAGUE: As you give these examples to the best approximation state about when this occurred to the best that you can. And if there's a problem because they were on such a recurring basis—

A. Exactly.

JUDGE SPRAGUE:—that it's difficult because of the repetition, then just say so.

A. Yes. It is difficult because it was very repetitious, and it was so often....

. . . .

Q. Was there another incident, and I'm referencing December 10th, 2003, where Maureen had an outburst on you in front of Judge Lokuta?

A. Yes.

. . . .

Q. Can you tell the Court about that?

A. Yes, I can. The judge had miscellaneous court that day, and it was customary at the end of her miscellaneous court that the files would come back to me for processing. And there was a receipt that the prothonotary people usually filled out, and it would indicate as to whether or not a matter was continued or whatever.

So when Maureen brought me back the files, I noticed that the receipt wasn't there. And I said, Maureen, I have a question about this one, I noticed that the receipt isn't here. And she turned on me. She was walking away. She turned around. She turned on me, got right in my face, and started screaming at me and pointing at me and say, how dare you call me a liar.

And I said, Maureen, I didn't call you a liar, I just asked where the receipt was. Don't you ever question anything that I do. Oh, yeah, you're the one who never makes any mistakes. And she started yelling and screaming and going on and on and on.

And then she started to walk away, and the judge was in her chambers but in the doorway and noticing all of this and did nothing to stop it which was also quite usual. If she saw some—

MR. SINATRA: I'm going to object to the editorialization.

JUDGE SPRAGUE: Overruled. Continue.

A. —between her staff members, she did nothing to diffuse it and to set it right and to resolve it. So Maureen turned on—After she turned away from me, she started yelling to the judge, she's the worst secretary I've ever seen in my life, she wouldn't know her ass from a hole in the ground.

. . . .

Q. Do you recall an incident on—I'm referencing June 20th, 2003—where Judge Lokuta and Maureen Gushanas were arguing about something with Maureen's vacation?

A. Yes.

Q. Can you tell the Court about that?

A. Because they were arguing quite a lot.

Q. Who was present, first of all, at that time?

A. We were all in the judge's chamber. It was the judge, myself, I believe Selyne Youngclaus, Rebecca Sammon may have either been in chamber or within earshot, but I think she was in chamber. I think we were all in the judge's chamber. And Maureen had given the judge a memo requesting a vacation, and the judge denied it saying that she didn't have six weeks' notice and she required six weeks' notice which was a rule that I never knew about, changed constantly. You never knew what the rules were.

MR. SINATRA: I'm going to object to—

JUDGE SPRAGUE: Overruled.

A. So Maureen was taken back by this. She didn't realize six weeks' notice

was supposed to have been given. But she got very, very agitated and upset. And you could see that a fight was going to brew because she came bounding back into chambers and pointed at the judge and said, why, Judge, is it because I'm not sleeping with you anymore? And then she flew out.

Well, this was not a shock to me, but it was a shock to a lot of other staff members and made them very uncomfortable and upset them.

BY MR. PUSKAS:

Q. What was Judge Lokuta doing during this time?

A. She was sitting at her desk.

Q. Do you recall anything that she said?

A. Maureen—I think she said something like, Maureen, you know that you have to have six weeks' notice. And then she just let her go. That was it.

Q. How loud was Maureen Gushanas?

A. Very loud, extremely loud. She screamed it.

Q. Were there other occasions where Judge Lokuta was arguing in chambers with Maureen Gushanas?

A. Many, many, many occasions they were fighting in chambers, and the judge will call chambers constantly, and they would fight over the phone. It would disrupt everything that you were trying to do during the course of the day. The phone calls back and forth, the judge would call. Maureen would hang up on her. The judge would call back. I'd pick up the phone.

MR. SINATRA: I'm going to object to the phone calls.

JUDGE SPRAGUE: Did you observe this?

A. Oh, I was there, sir, absolutely.

JUDGE SPRAGUE: Overruled.

A. And a lot of times I had to answer the phone, and they would be going back and forth. And then the judge would yell at me, give, you know, the phone to Maureen. And then they would go back and forth. And one particular time—Maureen was always trying to cover herself because she told me—

MR. SINATRA: I would object to—

JUDGE SPRAGUE: That's sustained. You can't just tell us what Maureen said.

A. I can't tell you what she said, okay.

BY MR. PUSKAS:

Q. You can continue. You were talking about these phone calls where you would pick up.

A. Yes.

MR. SINATRA: I'm going to object. That's—

JUDGE SPRAGUE: This is a conversation with Judge Lokuta. Overruled.

MR. SINATRA: Can we have a time period?

JUDGE SPRAGUE: This happened all the time I'm hearing.

A. It did, sir, yes, all the time.

JUDGE SPRAGUE: Go ahead.

A. It certainly did.

. . . .

Q. When you were picking up the phone, what did you hear Judge Lokuta say?

A. You get Maureen Gushanas on this phone right now. And then I'd have to go and try and get Maureen and try to get Maureen to answer the phone so she wouldn't keep calling back every five minutes. And that was a pattern that would repeat constantly.

Q. Were you able to hear what Judge Lokuta was saying to Maureen Gushanas—

A. Yes, I was.

Q. —while you were present? What did you hear?

A. At one particular time Maureen held the phone out for me to hear.

. . . .

JUDGE SPRAGUE: ... The question was, when Maureen held out the phone for you to hear the judge, what is it that you heard from the judge.

A. The judge called her, she said, Maureen, you're nothing but a fat pig, whore, lowlife.

MR. SINATRA: May I have that date again, please.

A. I believe it was 3/28/03.

MR. SINATRA: Thank you.

BY MR. PUSKAS:

Q. What can you tell the Court about Judge Lokuta's tone or volume when you heard that statement?

A. She was screaming it. (N.T. 1463–89).

Rebecca Sammon testified about Respondent's alienation from other offices of the courts of Luzerne County, indeed from virtually everyone who worked in the courthouse, as follows:

Q. And what other kind of things did she have you do?

A. I know that she had me—The first year I was there—I'm sorry, I don't mean to go back—but she had me research into a complaint with the AOPC regarding some treatment and how she felt that it was—felt like maybe she was being mistreated.

Q. Mistreated by whom?

A. By other members of the county court system, be it the other judges, the court administrators, you know, different people. I would also answer the phone sometimes. I would write memos back and forth to other—to a lot of them to file. I would, you know, I would—When I left there, I thought that, you know, memo writing you had to document everything. It would be like stub toe, write memo.

Q. Did she instruct you to write those memos?

A. Yes.

. . . .

A. ... And I was to look into different matters regarding documenting different things that were happening back and forth with the AOPC, researching different issues, like for one issues with the sheriff, issues with, you know, different things that were going on. (N.T. 1242–44).

In her deposition (Exhibit R–643) Sammon spoke on the subject as follows:

Q. Did you interact with any of the other interns or people working in other judicial offices?

A. No, sir, uh-uh.

Q. Why not?

A. I wasn't able—I wasn't allowed to.

Q. What do you mean, you weren't allowed to?

A. She didn't like me talking to other judges. She didn't like me talking to the other interns.

Q. Did she discourage that?

A. Oh, yeah. Like, I know Judge Augello's secretary. She's not a friend of our family, but they're friendly, she and my mom. She took Mrs.— her last name is Hanlin—Mrs. Hanlin's daughter—my mom took— my mom was—worked at, like, a nursing home facility. And she— my mother was the assistant vice-president, and her daughter was a patient there when she was very young.

I don't know if it was an accident or what, but she had some very debilitating injuries. So she would kind of— she was friendly with my mom and was very thankful for that. And my mom would say, you know, tell Mrs. Hanlin hello for me or whatever. And when she would call, I would be polite and pleasant to her; and she would say, don't be pleasant to that woman.

Q. She would tell you that?

A. Or she's no friend of you or this chamber. And I was, like, well, my mom knows her, and she's really nice.

Q. Did you ever—did she ever explain to you why she considered them not friends of her chambers?

A. She kind of had this attitude like she was out to get her.

Q. And from your perspective, you coming in from the outside working there, did you get the sense that people were out to get her?

A. At first—when I first came there, I was, like, geez, they do kind of treat her a little bit unfairly. But then— and she was, like, it's because I'm a woman. And I'm like, gee, that's not cool. But after that, kind of being there, I was, like, no it's not because you're a woman; it's because you're not incredibly nice to be around.

And this is horrible because I feel awful about this. This is someone that I really looked up to and I— I'm—in no way, I'm kind of worried about myself because she tends to do

retaliatory things against people.... [11]

....

Q. How would you describe her chambers, the way it looked? Is there anything that stuck out in your mind?

A. Not really. I mean, she would hoard things. Like, she had drawers full of Beanie Babies and just for no apparent reason.

Q. Did she hand them out to children?

A. No. One time she said—there were little kids out there; and someone said, why don't we give them a Beanie Baby? And then she said, sure. And then she said, no, no, they're valuable. And I was—I was thinking, why does she have them? She would always save copies of the cards that she sent people, like a birthday card. She'd make you make a copy of it.

Q. Of what she sent?

A. Yes. Like, it could have been a birthday card. Who the heck saves birthday cards they send to other people? But she would make copies of that. And I know when—

Q. Did she keep that in a file?

A. Yeah. She had binders upon binders upon binders.

Q. And where does she keep these binders?

A. In the chambers.

Q. In her office?

A. I'm sure some of it was at home because if it was continuing to be of the magnitude it was, there's no way she could have stored it all in there.

....

Q. And they were stored in, what, filing cabinets?

A. Or in bookcases. And they would be, like, letters to the AOPC, letters to Judge Augello regarding, you know, the elevator or soap or whatever the heck it was she was going off about that particular week. (Exhibit R–643, pp. 32–42).

Selyne Youngclaus, Respondent's law clerk, testified on the subject:

Q. Did Judge Lokuta have any policy on her personal staff interaction with other staff at the courthouse?

A. We could not socialize with other staff. In the 18 months I was there I never met another judge from Luzerne County. I would take coffee breaks with the court reporters. I met a secretary. I think it was Judge Augello's secretary, Teresa. I don't know her last name. I was told—Well, I wasn't told. I take that back. I would go downstairs. I would tell them I was going for a coffee break. I would go downstairs. They had a snack room. If I was gone too long, Maureen would come down and say that the judge sent her to come back and get me. And I was told that I shouldn't—

MR. SINATRA: I'm going to object. There's not even an identification of the speaker here.

JUDGE SPRAGUE: I take it that Maureen is speaking to you and relating what she was told by the judge.

A. Yes.

JUDGE SPRAGUE: Objection overruled. You can tell us.

A. Pardon me, Your Honor. I'm sorry. Maureen would come down and get me and tell me the judge wanted me back upstairs. When I would get

11. See n. 6, *supra.*

back upstairs, she would ask what I was doing.

JUDGE SPRAGUE: Who's she?

A. I'm sorry, Judge Lokuta. I'm sorry, Your Honor. She asked what I was doing, where I was, and I would tell her who I was with. And the judge told me that they were not friends of the court, I should not be discussing things with them or hanging out with them. (N.T. 1331–32).

Susan Moyer, Respondent's secretary, testified on the subject:

A. This day was also a day that a letter I had—a handwritten note I had received from Judge Conahan when I started was thrown into my face which was thrown into my face numerous times.

JUDGE SPRAGUE: Can you explain what you mean by that?

A. Well, Judge Lokuta and Maureen did not want any of the judges or any of the other court personnel knowing any of the business that was going on in the chambers. They disliked the judges on the third floor very much.

MR. SINATRA: I'm going to object to that and ask that that be stricken.

JUDGE SPRAGUE: I sustain the objection and strike that part of the answer. You said throwing this letter in your face. Just explain what you meant by that.

A. Well, Maureen would say to me, I can't believe you got a letter from Judge Conahan, you know that we hate him here, and Judge is the one who hired you, not Judge Conahan, so you need to remember where your priorities are. That was thrown up to me numerous times.

Maureen also said, you know, that still leaves a bad taste in my mouth. And Judge never said anything about it. She just stood there with a smirk on her face.

JUDGE SPRAGUE: Was Judge Lokuta present when this—

A. She was there, yes.

JUDGE SPRAGUE: Excuse me.— when these kind of statements were said to you by Maureen?

A. Yes, sir.

JUDGE SPRAGUE: Thank you.

A. You're welcome.

JUDGE SPRAGUE: Proceed, Counsel.

BY MR. PUSKAS:

Q. Let me back up for a minute here. When you were hired by Judge Lokuta, you've mentioned the letter here. When did you receive a letter from Judge Conahan and under what circumstances?

A. I received a note from Judge Conahan. Maureen had gone down for the mail one morning.

Q. And when was that after you were hired, how long?

A. A few days.

Q. And you were at work this day?

Q. I was at work this day. Maureen had gone down for the mail. She came up. She handed me a letter, an envelope. And it was from Judge Conahan. I opened it up, and it was just a note wishing me well and if I needed anything to let him know.

Maureen asked me why I was getting a note from Judge Conahan. And it had been signed Mike. She said, you call him Mike. I said no, I call him Judge Conahan but he just signed it Mike. And she said, well,

why would he send you a letter. I said, because I ran a bail program under his direction and I had worked with him for approximately seven years. And she said, well, he's not your boss, Judge is, and if you're friends with him that leaves a really bad taste in my mouth. You don't belong here.

Q. Did Maureen Gushanas inform Judge Lokuta about that note?

A. She did. Judge had been gone. Judge was not in that day when I received the note. But Maureen called her.

Q. Were you there when she called her?

A. I overhead her call the judge, yes.

Q. And what happened next?

A. She came out and she said, Judge, is—

MR. SINATRA: I'm going to object to—

JUDGE SPRAGUE: Sustained. Did you have any conversation with Judge Lokuta about this conversation with Maureen or the note that you got from Judge Conahan?

A. One the day I got the note, sir?

JUDGE SPRAGUE: No, anytime.

A. On that day, yes.

JUDGE SPRAGUE: And tell us about that conversation.

A. Maureen had brought up the note again. And I don't know what kind of expletives to use, sir.

JUDGE SPRAGUE: We understand this is not you speaking. We weren't there, so the only way we can know what you're talking about is for you to recreate it, so you use what language. But my focus is not on what Maureen said but what Judge Lokuta said. If Judge Lokuta was present when Mau-reen's talking to you, then you can relate what Maureen said.

A. Thank you, sir. Judge Lokuta was present. Judge Lokuta never had a real lot to say to me unless she was chastising me. Maureen would be the one who'd say, well, if you're a friend of that fucking pig on the third floor, you don't belong here and I still can't believe you got a note from him and that still leaves a bad taste in my mouth. Judge Lo-kuta was standing there, and she would just smirk.

JUDGE SPRAGUE: Continue, Counsel.

BY MR. PUSKAS:

Q. What happened to that note?

A. Judge—According to Maureen, the judge wanted it in my file, so that's where it went.

. . . .

JUDGE SPRAGUE: Your question is, did there come a time when Judge Lokuta spoke to you about that memorandum?

A. Yes, there was.

BY MR. PUSKAS:

Q. And when did that occur?

A. On February 22nd.

Q. And the year?

A. 2005. I apologize. She asked me what was going on, why I would receive a note from Judge Conahan.

JUDGE SPRAGUE: She being Judge Lokuta?

A. Yes, sir.

JUDGE SPRAGUE: Go ahead.

A. And I told her about the bail program and that Judge Conahan and I always had a good rapport. And she said, but he's not the one who offered you a job, I did, so you need to know where you loyalties lay.

That's when she told Maureen that she wanted the letter put in the file.

. . . .

Q. What, if anything, were you told by Judge Lokuta about your interaction with other court departments or other court personnel?

A. Judge Lokuta did not want anyone in her office being friendly with anyone else. She did not want people coming to the office. She told me that. And she did not want me talking to anyone in the courthouse. I was not allowed to use the phone.

MR. SINATRA: Can we identify who the she is, the use of the pronoun?

A. Judge Lokuta. I apologize.

JUDGE SPRAGUE: That's all right. Proceed.

A. Judge Lokuta would tell me that she did not get along with the other judges or any of the—most of the courthouse personnel and that I would be smart not to hang out with them or associate with them in any way because they were always causing trouble, they were a bunch of incompetents.

She did not want judges coming to chambers. She did not want judges calling on the phone. As a matter of fact, she said to me at one point, Maureen worked long and hard to have attorneys not come here or call on the phone, and you're too flowery.

. . . .

Q. What did Judge Lokuta tell you when you were on the phone telling somebody not to call but you were being nice?

. . . .

A. She would tell me I'm too flowery which meant I was too nice to people, and Maureen had worked long and hard not—to have them not

come in, and she didn't want me to disrupt that plan of action.

MR. SINATRA: I'm going to object to interpreting what I'm too flowery means. It's up to the Court to interpret that.

JUDGE SPRAGUE: Overruled.

BY MR. PUSKAS:

Q. Were you given any instruction regarding how you were—if there was—If a phone call was made to the office about Judge Lokuta's whereabouts, were you given instruction on how to answer that?

A. Verbatim.

JUDGE SPRAGUE: By whom, Counsel?

MR. PUSKAS: By Judge Lokuta.

A. Verbatim, yes, I was.

BY MR. PUSKAS:

Q. What were you told?

A. Judge is not available, that's it, Judge is not available at this time, may I take a message. And then I would take the message.

Q. Now, under what circumstances were you instructed about that?

A. If anyone were to call, the judges or the court administrator or anyone, anyone, Judge is not available, may I take a message.

Q. Did that also apply if Judge Lokuta was, in fact, in the chambers?

A. Yes. (N.T. 1375–90).

Susan Weber testified about the relationship Respondent had with the court administrator's office and employees of that office;

Q. Can you tell the Court about that?

A. Yes. The judge came in, in the afternoon, and right behind her Jack Mulroy who works for the court administration came in behind her.

He had information for her concerning summer interns. And he said that to her, Judge, I have information for you on your request for when summer interns can start.

Well, the judge turned on Jack so fast and so angry at him for approaching her. And she said, Jack, I told you that I want this—this jurist wants that in writing, I need that information in writing, that's the way this jurist wants it. She kept saying, this jurist. And Jack apologized. He said, Judge, I'm terribly sorry, I had no idea, with all the other judges, I just usually let them know verbally. She continued to scold him about it. And then—

Q. What was her tone, volume, and manner?

A. Volume very high, tone extremely condescending to this man, and I really felt for him standing there taking this.

Q. What happened after that? So she scolded him?

A. Yes, she did. And then Mr. Mulroy left. And then after that, then I got yelled at because he came in after she came up the steps and was out of breath. That was my fault. And so I got yelled at for that. And she said to me, you have to understand he's just a lackey, he answers to us, we tell him, he doesn't dictate to us. . . .

. . . .

And again:

A. One of the girls that works at court administration—the name is Ann Hoedl—has always been introduced to me and known to me as Sis. Everybody knows her as Sis. I was introduced to her as Sis and have always called her Sis. And I was told that day that I was not permit-

ted to call her Sis, I must call her Ann by her given name.

Q. How long had you been calling her Sis?

A. Well, I was working for the judge since 1996 and ever since I knew Ann. I don't know exactly when she started working, but for years.

. . . .

Q. Did Judge Lokuta have any particular instructions that she gave to staff that you would have heard regarding your interaction with other judicial chambers or other court personnel?

A. Upon arrival to my second stint, I was told in no uncertain terms was I to attend any secretary luncheons, any court administration staff meetings that took place once a month, I was not to be friendly with anybody from court administration or any of the other secretaries. They were the enemy.

Q. And who told you this?

A. Judge Lokuta.

Q. And were those the words she used—

A. Yes.

Q. —they are the enemy?

A. Yes.

Q. Was there any protocol that Judge Lokuta had for the court schedule and whether she gave that to court administration?

A. She did not want court administration to have her schedule, so we were forbidden to give court administration her schedule. Only the prothonotary could have it and the stenographers.

. . . .

And again:

Q. Did Judge Lokuta give you any specific instructions regarding a woman named Kay Faber?

A. Yes, she did.

Q. Who was Kay Faber?

A. Kay Faber works for court administration, and Kay Faber lives about a quarter of a mile from my home. Kay Faber is very terrified of driving in the snow, so when the bad weather starts—

. . . .

A. Kay Faber is very frightened of driving, so whenever it would snow or appear to be ready to snow, I would take Kay in and drive her home. Judge knew this. I always did it. On the eve of a snowstorm as the judge was leaving the chamber, she turned and said to me, oh, by the way, you're not to take Kay Faber in if it snows. And I said, well, Judge, you know that I always do take Kay when it snows. And she said, well, you're not allowed to, it's inappropriate.

Q. Did she explain why?

A. She said that it was because there was—Kay Faber does work for Senior Judge Brown, and he was doing an opinion concerning the Delesandro matter and Judge Lokuta. And she felt that it would be inappropriate for me to be riding in the car with her, which I ignored. (N.T. 1504–12).

Susan Weber testified about Respondent's relationship with President Judge Conahan:

Q. What, if anything, can you tell the Court about Judge Lokuta's treatment of Mort Gordon?

. . . .

A. Mort Gordon was the judge's law clerk when I came back for my second stint. And Mort Gordon was friendly with Judge Conahan. So from time to time, he would go over to the courthouse and visit with the judge. Judge Lokuta found out about it and was very upset over this, and she felt that he was relaying information to Judge Conahan concerning her chambers. And she got very paranoid about this. And as a result, she started coming down on Mort for every little thing that he did and berating him.

And here again she would have other staff members in her chamber, and she would call him in, and she would berate him right in front of everybody. And it was horrible to watch. And—it was horrible. (N.T. 1516–17).

### Discussion

■■■ We find that Respondent's conduct described in the testimony set out above is clear and convincing evidence of violation of:

1. Canon 3 A.(3) of the Code of Judicial Conduct as charged in Count 1;

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2;

3. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper administration of justice as charged in Count 6; and

4. Canon 3B.(1) of the Code of Judicial Conduct.[12]

---

12. See n. 5, *supra.*

We will discuss these findings in the order listed above.

1. Canon 3A.(3) provides:

Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity, and should require similar conduct of lawyers, and of their staff, court officials, and others subject to their direction and control.

■ What we said earlier when discussing Respondent's courtroom conduct as violating Canon 3A.(3) applies as well to Respondent's conduct in chambers. We will not repeat it but we will make some additional observations bearing on the conduct of her tipstaff, Maureen Gushanas.

The canon pointedly requires, not only that *the judge* be patient, dignified and courteous, but also that the judge "require similar conduct of ... *[her] staff*" (emphasis added). Respondent fails this test as well, for the conduct of Maureen Gushanas described in this record was neither patient, dignified nor courteous to those with whom she daily dealt in her official capacity as Respondent's tipstaff.[13] We will not belabor the point except to say, that reading the testimony in this case on the day to day comportment of Respondent and Maureen Gushanas in this office, one gets the picture of something out of Lewis Carroll or Dickens rather than of the chambers of a judge of the court of common pleas.

So, we find, for this additional reason, that Respondent has violated Canon 3A.(3) of the Code of Judicial Conduct.

■ 2. What we said earlier about Respondent's discourteous conduct as being such that brings the judicial office into disrepute is applicable to her conduct in chambers. We adopt that language and

find that the testimony describes conduct in chambers which is so extreme as to bring the judicial office into disrepute.

3 and 4. As noted above, we find that the testimony set out in the Discussion above is such that prejudices the proper administration of justice (Pa. Const.Art.V, § 18(d)(1)) as well as a violation of Canon 3B.(1) of the Code of Judicial Conduct.

As to 3. Eight witnesses—five law clerks,[14] two secretaries and one legal intern—who worked for Respondent at various times between 1996 and 2004 testified that the "loud," "nasty," "out of control," "intimidating," "oppressive"—indeed bizarre—conduct of Respondent, which was "inescapable" and, on some occasions, of her tipstaff, Maureen Gushanas, was distracting and severely hampered them in the performance of the duties for which they were paid to perform. We expect that it would. We find that it did. Each one of these had an essential role in the operation of the Court of Common Pleas of Luzerne County. Each one of these had a job integral to the operation of Judge Lokuta's courtroom, integral to the performance of her judicial duties, which, in turn, is integral to the proper administration of justice in Luzerne County. We refer again to our holding in *In re Smith* where we said:

We therefore adopt the following standard to determine the elements which constitute the proper administration of justice. The administration of justice encompasses all work of the courts of common pleas which aid in the systematic operation and normal functions of the court system. Conduct which prejudices the proper administration of justice ... is conduct which obstructs or interferes with those activities which enable the

---

**13.** For more on Gushanas's conduct, see Adonizio incident, *infra*.

**14.** One law clerk, Flaherty, also worked as a tipstaff.

systematic operation of the courts. The term "systematic operation" encompasses not only the procedures adopted by courts which aid in functioning, but also the standards of conduct expected of judicial officers in the performance of the work of the courts. Hence, when a judicial officer's conduct departs from the standard expected of judges and has the effect of obstructing or interfering with the systematic operation or normal functions of the court, his conduct will have affected the proper administration of the courts.

687 A.2d at 1237. We follow *Smith;* find that Respondent's conduct in chambers did obstruct and interfere with the systematic operation or normal functions of the court; and hold that, thus, that conduct did affect the proper administration of justice.

■ As to 4. The evidence which fills this record establishes that Respondent failed to act in accordance with the directive of Canon 3B.(1) that she "facilitate" the other judges and court departments in the performance of their responsibilities, but, more than that, establishes that this Respondent had her chambers on a war footing, battle-ready for the warfare which she daily waged with the court departments and other judges, particularly the president judges of Luzerne County.[15] She deliberately isolated herself and her staff from the rest of the courthouse and had standing orders that her staff was not to socialize, in or out of the courthouse, with other courthouse employees, particularly if they were deemed to be "enemies"

or "not friends of this chamber." [16] Notables included in this category were the prothonotary, the court administrator and President Judges Toole and Conahan and anybody who happened to be employed in their offices.[17] In her chambers animosity was in the air. Members of her staff were berated for being cordial, even civil, with those Respondent designated as "not friends." [18] This conduct is antithetical to the instruction of Canon 3B.(1).

We, therefore, hold that Respondent's conduct is a violation of Canon 3B.(1) of the Code of Judicial Conduct.

## E. *PUBLIC DISPARAGEMENT OF PRESIDENT JUDGE AND OFFICES OF THE COURT ADMINISTRATOR AND PROTHONOTARY*

### *Findings of Fact*

■ 38. Respondent aired her dissatisfaction with the president judges and other court departments in public by repeatedly placing lengthy recitations of her displeasure on the record in court. In these declarations Respondent was contemptuous of orders of the president judges and complained that they placed an unfair and discriminatory burden on her and blamed them for the dysfunction of her court.

39. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follows occurred as described in the testimony at the times and with the frequency as related by the witnesses.

---

15. A striking example of this is found in an exchange of memoranda Respondent had with then Acting President Judge Augello in 1996. These memoranda are Board Exhibits 17 and 18 and are set out *infra,* in this Opinion. Respondent's responses to Judge Augello demonstrate how Respondent reflexively warms to controversy—and, in fact, goes looking for it.

16. N.T. 1331–40 Youngclaus; N.T. 1386–87 Moyer; N.T. 1508–10 Weber.

17. N.T. 1375–79 Moyer; N.T. 1508–10 Weber.

18. N.T. 1242–47, Exhibit R–643, pp. 32–34 Sammon; N.T. 1387–90 Moyer.

*Discussion*

Numerous witnesses testified about Respondent's penchant—actually her compulsion—to spread on the public record bitter complaints about her president judge, other Luzerne County judges, and other court departments, particularly the office of the court administrator.

For example, law clerk Ted Krohn testified;

Q. During the time that you worked for Judge Lokuta and you were in her courtroom, did you observe her speak from the bench about other court departments or judges?

A. Yes.

Q. And what kind of commentary would she make?

. . . .

A. She would constantly criticize the court administrator's office for the nature and type of cases that were assigned to her. She would constantly criticize some of the other judges for assigning certain cases to her. And many times those comments would take anywhere from ten to 15 minutes of court time. She would just go on and on in the courtroom being critical to the extent that I've just indicated.

Q. And how frequently did that occur with Judge Lokuta?

A. Varying. Sometimes it wasn't there, other times it would occur two, three times a week. (N.T. 77–78).

Court reporter Dan Coll testified:

Q. Mr. Coll, have you heard or taken down as a court reporter as part of your official duty negative commentary by Judge Lokuta about court administration or the President Judge or her workload?

. . . .

A. Many times. She criticizes administration always.

. . . .

A. . . . But she would constantly criticize the President Judge, Court Administration in itself ad nauseam . . . . (N.T. 576–77).

Court reporter Cynthia Rachilla testified:

Q. And if you could put a time frame on what you relate, please do so?

A. Yes. Yes. 2004, open court, again, a continuance on the record with several paragraphs filled with how in her burdensome schedule that was thrust upon her by the new president judge, an order that he had promulgated which she has committed to memory.

Again, often bashing the other judges in front of an open courtroom and how her brethren of the bench do not do things as she does, and that her way—that she was penalized for doing things in her way. 2004, again—

JUDGE SPRAGUE: When you say—before we move on, when you say bashing other judges, can you just—do you have a concrete illustration to tell us?

A. Again—the words themselves, Judge?

JUDGE SPRAGUE: As best you can recall.

. . . .

A. Again, the words, my brethren on the bench, and, again, not in the complimentary way.

JUDGE SPRAGUE: Can you illustrate it?

A. How it was done?

JUDGE SPRAGUE: Mimic it.

A. Okay. Well, my brethren on the bench may believe that this is how

it should be done, but I, working as the judge from the 11th Judicial District for the Court of Common Pleas, believe it should be done this way, which is a different tone. (N.T. 636–37).

Cynthia Rachilla also said:

Q. Finally, Ms. Rachilla, could you tell the Court the tone, volume, or manner in which Judge Lokuta delivered what I read from that last transcript or Board Exhibit Number 11?

A. Again, when she goes on the portions where she speaks about the responsibilities, at that point she, again, becomes louder. The word thrust, just as you said, becomes more a louder intonation. She becomes more animated and has like the frustrated look on her face that she's so overburdened.

Q. How frequently do these commentaries occur in her courtroom?

A. I can say that wherever she's been, whether it was down in Perm Place Building, over in Orphans' Court in the main building, that each time you are assigned to her, so six to eight times, every time during that week there will be some comment about her accommodations at whichever place she is and either regarding the Prothonotary, her other brethren, or any new promulgations from any—from the other judges.

In the Penn Place Building, it was about her accommodations, how poor they were and how she didn't have the right equipment, how the courtroom was inappropriate. In her courtroom in the main courthouse, it's how she has no microphone system and how the air is—

MR. SINATRA: I'm going to object. She is not responsive. The question was how frequently does she—does the Judge make comments related to scheduling problems. I will ask that it be stricken.

JUDGE SPRAGUE: Your objection is sustained. Answer just the frequency, and I take it just about all the time?

A. Correct.

BY MR. PUSKAS:

Q. And besides what I have read here, your—what other areas does she cover in these commentaries?

. . . .

A. The commentaries will include the inadequacy of the Prothonotary's Office, how files are just not done correctly and she doesn't—they're never fully there. There was one point where a clerk tried to point out to her where a certain stamp she said was missing was there, and the clerk—she said it's not on this copy. The Prothonotary's Office doesn't have the correct files. The clerks don't turn around to look at their correct time, to make sure they're there with their hand when she hands them the paper.

The Sheriff's Office isn't there when she needs her security. The clock in the courtroom is wrong and no one has come to fix it, and it makes it difficult to have court if you don't know what time it is. The condition of the air in her courtroom is on, it's drafting down her back. That's all I can think of right now. (N.T. 670–73).

Court reporter Angela Sallemi testified:

Q. During the time that you've been in Judge Lokuta's courtroom, have you observed her making negative commentary about other court departments or complaining about her workload or president judge?

A. Yes. That was a routine—

. . . .

A. That was a routine occurrence in Judge Lokuta's courtroom. She would go on for pages with self-serving remarks, constantly criticizing every other department. And, once again, it's a court record, and you have other litigants in the courtroom, other attorneys listening to this who are charging their clients to have to sit in a courtroom listening to why Judge Lokuta is put-upon or burdened or harassed, and her self-aggrandizing statements, constant self-serving statements that, once again, clients are being charged for by their lawyers sitting in courtrooms whenever she decides to do this. (N.T. 722–23).

Attorney Virginia Murtha–Cowley testified:

A. Well, we would be waiting 15, 20, a half hour. She would get on the bench, and then, you know, say she had many other things to take care of. That would be common. Or she would get on the bench and go on for another 10 minutes or more about how—what her workload is and how she is treated by the other judges and by the courts and on and on and on. You know, usually—

. . . .

Q. And you were also explaining about commentary that Judge Lokuta would make on the record. How frequently would she make that kind of commentary?

A. Every time—

. . . .

A. Every time she took the bench. (N.T. 1009–10).

Attorney Nancy Violi testified:

Q. Did you have an opportunity when you were in Judge Lokuta's courtroom to observe her making commentary from the bench about other court departments, other judges, or her own court assignment?

A. Yes. I recall—

. . . .

A. There were numerous incidents when I was there for PFA court that Judge Lokuta would take the bench, and if she was late that morning, she would always take the bench and always make a comment that it was somebody else's fault. And many times she was making derogatory comments about Judge Conahan, and he was the reason why she couldn't get to the bench to be at her hearings on time. (N.T. 832–33).

Six transcriptions, samples of these declamatory orations, were placed in evidence (Board Exhibits 7–12). Four were read into the record: Board Exhibit 7 (N.T. 576–84); Board Exhibit 10 (N.T. 660–66); Board Exhibit 11 (N.T. 667–69); Board Exhibit 12 (N.T. 729–40). These transcripts exemplify what the witnesses were talking about. Reading the words spoken by Respondent in open court one first is startled by their thoroughly derogatory content, and by the animosity with which they are delivered. Reading on, however, the exercise soon becomes a tiresome one, finally a reader finds himself embarrassed—for the Respondent.

We find that Respondent's conduct described in the testimony set out above and in the transcripts (Board Exhibits 7–12) is clear and convincing evidence of violation of:

1. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office

into disrepute as charged in Count 2; and

2. Canon 3B.(1) of the Code of Judicial Conduct.

We will discuss these findings in the order they are listed above.

1. Conduct which brings the judicial office into disrepute.

These elocutionary excursions, embarked upon repeatedly by Respondent, commonly delivered upon the opening of court when courtroom occupancy normally peaks, were inappropriate, intemperate and uncalled for. They show no respect for the offices of the president judge and the court administrator and, more than that, they are frankly contemptuous of those offices. Probably the most important observation provoked by review of these speeches is that they show an abysmal lack of judgment. This conduct was extreme within the meaning of that word expressed in our opinions in *In re Cicchetti, In re Trkula* and the other cases cited earlier in our discussion of what conduct it is which brings the judicial office into disrepute. We find that this conduct of Respondent is such that brings the judicial office into disrepute—not only that, it was *designed* to bring the judicial office, indeed the entire Common Pleas Court of Luzerne County, into disrepute.

2. Canon 3B.(1) of the Code of Judicial Conduct.

■ The pertinent language of Canon 3B.(1) is:

Judges should ... facilitate the performance of the administrative responsibilities of other judges and court officials.

It would be hard to call up any course of conduct which would be more antagonistic to the injunction of the Canon than that described in this record. These digres-

sions, far from "facilitating" the efforts of other judges and court officials to fulfill their responsibilities, were intended to accomplish the opposite. These digressions took public Respondent's disaffection with the court system and the perceived discriminatory treatment she was receiving from the president judge. These digressions were delivered to captive audiences composed of people with business to do, and with such frequency that they became "routine." (N.T. 723 Sallemi).

We hold that this conduct of Respondent was a violation of Canon 3B.(1) of the Code of Judicial Conduct.

F. *THE ADONIZIO INCIDENT*

*Findings of Fact*

40. Maureen Gushanas graduated from community college and then took a job with the Pennsylvania Regional Tissue Bank where she worked as a transplant coordinator for five years. She then received training at Jefferson University Hospital in Philadelphia in the vision field and did volunteer work for a lens eye bank for corneal transplants. She then worked at Wilkes–Barre Hospital in some capacity in the operating room. She met Respondent when Respondent's mother had surgery at Wilkes–Barre Hospital. After that meeting she took care of Respondent's mother until she died in December 2000. She continued to work at Wilkes–Barre Hospital until March 2001 when Respondent's tipstaff, Judith Flaherty, left that employment. On March 26, 2001 Gushanas commenced work as Respondent's tipstaff. She has held that position to the present. (N.T.1901–05 Gushanas).

41. Theresa Hannon is the executive secretary for Judge Joseph Augello of the Court of Common Pleas of Luzerne County. She has held that position for 30 years and was so employed on June 10, 2004. On

that day she was in her office located on the third floor of the courthouse and she received a phone call in the early afternoon from Maureen Gushanas asking if P.J. Adonizio was in her office. She told Gushanas that he was not and told her he was in the court administration office. Hannon then went to court administration and told Adonizio that Judge Lokuta was looking for him. At that time Adonizio told Hannon that he didn't have the time right now because he had to take his wife to the doctor's. (N.T. 380–81, 393–94 Hannon).

42. Theresa Hannon was a witness to the Adonizio incident. (N.T. 379–404 Hannon).

43. Harold Refowich is presently employed by the Luzerne County Domestic Relations Department. On June 10, 2004 he was employed by the Jury Board of Luzerne County. On that date he was working in the jury board office which was located on the third floor of the courthouse near where the Adonizio incident took place. (N.T. 405–08 Refowich).

44. Harold Refowich was a witness to the Adonizio incident. (N.T. 405–25 Refowich).

45. Michael Onderko is employed as a tipstaff for Judge Joseph Augello. He has held that position for 17 years. On June 10, 2004 he stepped off the elevator on the third floor of the courthouse and immediately came upon P.J. Adonizio and Maureen Gushanas. Adonizio was a step or two away with his back to Onderko; Gushanas was in front of Adonizio. (N.T. 426–27 Onderko).

46. Michael Onderko was a witness to the Adonizio incident. (N.T. 426–46 Onderko).

47. Michelle Klinefelter is presently employed as a deputy sheriff of Luzerne County. She has held that position for six and a half years. In the early afternoon of June 10, 2004 she was working in courtroom 4 where Judge Conahan was conducting criminal court when she heard a female shouting outside the courtroom. Judge Conahan asked her "go outside and see what was going on because there was a female outside the courtroom shouting." Judge Conahan asked Klinefelter to please tell them to keep it down as he was trying to conduct court. Klinefelter then went into the corridor and that is when she was aware of who it was. (N.T. 446–48 Klinefelter; N.T. 456 Conahan).

48. Michelle Klinefelter was a witness to the Adonizio incident. (N.T. 446–54 Klinefelter).

49. Peter J. Adonizio is deputy court administrator of Luzerne County. He has held that position since 2000. (N.T. 346 Adonizio).

50. On June 10, 2004, at about 1:30 p.m. he was in his office on the third floor of the Luzerne County Courthouse talking to the staff. (N.T. 348 Adonizio; N.T. 380 Hannon).

51. At that time Maureen Gushanas entered the office and announced to Adonizio in a loud voice that "Judge Lokuta wants to see you now." (N.T. 348 Adonizio; N.T. 381–82 Hannon).

52. Adonizio told Gushanas that he couldn't see her now and told Gushanas that if she would step out into the hallway he would tell her why. Gushanas did and Adonizio told her that his wife had recently had a breast removed due to cancer and that his wife's first post-operative appointment with her oncologist was scheduled in 15 minutes and he was going with her to the doctor. He told Gushanas that he would meet with Judge Lokuta when he got back. (N.T. 348–351 Adonizio; N.T. 410 Refowich).

53. Maureen Gushanas said in a loud voice "I'm not telling her that." (N.T.

352–53 Adonizio). Adonizio said "fine" and started toward the elevators. At that point Respondent appeared in front of courtroom 4 which Adonizio would have to pass on his way to the elevator. (N.T. 353–54 Adonizio). Respondent angrily demanded that Adonizio meet with her. (N.T. 410–411 Refowich; N.T. 449 Klinefelter). Adonizio asked Respondent if she would step into courtroom 7, which was nearby, he would explain that he couldn't meet with her right now because of his wife's doctor's appointment. (N.T. 354–55 Adonizio; N.T. 410 Refowich).

54. Adonizio did not want to discuss his wife's medical condition in the courthouse rotunda, a public space. (N.T. 356 Adonizio).

55. Respondent continued to demand that Adonizio meet with her immediately and loudly proclaimed her displeasure at Adonizio's failure to show her the respect she was due as a judge of the Court. (N.T. 410–11, 422, 424, Refowich; N.T. 2953 Lokuta).

56. Respondent then began running around, jumping around, with arms waving (N.T. 354, 356–57 Adonizio), screaming, "he is harassing me, get him away from me," or words to that effect. (N.T. 354–55 Adonizio; N.T. 382, 385, 401 Hannon; N.T. 408–11 Refowich).

57. This yelling and screaming attracted the attention of a number of other people, viz., Theresa Hannon, Harold Refowich, Michael Onderko, Judge Conahan and Michelle Klinefelter.

58. This yelling and screaming continued until the elevator doors opened on the third floor and Gushanas shouted "Clear the elevator!" and she and Respondent got on the elevator. (N.T. 355 Adonizio; N.T. 390–91 Hannon; N.T. 434 Onderko).

59. At no time during this episode did Adonizio shout or raise his voice or physi-cally threaten Maureen Gushanas or Respondent

60. At no time during this episode did Adonizio have any physical contact with Respondent or Gushanas. (N.T. 357 Adonizio; N.T. 387 Hannon; N.T. 411 Refowich; N.T. 434 Onderko; N.T. 449–50 Klinefelter).

61. After Maureen Gushanas and Respondent returned to chambers, Respondent wrote a letter to President Judge Conahan complaining of Adonizio's conduct which she variously described as "inappropriate," "unwarranted," "physically intimidating," "menacing and threatening," "intentionally confrontive," "physically menacing," "offensive and unacceptable" and "unbefitting a public employee." In the letter she also stated that "Mr. Adonizio's actions included publicly berating and screaming at Maureen Gushanas, and this Jurist." She demanded that the president judge take "appropriate disciplinary actions against Deputy Court Administrator Adozinio [Adonizio] for the protection of myself, my staff, other courthouse employees and visitors." (Board Exhibit 5). She sent copies of the letter to each of the Luzerne County Commissioners as well as to Zygmont Pines, "Pennsylvania Court Administrator." (Board Exhibit 5).

62. All of the allegations in Respondent's letter to the president judge were false, as was the testimony of Respondent and Gushanas relating to the Adonizio incident, (N.T. 2805–28, 2901–61 Lokuta; N.T. 2026–43 Gushanas) including the testimony of Respondent and Gushanas alleging that Adonizio had committed assault and battery on Gushanas causing bruises to her arm. (N.T. 2812–14, 2924–26 Lokuta; N.T. 2026–43 Gushanas).

63. Respondent introduced a photograph of Gushanas purportedly taken June 10, 2004 in Respondent's chambers shortly

after the Adonizio incident, purportedly showing bruises inflicted by Adonizio. (N.T.2044–46 Gushanas, Exhibit R–351; N.T. 2826, 2928–49 Lokuta, Exhibit R–351). She also introduced a photograph of her own arm purportedly showing a bruise acquired when she hit her elbow on the elevator or on the water cooler while trying to escape from Mr. Adonizio. (N.T. 2046 Gushanas; N.T, 2816–19, 2825–26, 2925, 3359–63 Lokuta).

64. Any bruises shown in Exhibit R–351 on the arms of Maureen Gushanas or Respondent were not caused during the Adonizio incident on June 10, 2004 and, most particularly, were not caused by any assault and battery by Mr. Adonizio on Maureen Gushanas.

### Discussion

 We have said before, most recently in *In re Whittaker*, 948 A.2d 279 (Pa.Ct. Jud.Disc.2008), that in determining what was said or done on any given occasion our most important consideration is the testimony of those who saw or heard what happened, and the credibility of those witnesses.

In this case seven witnesses testified as to what they saw and heard: five were presented by the Board (including deputy court administrator Adonizio, one of the participants in the incident), two were presented by Respondent (Respondent and Maureen Gushanas, both of whom were participants).

Two versions of this incident are presented and they are, in every respect, irreconcilable. Respondent's version seeks to convince us that it was Adonizio who was yelling and screaming, threatening and physically intimidating Respondent and Gushanas and who physically assaulted Gushanas causing bruising to her arm. On the other hand, Adonizio's version seeks to convince us that on that day, Respondent and Gushanas were yelling, shouting, screaming, out of control and causing a noisy commotion outside courtroom 4.

We find that it happened as Adonizio and Hannon and Refowich and Onderko and Klinefelter said it happened, and not the way Respondent and Gushanas said it happened. This finding is based on a number of things including the testimony of those who witnessed the proceedings which was as follows:

 Maureen Gushanas described the episode as follows:

Q. Do you recall an incident in June 2004 involving a Peter Adonizio?

A. Yes, I do.

Q. Can you tell the Court what happened?

. . . .

A. Judge and I went up to the third floor.

BY MR. SINATRA:

Q. Okay. And for what purpose?

A. To find P.J. Adonizio.

Q. Describe to the Court what happened.

A. Well, judge and I got off the elevator and we walked halfway down the hall and we ran into Ann Burns, who is one of the deputy court administrators.

And judge asked Ann Burns if she knew where P.J. Adonizio was, because we've been calling and no one got back to us, relevant to a meeting.

And Ann said, sure, judge, he's in court administration, which was right down the hall.

And judge had asked me to go get him. So I did.

And when I walked into court administration, his back was toward me. And I said to him, P.J.—and he

looked like this, and then he did another take—I said, judge would like to see you in chambers.

And at that point, he grabbed my arm—

Q. Who is the "he" who grabbed your arm?

A. P.J. Adonizio.

Q. How did he grab your arm?

A. Very hard. It was like a vice.

Q. Go ahead.

A. And he dragged me. I was walking, but he held on to me and was pulling me out of court administration, in the hall.

And he held on to my arm, and he put his finger in my face, and he said to me, I'm sick and tired of her sending you up here to get me. I can't meet with her today. My wife has a doctor's appointment. Where is she?

I said, P.J., please let go of my arm.

And he said, Where is she? Where is she? I'll tell her myself. There she is.

At which point he turned and he went, taking giant steps, charging to the judge and went after her. He was going so fast, I couldn't even keep up.

. . . .

Q. And what was the tone, manner and volume of this individual when he made those comments to you?

A. He was screaming. It was echoing throughout the rotunda.

. . . .

Q. And you described him walking in a purposeful way towards the judge.

And I'm going to ask you to be an actress again. And I guess I'm not quite 15 feet from you, but it will have to do. If you would, can you show the Court how Mr. Adonizio approached the judge that day? She was stand-

ing, as you said, some 15, 20 feet away from him. Would you show the Court exactly what happened?

A. He came after her like this.

Q. Okay. And you ended up practically knocking me over on my face.

Where did he end up?

A. The same place, knocking the judge over.

JUDGE SPRAGUE: You have to speak up.

A. (Continuing) The same place, just very close to the judge, almost knocking her over.

. . . .

Q. By the way, when Mr. Adonizio had a hold of your arm, as you said, in a vice-like grip, what, if anything, did you say to him?

A. Please let go of my arm.

Q. Did he eventually leave go of your arm?

A. Yes, when he turned to go find the judge.

Q. Now, can you tell the Court what happened next?

A. Well, he went to the judge. And he came very close to the judge. And he, like I said, said to her, I can't meet with you today. My wife has a doctor's appointment. She had a mastectomy.

But he was shouting. He was screaming at the top of his lungs. And he said to her, Come on. Come on. I want to go in Courtroom 7.

BY MR. SINATRA:

Q. What happened next?

A. Michelle Klinefelter, who is a deputy sheriff, came out of Courtroom Number 4. And she was adjusting her earpiece and she had a radio on her side that she was turning down,

I guess, and said, What's going on here?

And judge said, he's harassing me. And P.J. just kept screaming.

And I said, judge, let's just go.... (N.T.2026–40).

Respondent described the episode as follows:

Q. Can you tell this Court in your own words what happened with respect to Mr. Adonizio on June 10, 2004?

A. A situation arose involving two of my summer interns. These were two young women. And they were asked to go into a room with four men and they were interrogated as—

MR. PUSKAS: Objection. If he's asking about the incident with the deputy court administration, this isn't it.

MR. SINATRA: Well, in fact, it is. It's a background to what occurred.

JUDGE SPRAGUE: Overruled.

. . . .

A. (Continuing) I had a non-jury trial or a bench trial going on that day. There was confusion as to where the witnesses were and one of the attorneys.

I asked the two young women if they would go upstairs to the third floor and speak to the court administrator to see if, perhaps, they had told my witnesses to go to a different courtroom.

They came back. I was about ready to take the bench. I did not want to delay the proceedings. And the two women were noticeably shaken.

They said, Your Honor, we'd like to talk to you about something. One little girl—there were two of them. One was—her name was Ankner, and

the other was Butchko, Lisa Butchko and Amanda Ankner.

MR. SINATRA: That's A-n-k-n-e-r and B-u-t-c-h-k-o.

THE WITNESS: Yes.

BY MR. SINATRA:

Q. Go ahead.

JUDGE SPRAGUE: It's clear this is not being offered for the truth of what's being said, but just to understand what it is that you then did.

MR. SINATRA: That's correct. Your Honor.

A. They said, Your Honor, we're sorry we're running late, but we went upstairs and we were told that we had to go into a room. There were four men there. All the young girls or the young interns were brought into the room. There were no men there other than the four older gentlemen. And the girls told me that they were criticized as to how they were dressed.

I, at that point, asked them if they could just write their own recollection of what took place, because I didn't want to delay the trial, but I knew that I was responsible for these two individuals. And I was not aware and had not been given notice of any type of meeting with anyone.

After the trial was concluded, and it was a rather brief trial, it was rapidly concluded, I sat down with them. And they described to me who these four individuals—who when they thought they were. And by description, and by name, I found out that one was Mr. McGarry (ph) and one was Mr. P.J. Adonizio. Mr. McGarry is a court administrator, but he works for probation services. Mr. Adonizio is a deputy court administrator.

I allowed the girls to go to lunch. And I—because of the personal nature of this and because of the sensitive nature of it, I personally made calls, trying to find out what, if anything, had taken place, because I was not told that there was any type of meeting. I knew that I was responsible for the well-being of these two individuals.

JUDGE SPRAGUE: Judge Lokuta, we do not need a whole speech.

THE WITNESS: Okay.

JUDGE SPRAGUE: This was offered just to have a little understanding as to the background, because the question was really what happened between you and Mr. Adonizio. I'd ask you to answer that question.

THE WITNESS: Yes, Your Honor.

A. (Continuing) My calls were not being returned. I waited till approximately 1:20 and went upstairs on the elevator with Maureen Gushanas, because by identification, by description—

. . . .

BY MR. SINATRA:

Q. I'd like you to take the Court through what happened. Right now, we're back in June 2004 and we are riding up the elevator. And I want you to take this Court through what happened.

A. Maureen Gushanas and I went off the elevator. There were very few people around. It was a national day of mourning because President Reagan was lying in state.

I looked and I saw that Ann Burns, who is another deputy court administrator, was down the hall. I went over to Mrs. Burns and I said, Ann, do you know where P.J. Adonizio is?

And she said, yes, I think he's in court administration.

I asked Maureen Gushanas, I said, Maureen, could you please go and ask P.J. to meet me downstairs, I'd like to speak to him.

. . . .

Q. ... And I'd ask you to describe to the Court where you went and what happened.

A. I spoke to Ann Burns initially. We exchanged pleasantries. . . .

Q. What happened next?

. . . .

A. (Continuing) I turned in the direction of the sound. And I saw Maureen Gushanas and P.J. Adonizio.

. . . .

Q. What happened next?

A. I heard P.J. Adonizio say, I'll tell her myself. I'm sick and tired of her sending you for her to meet with me, or words to that effect.

. . . .

Q. What was the tone, manner and volume of Mr. Adonizio?

A. The tone was loud, boisterous. The manner the angry.

Q. What happened next?

A. I looked. I saw that P.J. Adonizio had Maureen's left arm with his left hand. His right hand was pointing in her face, within inches of her nose.

I heard Maureen say, P.J., take your hand off me. Don't touch my arm.

Q. Okay.

A. At that point, he said, there she is. And he started marching toward me.

Q. When you say, "marching," can you be an actress and show the Court what happened?

THE WITNESS: May I step down, Your Honor?

JUDGE SPRAGUE: Sure.

A. I was standing in the foreground here. He started moving toward me in a deliberate stomp or march.

BY MR. SINATRA:

Q. Okay.

A. He got within inches of me.

Q. Okay.

A. And I said, P.J., do we have a problem? I was scared. And that was my way of diffusing what I thought was an explosive situation.

Q. I would like you to show the Court, also, while you're here, you said that he had her by the arm and he had his finger in her face. Would you show the Court exactly what you recall seeing?

A. Yes (demonstrating).

Q. Okay.

A. He was much closer. He was like this.

Q. Okay.

A. And he's bigger, too.

Q. Okay. You can return.

A. (Witness returns to the stand.)

Q. So literally within about an inch of her nose—

A. Yes.

Q. —with his finger, and his body was very close to her as well?

A. His body was moving into her. And then at one point, he broke away when he saw me and he started charging and marching toward me. Maureen was behind. She couldn't keep up with him. And I was terribly frightened.

Q. What happened next? Now he's in front of you. And you say to him, is there a problem in an effort to diffuse the situation. What happened?

A. He started screaming at me. He said, yeah. Yeah, I have a problem. I have a problem. My wife just had a mastec—and then he stopped. She had a mastectomy. And I can't remember exactly, because at this point I was just terribly frightened.

He said, yeah. Yeah. He said, I'm sick and tired of this, to me. And I said, P.J., don't speak to me in that fashion.

Q. What were you trying to do?

A. I was trying to not inflame him. He was totally enraged. And I was just trying to do anything that I could so that he wouldn't lash out any further at me.

. . . .

. . . At one point, all of a sudden, he stopped. And a deputy sheriff appeared. She came out of the courtroom. Most of the situation had already taken place by the time the deputy sheriff arrived. She had a hearing device, I guess a radio, and she was adjusting it and taking it out.

And she said, what's going on here? And I said, P.J. is harassing me.

Q. Did you know this deputy sheriff?

A. I knew her by sight, but not by name.

Q. Do you know her now as Deputy Sheriff Klinefelter?

A. Klinefelter, yes. (N.T. 2805–18).

In conspicuous contrast, Theresa Hannon testified that after the phone call from Maureen Gushanas inquiring about P.J. Adonizio's whereabouts, she went down or across the hall to court administration and told Adonizio that Respondent was looking for him and then:

A. ... I stood in Court Administration. I was talking to one of the girls in there. And as he was leaving the office, Maureen Gushanas was coming in the doorway looking for him.

I overheard her say that Judge Lokuta wanted to see him right now. And he said if you come out here, I don't have the time right now, and I will tell you why.

Q. Let me ask you: What was Maureen Gushanas's tone to Mr. Adonizio?

A. Very loud.

MR. SINATRA: I object.

JUDGE SPRAGUE: Overruled.

A. It was very loud.

BY MR. PUSKAS:

Q. Can you give the Court an example of how she said that to the best of your recollection?

A. PJ, Judge wants to see you immediately. And Mr. Adonizio said I don't have time right now, and I will explain to you why I don't.

Q. What was his manner towards Gushanas?

MR. SINATRA: I want the record to reflect while the tone of voice may have been fairly insistent, that certainly was not loud. We have heard counsel louder in this courtroom.

JUDGE SPRAGUE: It was emphatic and certainly above the normal level of speaking. The question was what was Mr. Adonizio's manner.

BY MR. PUSKAS:

Q. What was Mr. Adonizio's manner toward Maureen Gushanas?

A. He just said in a normal tone if you would step outside, I will explain why I cannot see the Judge right now.

Q. And approximately how close was he to Maureen Gushanas?

A. They were maybe two feet apart.

Q. Did he ever touch her?

A. Not to my knowledge. I didn't see him lay a hand on her.

Q. What happened next?

A. All of a sudden, I heard this ungodly outburst, and I thought it was a defendant or a victim screaming he's harassing me, he's harassing me, get him away from me.

Q. Where were you at that time?

A. I was standing in the Court Administration. I was coming out of the door proceeding to go back to my office.

. . . .

Q. All right. So when you observed Maureen Gushanas and Mr. Adonizio, you were on the outside looking in?

A. I was on the outside looking out. I was standing right in the doorway looking at them.

Q. When they left, where did they proceed?

A. They proceeded to go around the corner. And when they got around the corner, that is when I heard this ungodly screaming.

. . . .

Q. Were you paying attention to them the whole time they walked away because you mentioned you heard something?

A. Yes, I was.

Q. Please continue with your testimony.

A. I heard this ungodly screaming of somebody saying he's harassing me, he's harassing me, get him away from me. And when I proceeded to come, I did a dead stop because I

saw that it was Judge Lokuta who was saying that.

Q. And how did she appear to you?

A. Very irrational. She was like screaming and turning and—

. . . .

Q. Please describe what you observed.

A. When I was walking proceeding towards my office, I had seen that it was Judge Lokuta, that she was the person who was screaming. And I saw her pacing around, like going around and just throwing her hands up. He's harassing me.

Q. What was Mr. Adonizio doing?

A. He just said Judge, if you step in here, I will explain to you why I can't see you.

Q. What was her response?

A. Get away from me. Get away from me.

Q. Approximately how far apart were they at the time this was going on?

A. Maybe ten feet.

Q. And their location would have been?

A. Right by courtroom four.

Q. Did you observe any other individuals in the area?

A. There was one of our Sheriffs.

. . . .

Q. The Sheriff that you mentioned, where did you see the Sheriff come from?

A. She came out of courtroom number four.

Q. Did you know who the sheriff was?

A. I knew her by her first name Michelle.

Q. What did you observe at that time?

A. She just said to keep it down.

Q. What happened next?

A. I just proceed towards my office. I turned around and went around the other way to my office.

Q. Did you ever see Mr. Adonizio lay a hand on Judge Lokuta?

A. No, I did not.

Q. Did you ever see him lay a hand on Maureen Gushanas?

A. No, I did not. (N.T. 381–87).

Harold Refowich testified that he was working in his office on the third floor of the courthouse when:

A. I heard some loud noises in the hallway. I heard female voices talking very—yelling very loudly. And as a natural reaction, I stepped out of the office to see what was happening.

Q. When you stepped out, what did you observe?

A. I saw Judge Lokuta and her tipstaff Maureen coming down the hallway, and I saw Peter J. Adonizio walking towards the elevator.

. . . .

Q. You testified that you heard yelling. Who was yelling?

A. It was either Judge Lokuta or her tipstaff. I couldn't distinguish between the two voices because I don't know either one of them well enough to distinguish.

Q. What interaction did you observe between Judge Lokuta and Mr. Adonizio?

. . . .

JUDGE SPRAGUE: You can ask the question and move on. Sir, you hear these noises and you went out to see what was what; correct?

A. That's correct.

JUDGE SPRAGUE: Go on from there and tell us exactly what you

observed, what you heard and what was going on.

A. I observed the Judge—Judge Lokuta that would be—demanding that Mr. Adonizio meet with her. And Mr. Adonizio's response was that he had a very important appointment to take his wife to, and that he had to leave the building, and it was very important. It was a medical appointment, and that he couldn't meet with her at that time. But he would gladly meet with her at another time and place of her choosing. It just couldn't be at that particular time.

BY MR. PUSKAS:

Q. What was Mr. Adonizio's manner in talking to Judge Lokuta?

A. His manner was I would say frustrated and kind of almost defensive that I need to get out of here. This is very important. I need to take my wife to the doctor.

Q. And what about Judge Lokuta?

A. Judge Lokuta seemed to be angry, upset and almost offended that he would not—I think I heard something to the effect that she be shown the respect that was due a Judge of the Court, and he wasn't showing her that respect by walking away from her and getting on the elevator and leave.

. . . .

Q. Did you observe Mr. Adonizio make any physical contact with Judge Lokuta?

A. No, sir.

Q. Did you observe him make any physical contact with Maureen Gushanas?

A. No, sir. (N.T. 408–12).

Michael Onderko testified that when he got off the elevator on the third floor that day he encountered Mr. Adonizio and Maureen Gushanas and that:

A. Mr. Adonizio was trying to ask Maureen to step out of the hearing distance so that he could tell her something. And she was refusing to go anywhere—to move at that point.

And I heard something said from Mr. Adonizio about his wife. And then I heard a statement made that you are harassing me.

Q. Who made that statement?

A. Maureen Gushanas.

Q. To Mr. Adonizio?

A. To Mr. Adonizio.

Q. What was her tone and manner when she said that?

A. It was in a loud voice.

Q. What happened after that?

A. At that point if I remember right, Mr. Adonizio turned towards the elevator and maybe took like one step towards it. And he either seen over his shoulder or the way he was standing toward the elevator that Judge Lokuta was coming from his left, which would be coming from courtroom four towards him.

. . . .

Q. . . . And what did you observe then?

A. The Judge was moving forward in that direction. I heard she was loud in whatever she was saying. I did not catch the first words.

And then when she come up past the next light as she was walking in that direction, the courtroom door opened, a sheriff come out and yelled to hold the noise—to hold the noise down.

Q. What was Mr. Adonizio doing?

A. Just standing there when he stepped forward from the elevator

close to the same area I first seen him at.

. . . .

Q. What happened next?

A. As the Judge was coming forward towards Mr. Adonizio and myself and Maureen Gushanas, the Sheriff was right behind her. And I heard her state he's harassing me to the Sheriff. And that was as they were coming forward. . . .

. . . .

Q. What did you observe about Mr. Adonizio's manner or tone towards Judge Lokuta or Maureen Gushanas?

A. Mr. Adonizio seemed like he just wanted to leave, and he was normal voice speaking.

. . . .

A. And the Judge was loud at that point yet. And I know Maureen yelled clear the elevator. Like I said, I was surprised that Judge Mundy was on the elevator getting off at that point.

BY MR. PUSKAS:

Q. Did you ever see Mr. Adonizio make physical contact with Judge Lokuta?

A. No.

Q. Did you see him make physical contact with Maureen Gushanas?

A. No. (N.T. 429–34).

Michelle Klinefelter, dispatched by Judge Conahan to deal with the disturbance outside his courtroom,[19] testified:

Q. I would like to draw your attention to June 10, 2004. Did you observe an incident between Peter Adonizio and Judge Lokuta?

A. Yes, I did.

Q. Do you recall that incident?

A. Yes.

Q. Could you please tell the Court where you were at that time?

A. I was in courtroom number four as a Deputy for Judge Conahan.

Q. Were there proceedings going on at that time?

A. Yes, there was.

Q. And proceed. What happened?

A. As I was standing in the courtroom, Judge Conahan advised me to go outside and see what was going on because there was a female outside the courtroom shouting. And he said will you please tell them to keep it down? I'm trying to conduct court.

Q. Did you hear anything while you were in the courtroom?

A. Just a female shouting. That is it.

. . . .

Q. And what did you do?

A. I went outside the courtroom doors. And as I opened the courtroom doors, I went to tell them to keep it down because Judge Conahan was trying to conduct court. And that is when I was aware of who it was.

Q. And who was it?

A. It was Judge Lokuta and P.J. Adonizio.

Q. What did you observe happening when you came out?

A. I just observed she was yelling at him, and he was trying to tell her something.

Q. Could you please—specifically, what was she yelling at him?

---

19. Judge Conahan testified he was holding criminal court in courtroom 4 and heard a "loud ruckus" going on outside in the hallway and sent one of the deputies to investigate it. (N.T. 455–56).

A. She was shouting towards me he's harassing me. Get him away from me. And then I don't know what the dispute was prior to me coming out of the courtroom. I don't know.

Q. What was Mr. Adonizio doing?

A. He was like standing in front of the courtroom along with her. He was saying to her can't you just listen to me? Can't you just listen to me? I can't stay. I can't stay.

Q. And did you observe—what did you observe about Mr. Adonizio's demeanor and manner?

A. He seemed like he had tears in his eyes or something. Like he was upset.

Q. And what did you observe about Judge Lokuta's demeanor and manner?

A. She just seemed angry about something. I don't know what the situation was about then.

. . . .

Q. Did you observe Mr. Adonizio make any physical contact with Judge Lokuta?

A. No.

Q. Did you observe Mr. Adonizio make any contact with anybody else in that corridor?

A. No. (N.T. 447–50).

P.J. Adonizio testified that:

Q. Mr. Adonizio, I would like to draw your attention to June 10, 2004. Do you recall this date?

A. Yes.

Q. Where were you at that time?

A. I was in the Courthouse. I was in the Court Administrator's office. This particular time frame, it was about 1:30 in the afternoon.

Q. And on this particular date, did something unusual happen at the Courthouse?

A. Yes.

Q. Involving Judge Lokuta?

A. Yes.

Q. All right. What happened first? You were in your office.

. . . .

A. On the third floor of the courthouse. I was standing there talking to the staff. And Judge Lokuta's tipstaff Maureen Gushanas came in. It's an open doorway. It is a hallway.

She came in and said Judge Lokuta wants to see you now. And I turned to her and said I can't do that. And I said if you will step out here, Maureen, I will explain to you why.

. . . .

A. We stepped out into the hall near the podium, and I told her I said Maureen, my wife had her breast removed due to cancer. Today was my first oncology appointment. And I was to meet my wife in the oncologist's parking lot in the next ten or fifteen minutes.

I will meet Judge Lokuta when I get back, but I have to go to this appointment with my wife.

. . . .

Q. ... What happened next?

A. With Maureen you are asking me? She said I'm not telling her that.

Q. What was her—are you giving an example?

A. Yes, I am.

MR. PUSKAS: Let the record reflect that Mr. Adonizio is talking very loud.

MR. SINATRA: I am going to object to the characterization.

JUDGE SPRAGUE: Counsel, I think it was a fair characterization. Continue on.

. . . .

BY MR. PUSKAS:

Q. Mr. Adonizio, continue.

A. I'm not telling her that. I said fine. And I started to go this way to my right, which would be in front of this podium coming this way.

JUDGE SPRAGUE: When you say coming this way, you mean the direction of the elevator?

A. Your Honor, it bends around, yes, towards the elevator . . . .

. . . .

Q. Please continue.

A. At that point, Judge Lokuta appeared.

Q. What direction did she come from?

A. This way down the hallway.

Q. Is that depicted in any of the exhibits?

A. Yes . . . . She was right in front of courtroom four, which would be right there. In between the two big light pillars, that is courtroom four.

. . . .

Q. Please continue.

A. At that point I said, Judge, if you will step into courtroom seven, I will explain to you why I can't meet with you right now.

Q. And what did Judge Lokuta do?

A. Don't talk to me that way. I said Judge, and she started to run around here in a circle within the proximity of where I said I first came in contact with her. He is harassing me. Get him away from me,

MR. PUSKAS: Let the record reflect that Mr. Adonizio is yelling very loudly.

A. I moved closer to her. I said Judge, please let me explain. And I wanted to tell her why I couldn't meet with her at that point. In her rambling, he's harassing me. Get him away from me. You owe me an apology for talking to me that way.

I stood there in disbelief that, first of all—

MR. SINATRA: I am going to object to the witness's editorialization.

JUDGE SPRAGUE: Overruled. Continue.

Q. At that point, Sheriff Klinefelter came out of courtroom four. Keep it down. She was sent out—I find out later—from Judge Conahan who was on the Bench.

MR. SINATRA: I am going to object to what he found out later.

JUDGE SPRAGUE: Just relate what you observed and what happened.

A. She came out and said keep it down here when she realized it was Judge Lokuta and myself standing there. Judge Lokuta and Maureen Gushanas at this point moved over to the elevators. And Maureen Gushanas yells clear the elevators in that same boisterous voice.

. . . .

Q. And Mr. Adonizio, approximately what was the distance between you and Judge Lokuta during that encounter?

A. She was jumping around. When we first encountered each other, it was about 15 feet. And then I moved closer, but she kept running around.

Q. When you say running around, exactly what was—if you can even demonstrate, what was she doing?

A. He's harassing me. He's harassing me. And I'm standing there like

this: Your Honor, just let me explain why I can't meet with you right now.

Q. Thank you, Mr. Adonizio.

MR. PUSKAS: Let the record reflect Mr. Adonizio left the witness stand and was jumping erratically.

MR. SINATRA: I am going to object to the characterization and editorialization. He did what he did. He ran around. It is obvious she was trying to avoid him. I object to the characterization and ask that it be stricken.

JUDGE SPRAGUE: The Court will describe it as jumping around. Go ahead.

MR. PUSKAS: Thank you.

JUDGE SPRAGUE: With arms waving.

MR. PUSKAS: Thank you, Your Honor.

BY MR. PUSKAS:

Q. Did you ever make physical contact with Judge Lokuta?

A. No.

Q. Did you every make physical contact with Maureen Gushanas?

A. No.

Q. While Judge Lokuta was running around, you were doing what?

A. Just standing there like this with open—Judge, just let me explain. That is all I could get out because she was screaming.

Q. And what did you do after this incident, immediately after it? You said the Deputy Sheriff came out and asked everybody to be quiet?

A. Judge Lokuta and Maureen went over. Maureen yelled to clear the elevators. They left, and I was standing there.

Shortly thereafter, I got on the elevator and went down, got in my car and went to the appointment with my wife. (N.T. 347–58).

Our decision to accept Adonizio's version and to reject Respondent's version was an easy decision to make for at least the following reasons:

1. P.J. Adonizio, Theresa Hannon, Harold Refowich, Michael Onderko and Michelle Klinefelter are credible witnesses who tell a credible story. In contrast Respondent and Gushanas are not credible nor is the story they tell. More than that, Hannon, Refowich, Onderko and Klinefelter were observers of—and, as opposed to Respondent and Gushanas, not participants in—the incident, and, they—as opposed to Respondent and Gushanas—have no personal stake in what we decide.[20] There is absolutely no reason for us to find their testimony was anything but truthful.

2. We find it highly improbable that Mr. Adonizio, a deputy court administrator, would "physically menace" a judge; that he would yell and scream at her "at the top of his lungs," so loudly that "it was echoing throughout the rotunda"; that he would physically commit assault and battery on the judge's tipstaff[21] by "grabbing" her by the left wrist with his left hand and holding it "like a vice" at the same time pointing his right hand in her face "within inches of her nose,"[22] and "dragging" her out of court administration into the hallway.[23]

---

20. Respondent disputes this and we will treat this *infra.*

21. And in the presence of the judge—not to mention several other witnesses.

22. The improbability of this maneuver will become quickly apparent to anyone who tries to perform it.

23. Maureen Gushanas is a very large woman. She appears young and healthy. She would

On the other hand, the story told by Adonizio and the other witnesses is not improbable. To be sure, the behavior of Respondent which they describe is bizarre, to say the least; however, Respondent was an inveterate hater of court administration and anyone connected with it.[24] She was ever on the lookout for any excuse to document another "grievance" (or what she perceived as such). Furthermore, she was well known to be quick to anger at any sign that she was not being accorded the full measure of respect as she judged she was due.[25] One thing not disputed in all the descriptions of the action on the third floor is that Adonizio wasn't doing what Respondent was demanding he do. He was saying he would do it later. If Respondent was going to act in character, if she was going to act as she always did when she perceived disrespect, she was going to get angry.

3. We believe the testimony of Respondent and Gushanas that Adonizio committed the crime of assault and battery on Gushanas is false for another reason which we find particularly telling.

That reason is: in the letter Respondent immediately wrote to Judge Conahan reporting the incident, assault and battery is not mentioned. In that letter Respondent described Adonizio's misbehavior in 10 different ways—all designed to persuade the president judge to take "disciplinary actions" against him. We have no doubt that if Mr. Adonizio had assaulted and battered Maureen Gushanas that would have been in the letter. Respondent was alert and industrious to identify, document and report perceived transgressions by court administration personnel—if an actual transgression had occurred, especially an assault and battery, there is no doubt it would have been reported.[26]

When confronted with this on cross-examination, Respondent had difficulty dealing with it. We illustrate:

Q. Let's take a look at your letter here. It's not very long. . . .

Now, if we stop at that first sentence, Judge Lokuta, you described his conduct, the deputy court administrator, as unwarranted and physically intimidating actions, correct?

A. Yes.

Q. You don't say anything about him actually physically acting out on anyone in the sentence, do you?

A. No.

Q. All right. Let's go to the next sentence.

 . . . .

Now, in that second sentence, here again, you describe Mr. Adonizio's conduct, "by engaging in menacing and threatening actions."

Do you agree with me that that says nothing about him actually physically acting out on either you or your then-tipstaff, Maureen Gushanas?

A. Well, I think, in total, that's what it's connoting.

Q. Well, I'm asking you about this sentence, Judge, "engaging in menacing and threatening actions."

be very difficult to "drag," especially if she wasn't cooperating.

24. She never denied this. As a matter of fact, she proclaimed it. (See Board Exhibits 7–12).

25. This record is full of testimony about this. She even was reported as being offended and

very angry if she was called "Judge." That wasn't good enough. It had to be "Your Honor." (N.T. 1258 Sammon; N.T. 1328–29 Youngclaus).

26. Not only was it not reported in the letter to Judge Conahan, it was never "reported."

You would agree with me that that does not connote physically acting out on somebody?

A. That sentence alone may not connote that.

Q. Okay.

A. Read in its entirety—

Q. Thank you, Judge.

JUDGE SPRAGUE: Come on, Judge Lokuta. I have already instructed you to answer. This is cross-examination. It is appropriate to answer the question.

Counsel has been very specific. He's going through this letter sentence by sentence. You can deal—your counsel can—with the entirety of it as you want.

But answer the question, which is taking the second sentence. Does the second sentence specifically say there was a physical assault in the sense of touching?

THE WITNESS: No, it does not.

MR. PUSKAS: Thank you, Your Honor.

BY MR. PUSKAS:

Q. Let's go to the third sentence, Your Honor. It says, "Mr. Adonizio's actions included publicly berating and screaming at Ms. Gushanas, and this jurist."

Again, Judge Lokuta, you would agree with me that that sentence says nothing about Mr. Adonizio physically acting out on either you or Maureen Gushanas?

A. Correct.

Q. All right. Let's go to the next sentence. "His behavior, which was both intentionally confrontive and physically menacing, amounted to behavior unbefitting to a public em-

ployee, and I find it to be offensive and unacceptable."

You would agree with me that that sentence says nothing about Mr. Adonizio physically acting out on either you or Maureen Gushasnas?

A. It talks about physically menacing. So I guess one could define it in that way.

Q. Judge Lokuta, this says, "intentionally confrontive and physically menacing."

A. Intentionally physically menacing could be read in that context, is what I'm trying to say.

Q. So you believe menacing means that somebody actually physically touched someone?

A. I believe intentionally physically menacing may amount to that. And I am measured in my response in this letter. I'm trying to be as professional and as measured in this. Because it was still my hope that some of these matters could have been resolved.[27]

JUDGE SPRAGUE: Just so we are clear, Judge Lokuta, you're saying, in response to the question, that the language here, "physically menacing," it is your position that that includes the battery to which you have testified to on both you and your assistant?

THE WITNESS: Yes.

. . . .

Q. My question, Judge Lokuta, is, you have testified in these proceedings that you take pride in your scholarship. You testified about your background, your education, your work in Sheffield, England, teaching constitutional law.

27. See n. 30.

And my question is, you know how to use vocabulary and words to accurately describe something, do you not?

A. Yes. But this letter was drafted immediately in the time frame of having been confronted in this violent way. I was still nervous and shaken up. Perhaps my words were not coming to me in the way they should have. (N.T. 2933–39).

For this additional reason—absence from Respondent's letter of any mention of assault and battery—we find that no assault and battery occurred during the farcetta on the third floor of the courthouse on June 10, 2004 and, therefore, the testimony of Maureen Gushanas and Respondent that it did, is false.

4. At the trial, Respondent provided photographs of herself and of Maureen Gushanas allegedly showing bruises on their left arms. (Exhibit R–351). Their testimony was that the bruises on Maureen Gushanas's arm were caused by the assault and battery performed on her by P.J. Adonizio, and that the bruise on Respondent's arm was caused when she banged her arm on the elevator or water cooler when she was escaping from Mr. Adonizio. Gushanas testified that the photographs were taken "almost immediately" after the Adonizio incident (N.T.2045); but Respondent testified they were not taken until after she "drafted" the letter to Judge Conahan reporting the incident (Board Exhibit 5) (N.T. 2944). This is Respondent's explanation of why the photographs—admittedly taken for the sole purpose of documenting the injuries to Maureen Gushanas and Respondent—were

not included in the letter to Judge Conahan: for if they were taken before the letter and not included in the letter, that would make the testimony of Respondent and Gushanas on the point even more difficult to credit. It is improbable enough that Judge Lokuta, trying to convince her president judge that her tipstaff had been battered, would write a letter reporting the event, and make no mention of it. But it is even more improbable that if Judge Lokuta had photographic proof of the injuries, that she would not have sent the proof to Judge Conahan. In any event, even if the pictures weren't taken until after the letter went out of the office,[28] according to Respondent and Gushanas, they existed immediately after it went out but they were never sent to Judge Conahan. (N.T. 2944). According to Respondent they certainly existed when Respondent received Judge Conahan's letter of June 21, 2004 in which he tells her that he doesn't believe her, that investigation had found that P.J. Adonizio had done nothing wrong and that Maureen Gushanas had. It is difficult for us to believe that if Judge Lokuta, having just been told she was a liar, was holding photographic evidence of physical injuries to Maureen Gushanas and herself, that she would not have immediately brought that evidence to Judge Conahan.

The claim that the photographs were taken as described by Respondent and her tipstaff is further weakened by the fact the Respondent never mentioned their existence until August 25, 2006 during her deposition and were not produced to the Board until sometime after that. (N.T. 2947–48, 3359–60).[29]

---

**28.** The testimony doesn't tell us when the letter went out of the office. Respondent says the photos were taken after she "drafted" the letter. In normal course, after a letter is drafted, it is typed, reviewed, addressed, and a decision made as to how it should be delivered. How was it delivered? By post? By hand? By fax? It is not at all clear that the photographs were not in hand before the letter went out the door.

**29.** Respondent's failure to produce these photographs—taken to document, and offered to

The question of whose idea it was to take the photographs came up during the trial. Respondent's responses to questions on the point put to her by the Court were evasive and self-contradictory.

JUDGE SPRAGUE: How was the decision made—the circumstances, I don't think there's been any testimony—how did it come about to take photographs?

THE WITNESS: I think that was almost an afterthought.

The initial decision made by me, as the judge that witnessed this, was to try to reach out to the president judge.

And knowing if, indeed, Mr. Adonizio had some type of problem with cancer, having gone through that myself, I know people are emotional.

So the initial contact by me to Judge Conahan was to see if we could mediate this, to see if we could coexist. There was no intention to file an assault charge by me. The idea was to reach out.[30]

JUDGE SPRAGUE: Judge Lokuta—

THE WITNESS: Yes.

JUDGE SPRAGUE:—I'm pretty aware of that testimony by now. My question is quite simple.

How did the decision to take photographs occur? And give me that sequence, if you will.

THE WITNESS: Sure. After the time of the conversation with Judge Conahan and after the time that this letter was written, I think it was determined that Maureen Gushanas' bruises were really coming to light. And I looked down at that point and discovered that I had one on my left arm as well.

So it was just a matter of putting—taking the camera. We already had the camera there, because we had taken pictures of those two interns. And the pictures weren't even developed until much later anyway.

So it was just done after the time that Judge Conahan sort of indicated to me that the situation, as I witnessed it, was totally different than the one he did.

JUDGE SPRAGUE: Whose idea was it to take the photographs?

THE WITNESS: I think Maureen Gushanas was the first one to have her photograph taken. And then later on, I did.

JUDGE SPRAGUE: That's not my question. Whose idea was it to take the photographs?

THE WITNESS: I think it was Maureen Gushanas'. And I believe the then-secretary took that.

JUDGE SPRAGUE: I'm not asking who took the photographs.

My question is, very simply, whose idea was it to take the photographs?

THE WITNESS: It was my idea to take the photographs.

---

prove, injuries sustained at the hands of Mr. Adonizio on June 10, 2004—for more than two years—and then only because they were accidentally mentioned in her deposition—leads us to seriously doubt that they were taken on June 10, 2004 "almost immediately" after the incident, as Respondent has asserted. Also inconsistent with Respondent's admitted reason for taking the pictures is Respondent's testimony that "the pictures weren't even developed until much later anyway." (N.T. 3362).

30. If Judge Lokuta regards her letter to Judge Conahan, in which she demands that Judge Conahan take "appropriate disciplinary actions against [Adonizio] for the protection of myself, my staff, other courthouse employees and visitors," as an offer to "mediate," as a plea to "coexist," as "reach[ing] out to the president judge," Mr. Adonizio is lucky she wasn't angry.

JUDGE SPRAGUE: That's all I've asked you. Thank you. (N.T. 3360–63 Lokuta).

So, Respondent said it was her idea to take the photographs. But she also said that she had "nothing to do with it." We refer to N.T. 2948 where Board counsel, examining Respondent, was reading from Respondent's deposition:

Here is the question: "Was there was an investigation?"

Your answer: "I don't know that there was an investigation. I'm told that there was an investigation, but I was never questioned. I was witness to this. It was not only directed at Maureen Gushanas, but also at me."

"I know that there are pictures showing bruising of Maureen Gushanas that was taken by the secretary, *and I had nothing to do with that in terms of directing it.*" (Emphasis added).

With this testimony, Respondent's credibility suffers further—and not just on the subject of the photographs.

5. As we have said, we find that Theresa Hannon, Harold Refowich, Michael Onderko and Michelle Klinefelter [31] to be credible witnesses and have no trouble finding their testimony to be truthful.

The most conspicuous thing about their testimony is that it contradicts the testimony of Respondent and Maureen Gushanas in almost every particular. This was brought to Maureen Gushanas's and to Respondent's attention during the trial and they were invited to explain it. Gushanas explained it as follows:

Q. So if Deputy Sheriff Klinefelter testified that it was Judge Lokuta who was screaming, is she lying?

A. Yes, she would be, because it was only P.J. who was screaming.

Q. And what if Michael Onderko, if he's testifying that it was Judge Lokuta who was screaming, and he didn't see Mr. Adonizio place any hands on anyone, is he lying, too?

A. Yes, he is.

. . . .

Q. Now, if Mr. Refowich testified before this panel and told them that it was Judge Lokuta who was screaming and that he saw no physical contact between Mr. Adonizio and Judge Lokuta or anyone else, is he lying, too?

A. Yes. Yes, he is.

Q. And Theresa Hannon, what is her position in the courthouse?

A. She is Judge Augello's secretary.

Q. So if Theresa Hannon testified before this panel and told them that it was Judge Lokuta who was screaming and that no physical contact was made by Mr. Adonizio with either you or Judge Lokuta, is she lying, too?

A. Yes, she is.

Q. Judge Conahan, do you know who Judge Conahan is?

A. Yes, I do.

Q. And if he were testifying before this panel, which he did, and said that he heard a female screaming, not a male, is he lying, too?

---

31. There is a feature of Klinefelter's testimony, not present in the testimony of the other Board witnesses, which makes her testimony on the question of who was shouting outside of courtroom 4 even more probative. She testified that when she was in courtroom 4— *before* she came out into the rotunda—she heard *"a female* shouting"; that Judge Conahan had sent her outside to see what was going on "because there was *a female* outside the courtroom shouting." Thus, before she knew who it was, she knew it was *a female.* Thus does she exclude Adonizio as the shouter.

A. Yes.

Q. So all of those people are lying to this panel?

A. Yes.

Q. Why are they all lying?

A. Counselor, I don't know. You'd have to ask them. (N.T. 2113–16).

Respondent explained it as follows:

BY MR. PUSKAS:

Q. And, Judge Lokuta, you listened to Maureen Gushanas' testimony during these proceedings, correct?

A. Yes.

Q. Do you agree with her testimony?

A. Well, I haven't committed it to memory, Counselor. So what is it that you would like me to respond to?

Q. Do you agree with her testimony that Board witnesses to the incident came before this panel and provided false testimony about this incident?

A. Yes, I do.

Q. So when Theresa Hannon, Judge Augello's executive secretary, testified that Maureen Gushanas was very loud, was she providing false testimony to this panel?

A. I believe she was.

Q. And when Theresa Hannon testified that you engaged in, quote, unquote, ungodly screaming, was she also providing false testimony to this panel?

A. Yes, I believe she was.

Q. And when she testified that Mr. Adonizio never laid a hand on you or Maureen Gushanas, was she providing false testimony?

A. Yes, I believe she was.

Q. And when you heard Maureen Gushanas testify regarding Harold Refowich, who worked in the jury boardroom at the time, that he heard female voices yelling, was he also providing false testimony to this panel?

A. Yes. I didn't even see Harold Refowich there.

. . . .

Q. Was Mr. Refowich providing false testimony to this panel when he said that you were angry and upset?

A. Yes. I didn't see Mr. Refowich there. And I think I said that in my deposition.

Q. Was he providing false testimony when he said that Mr. Adonizio made no physical contact with you or Maureen Gushanas?

A. Yes. And I think each of these people that testified said everything differently. One wasn't consistent with the other. And if you look at the testimony, you'll see that.

Q. Judge Lokuta, was he also providing false testimony to this panel when he described your actions as intimidation?

A. Most definitely.

. . . .

Q. Now, when you heard Deputy Sheriff Michelle Klinefelter testify that she heard, quote, females shouting outside Courtroom No. 4, was she providing false testimony to this panel?

A. She might have heard that. That's what she heard. She wasn't there when this event even took place. She was in the courtroom. (N.T. 2954–60).

The Court inquired about this explanation:

JUDGE SPRAGUE: Well, I must ask this question, Judge Lokuta: Perjury, lying under oath, as we all know, is a very, very serious matter.

And I think the question that Mr. Puskas is asking, is it your view of the witnesses that he's so far specified to you, recognizing the seriousness of the crime of perjury, giving false testimony, nonetheless for some reasons, I'll leave it at that, have come in here and have committed such crimes?

THE WITNESS: I believe they have come in here and not testified in a truthful fashion.... (N.T. 2980–81).

Given the circumstances, we allow that there was little else that Respondent and Gushanas could say; but their suggestion that these witnesses individually made up their minds to commit perjury [32] is certainly adventurous but there is absolutely no evidence in this record which would lead us to believe it.

These are the reasons we made Findings of Fact Nos. 40–64. We find that those facts establish a violation of:

1. Canon 3A.(3) of the Code of Judicial Conduct as charged in Count 1; and
2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2.

We will discuss these findings in the order as listed above.

 1. The portions of Canon 3A.(3) pertinent to Respondent's conduct during the Adonizio incident are:

Judges should be patient, dignified, and courteous to ... others with whom they deal in their official capacity, and should require similar conduct of their staff.

The conduct of Respondent and Gushanas which we have found to have occurred as set out in Findings of Fact Nos. 40–64 are based on clear and convincing evi-

dence. This applies to Respondent's conduct and Gushanas's conduct. The facts so clearly establish a violation of Canon 3A.(3) we will not say more—we need not.

 2. We find that the evidence is also clear and convincing that this conduct of Respondent was so extreme that it brought the judicial office itself into disrepute. See *In re Smith, In re Cicchetti In re Trkula,* and other cases, cited *supra.* We refer not only to Respondent's conduct on the third floor of the courthouse rotunda but we refer also to Respondent's filing of a false report with the president judge and urging him to punish Mr. Adonizio based on the false allegations she made of Mr. Adonizio's conduct.

We have special concern about the false report. We find Respondent's report to Judge Conahan to be singularly dishonorable, exhibiting, as it does, an extraordinary level of malice.

We think it is fair to say that judges are generally highly regarded in their communities; in their courthouses, they are the "upper class." Whatever they say is likely to be regarded as *prima facie* true—at least in their courthouses. Whoever contradicts them is likely to have the burden of proof—particularly in their courthouses. Judge Lokuta no doubt knew—or believed—that this was the case in her courthouse. She also knew—or expected—that if what she said in the report was believed to be true, Mr. P.J. Adonizio would be subject to serious employment discipline if not termination. Knowing that, she filed the false report anyhow. We find this to be an abuse of her position, an abuse of her standing, and an abuse of her office. Mr. Adonizio is lucky there were four others who happened to be there.

---

**32.** For what purpose? Respondent gives her theory on that later in the trial when she accuses *all* the Board's witnesses of lying to this Court. See N.T. 2462–63, 2466–68, and we will discuss that theory, and the evidence of it, then.

We refer again to our opinion in *In re Smith* where we said that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*Smith, supra,* at 1239. Certainly the expectations of the public would include the expectation that a judicial officer would not deliberately make false charges of serious misconduct against a man whose only offense was to place more urgency on a visit to his wife's oncologist than on an immediate and impromptu meeting with Respondent.

We find that Respondent's conduct during the encounter with Mr. Adonizio and her making a false report with the president judge demanding disciplinary action against Mr. Adonizio for something he did not do, is such that brings the judicial office into disrepute.

### G. COOPERATION WITH PRESIDENT JUDGES AND FAILURE TO DO WORK

#### Findings of Fact

65. Michael Conahan has been a judge in Luzerne County Court of Common Pleas since January 1994. He served a five year term as president judge from 2002 through 2006. (N.T. 455, 461–62 Conahan).

66. Respondent ignored various directives of the president judges to: i) report vacation and sick days of her staff; ii) provide copies of reports of the attendance of her employees as well as of any claimed accumulated sick or vacation time; and iii) obtain approval for appointments of personnel. (N.T. 246–51 Toole).

67. Respondent consistently handled fewer cases and disposed of the cases she did handle more slowly than her fellow judges on the court. Because of this cases had to be taken from her and reassigned to other judges. (N.T. 253–54 Toole; N.T. 463–65, 468–71 Conahan).

68. In Luzerne County, at least in the years when Judge Conahan was the president judge, the practice was to assign a certain number of judges to handle the criminal list and the other judges to civil court or miscellaneous court. Whenever the judges assigned to criminal court were unable to dispose of all the cases on their lists, the court administrator would ask the other judges to help with the criminal cases. All of the other judges helped. Respondent did not. (N.T. 3309–31, 3694–3702 Conahan; Exhibits 21, 22 and 23).

69. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follow occurred as described in the testimony at the times and with the frequency as related by the witnesses.

#### Discussion

 We set down here samples of the testimony which leads us to make Findings of Fact Nos. 65–68.

Judge Patrick J. Toole testified:

Q. Could you please tell the Court—let me back up here for a moment. What kind of relationship did you have with Judge Lokuta as president judge?

. . . .

A. I think I have to ask you when. If you ask me what it was in 1992, it was one relationship. By the time 1996 came, it was different.

BY MR. PUSKAS:

Q. Well, let's start from the beginning. In 1992, what was it like?

A. 1992, she was elected—she was elected in '91 to take office in '92, along with three other judges. . . .

And the relationship, I thought, was good.

Q. Now, you indicated it changed?

A. Well, it changed over the years.

Q. When did it change?

A. Oh, I think it started to change at the end of 1992. I would check and determine statistically what was happening, what cases were being moved. And I had the feeling that—

. . . .

A. It was my opinion based upon my review of all our records at that time in checking with courtrooms that she was not producing the same amount of work as some of the other judges. At one point I asked her to come to my chamber.

BY MR. PUSKAS:

Q. What was her court roster at that time? Did you mention criminal court?

A. She was assigned to criminal court at that time. I can't remember the date, but I can tell you I remember the day. She came to my chambers. She was accompanied by her law clerk, Beth Boris. And on that day, I indicated to her that, very frankly, I didn't think she was shouldering her share of the work.

. . . .

A. I indicated to her that that was my opinion. She obviously disagreed and she told me on that date, I remember, that, I was not going to make her my clone.

Q. She said that to you?

A. Yes.

Q. Was there any further discussion?

A. I don't recall any further discussion. And I think from that point on, whatever relationships there were began to deteriorate. (N.T. 242–46).

Judge Toole also testified:

Q. What did Judge Lokuta do in response to your issued directives?

A. There were a number of directives that I issued over the years. The ones that I recall rather vividly are, I directed that every member of the bench was to advise me immediately if they were not able to appear and handle their assignment for a day. I also directed that any judge who was seeking to utilize vacation or sick time was to make the request to me as early as possible and indicated that early as possible meant that they should request vacation before the first day of the month preceding the month in which they wanted a vacation. And the reason for that was, that was the time allotted for applying for the service of a senior judge.

I also directed that each judge was to keep track of sick time, vacation time and any claimed accumulated sick or vacation time. And I would routinely ask the judges to submit reports. I also directed that each judge was to provide me with a copy of their 703 reports.

Going back, in the entire time I was president judge, I never received, never, despite numerous requests in memos, a list of the dates, the total and the claimed accumulation days of vacation and/or sick time claimed by any employees for the judge. That just never came. She would send me first a report would say I have this many days. And then I would send a memo to her and say, well, I have asked, please, that you only one give me the number of days, but that you give me the specific dates as well as

the day claimed or unclaimed, unused sick time or vacation time. That was never supplied.

703 reports, I requested those. And that fell on, I didn't get responses for a long period of time. And finally, one day I sent a memo indicating that I had not received the 703s, please respond. And the memo came back and said something to the effect that it was only a short time ago I learned that you were interested in the 703s. I file them all the time on time. And if you will supply me with the authority you claim entitles you to those reports, I will review, I don't remember if that was the word, but she would review my authority and let me know.

Q. Why did you want those 703 reports?

JUDGE SPRAGUE: For this record, can we just identify what a 703 is.

A. A 703 is the report that is required to be submitted by, then it was the judge to the AOPC. Then was no requirement that the president judge be given it. I wanted them because it gives you some indication of the nature of the work the judge is performing. It gives you some indication as to whether or not they are current. It helps you then decide the nature of the assignments that you have given. And also gives you a chance to determine if they are filing a correct report.

I then sent her a memo, telling her that, and I think that that was the memo where I said you question everything I direct. And that my authority is the statutory provision that provides the president judge with the power and the responsibility to run an efficient judicial system. And I also indicated to her that if they looked at a proposed amendment to the 703 sec-

tion, it would, she would find it instructive, because that proposed amendment would require and now it does require that the president judge and the court administrator receive the copies of the reports.

Same response was always to the same to the 703.

I also indicated then that I wanted every office to keep track of the attendance records of every employee but the law clerk. And that they should keep track of the time they arrive, the time they leave, and that should be available in the event I requested it. I then requested that, I think in January of, I think it's '96. That was never received.

Q. Did you also have a policy on personnel appointments?

A. I handed down a directive indicating that and I think this was right before Judge Ciavarella came on the bench, which would have been, it might have been '95, that one of the directives in a long list that I provided for his edification was that all personnel appointments were to be signed by me and that if anyone wanted to appoint anyone, they were to tell me. And if it were a personal appointment, I'd hand down the order, because we had some problems about hirings and salaries.

Q. And what did Lokuta do, Judge Lokuta do when you issued that policy?

A. She continued to sign her own orders.

. . . .

Q. You testified earlier about the incident where Judge Lokuta came to your office with Beth Boris. You were there to talk to her about her caseload. Did anything occur with

regard to her caseload from that meeting?

. . . .

A. I can tell you that I continued to try to monitor the dispositions on the criminal list. So you know how it worked then, we had two judges who would sit in criminal court. . . .

And it became readily apparent to me that one judge was—

. . . .

A. . . . disposing of many more cases. You try to keep the work equal. Again, when one person takes longer to try a case than another, eventually someone is doing more work than they should. I then decided at the next assignment period to take her out of criminal court and I think I made her then what we call the miscellaneous judge. Or I might have sent her to civil. I might have sent her to civil then. (N.T. 247–53).

. . . .

Q. As president judge, did you ever take cases from a judge's caseload and reassign them?

A. Yes.

Q. Was there any occasion you did that with Judge Lokuta's cases?

A. There were a number of occasions when that had to be done.

Q. Please tell the Court—

. . . .

A. At one point we had problems with equity court. There was a, I'll call it a backlog. I met with the court. I made a change of assignment and Judge Lokuta was assigned at that point to handle all equity, all summary appeals, the miscellaneous and that she was also to assist Judge Muroski, who was the orphan court judge. That assignment was, I

think, from the fall, September to January. And then it lasted longer.

BY MR. PUSKAS:

Q. What year would that have been?

A. That would have been 1996. I think six. I can tell you that I think approximately four months after the cases were assigned to her, there were still 17—there were 21, I think, when we started. There were 17 cases left and she had settled three in four months.

At that point we had another court en banc meeting and the Court decided that all of the judges there volunteered to take the list and that's how it was disposed of. And there were other occasions when, because she was absent, that her list had to be handled by someone else. (N.T. 253–54).

Judge Michael Conahan, president judge of Luzerne County from 2002 through 2006, testified:

Q. Can you describe for the Court your interaction with Judge Lokuta as President Judge?

A. As President Judge?

Q. Yes, as President Judge.

A. Prior to being President Judge, I think it was very formal. The day I was elected President Judge, and I took over those duties from Judge Augello who was the preceding President Judge, I think everything went okay until I assigned her to Perm Place, which was another facility located outside the main Courthouse.

And I did that because the juvenile court cases were on the third floor of the Courthouse, and we didn't have enough space. I moved Judge Ciavarella down to her Chambers and moved her down to—this was a brand

new facility that was built by the County. On the third floor, there was a courtroom, as well as our adult probation and juvenile offices. I moved her down there.

I think from that point on, the Judge was dissatisfied with that move, was very unhappy with being there. She didn't like the facilities, didn't like being taken out of the main Courthouse. And it just started to deteriorate from that point on, our relationship.

Q. How did that affect your work as President Judge vis-á-vis Judge Lokuta?

A. It seemed like anything I asked her to do, nothing ever got done.

. . . .

BY MR. PUSKAS:

Q. Can you give an example—

. . . .

A. The assignments were to Miscellaneous and Motions Court. The civil list, I think in the beginning, there was approximately a 50 case backlog that the Judge had while she was down there. The cases weren't moving.

I then assigned her from civil list to what we call motions miscellaneous court. I took the 50 cases and assigned them to the other Judges. We each took five or ten apiece and got rid of those in about five or six months, that civil backlog.

From that point on, she was in charge of Motions Court, Miscellaneous Court, PFA's and Summaries and had the availability to have two Senior Judges help her out in those courts.

Q. Was her particular assignment then? Which Courts—you have mentioned a Senior Judge was helping out in respect to what?

A. The two Senior Judges would help her out in relation to the PFA Courts when they were available and the summary appeals.

Q. Now did they normally handle that court, these Senior Judges?

A. No, not until Judge Lokuta got that assignment.

Q. Now as President Judge, do other court departments report to you about issues that they have?

A. Yeah. Well, you have a chain of command. You have Bill Sharkey, who is the Court Administrator. Everybody reports to him. I would meet with Bill on a daily basis for at least a half hour to an hour everyday on various things that are going on from union negotiations, to court assignments, to caseload assignments, to statistics or cases moving, budgetary items.

Q. Were you made aware of any difficulties with Judge Lokuta by another court department?

. . . .

A. I would get daily updates from Bill Sharkey, my Court Administrator, as to the performance of Judge Lokuta, what she was or wasn't doing. Based on that, that is how I made my assignments.

Q. Were there any difficulties with Court Administration?

MR. SINATRA: I have the same objection.

JUDGE SPRAGUE: I understand it. I'm overruling it on the basis of His Honor being the President Judge and his duties at that time to oversee the administration of the Courts in Luzerne County. Go ahead.

BY MR. PUSKAS:

Q. You can answer the question.

A. The Court Administration schedules oral arguments, assigns cases. Ann Burns is our civil list. Lois Woods is in charge of the PO's and Motions Court and things of that nature. There is a girl named Jean—there's four or five girls in that office.

. . . .

A. As a result of what I learned from the Court Administrator, I had assigned Judge Lokuta to Motions and Miscellaneous Court and then delegated to her to do all her own scheduling assignments. Court Administration was totally out of it.

She could do whatever she wanted in that court, whenever she wanted, whatever time frame she wanted, whenever she wanted to work. Whenever she didn't want to work, she had total control of everything— the scheduling and everything she wanted to do.

I wanted to get Court Administrator totally away from Judge Lokuta and her staff.

Q. Was Judge Lokuta—when other Judges had difficulties or problems with their court schedule, did Judge Lokuta help out?

A. No. I had two Judges during my term that were ill. And every other Judge participated in helping out with their caseload other than Judge Lokuta.

Q. Was she asked to help out?

A. She was. (N.T. 462–68).

We find that Respondent's conduct described in the testimony set out above is clear and convincing evidence of violations of:

1. Canon 3A.(5) of the Code of Judicial Conduct as charged in Count 3;

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper administration of justice as charged in Count 6; and

3. Canon 3B.(1) of the Code of Judicial Conduct.

The record is permeated with credible testimony from a variety of witnesses who corroborate the Respondent's recalcitrance regarding caseload and cooperation. Those who seek and then accept the position of judge within the Commonwealth do so subject to legally mandated obligations of diligence and consideration. As discussed elsewhere in this Opinion, Respondent did not generally adhere to a 9 to 5 schedule, and was frequently absent from the courthouse when her judicial duties beckoned. Worse still, as described in the testimony of President Judges Toole and Conahan, Respondent vigorously resisted accepting assignments and facilitating the business of the court. When President Judge Toole requested that she report staff vacation and sick days, and that she obtain approval for personnel actions, she ignored his requests. When President Judge Toole requested copies of Respondent's 703 reports (a form used to track cases which are ripe for, but have not been or may not be, timely decided), Respondent refused and without reasonable justification questioned the president judge's authority to request them.[33]

---

**33.** At the time, the Supreme Court Order requiring the filing of the 703 reports did not order that copies be filed with the president judges. However, it is the president judge's job to keep track of what is going on in Ms court and, thus, we believe it was perfectly reasonable for Judge Toole to request copies of the 703s. We can think of no reason why Respondent would not comply with such request and can only conclude that this was another demonstration of Respondent's reflexive animosity to whatever it was that her president judge might propose.

President Judge Toole testified about the Fosko case—a real estate tax assessment appeal which was in front of Respondent. After Respondent had made her decision and written her opinion, Judge Toole requested that she hold her decision because Judge Toole wanted her to meet with him and Judge Musto who were also deciding assessment appeal cases at the time. Judge Toole testified that he proposed a conference to explore the possibility of obtaining a consensus on the subject[34] so that uniform guidelines could be established for the handling of real estate tax assessment appeals in the county. Respondent declined to engage in discussion of the subject with the two judges and filed her opinion.

■ Although the Board has not designated which canon or constitutional precept this conduct violated, it made much of it. We hold that, although it might have been "nice" for Respondent to meet as requested, and although that might have pleased the president judge, her failure to do so is not a violation of any canon of the Code of Judicial Conduct or of any precept of the Constitution.

As described in Finding of Fact No. 68, it was the practice within the Luzerne County Court of Common Pleas, during the tenure of President Judge Conahan, that judges who were in the non-criminal divisions of the court, such as civil, juvenile, and miscellaneous, would make themselves available to help with criminal cases when the court's criminal docket was getting backed up. The following dialog between Judge Streib and Judge Conahan, which occurred during Judge Conahan's cross-examination, is informative of the process.

JUDGE STREIB: If I may, just one follow-up to Judge Sprague's question, to make sure I understand.

When the court administrator would go around and ask the civil judges to help out in criminal, obviously, anybody at Penn Place would not be asked?

THE WITNESS: That's correct. Well, no. That's incorrect, because we do that now with Judge Ciavarella.

. . . .

JUDGE STREIB: ... I'm trying to understand that would it have been common for the court administrator, if someone—whatever judge was located at Penn Place—

THE WITNESS: Right.

JUDGE STREIB:—Would they have been asked to assist during this criminal trial term?

THE WITNESS: They would have.

JUDGE STREIB: They would have?

THE WITNESS: Right. I'm at Penn Place now and I do that.

JUDGE STREIB: Okay. But was that the practice at the time that you were president judge as well?

THE WITNESS: Yeah.

JUDGE STREIB: And would they have been asked if they were in miscellaneous court?

THE WITNESS: Yes.

JUDGE STREIB: So, it wouldn't have mattered what court or what location?

THE WITNESS: The court administrator should know what judges— what that judge is doing. We hand out a schedule every week, you know, so the stenographers, the sheriffs, everybody knows what everybody's schedule is.

---

34. Judges Toole and Musto were preparing to file opinions at variance with Respondent's.

So they know what judge is in court or out of court because we make court assignments the Friday before the following week.

JUDGE STREIB: Okay. Thank you. (N.T. 3699–3702).

Board Exhibits 21, 22 and 23 include a breakdown by judge of all criminal matters disposed of during calendar years 2004 through 2006. (N.T. 3309–31 Conahan). The Exhibits reveal that, during that period, all of the judges of the court assisted with the disposition of criminal matters except Respondent. For example, Board Exhibit 21 includes the following breakdown of criminal cases disposed of by all of the judges of the court for 2004: P.J. Conahan 604.5; J.M. Toole 416.4; J. Augello 238; J. Mundy 294; J. Ciavarella 223; J. Burke 209; J. Olszewski 436; J. Cappelini 564.5; Sr. J. Toole 179.5; and Respondent 0. Exhibits 22 and 23 for calendar years 2004 and 2005, respectively, are similar in pattern, with Respondent having failed to participate in the disposition of any criminal cases in those years as well.

When asked by court administration at the direction of President Judge Conahan to take some of the cases of two judges who were ill, all of the judges of the court obliged, except for Respondent. When Judge Joseph Augello, by memo and acting on President Judge Toole's behalf, returned a case to Respondent (which she had previously returned to the court administrator), she immediately answered with a memo which, among other things, contained the threat of a lawsuit.

Judge Augello's memo to Respondent (Board Exhibit 17) stated:

The above file is returned to you for disposition. Miscellaneous Court cases scheduled during the months of June, July and August remain on the individu-al calendar of the initial Judge scheduled for the matter.

Judge Lokuta responded by immediately shipping the file back to Judge Augello, directly contrary to his instructions, with a quarrelsome memo telling him that he is intentionally discriminating against her by misapplying some rule about summer scheduling. Her memo concludes:

... Therefore, I cannot accept that this rule should only be applied to me and not to any other Judge.

Finally, I would request a copy of any written documentation of your election as interim President Judge for the purpose of any pending litigation. (Board Exhibit 17).

A few days later Acting President Judge Augello sent a memo to President Judge Toole, copy to Judge Lokuta, which reported:

1. On June 13, 1996, Judge Lokuta was scheduled to hear 25 plus protection from abuse cases. On less than 24 hours notice, Judge Lokuta advised the Court Administrator she would not be present.

2. On June 27, 1996, Judge Lokuta was again scheduled to hear 25 plus protection from abuse cases. Judge Lokuta advised the Court Administrator late in the afternoon of June 26, 1996, that she would again not be present to conduct scheduled court.

In both instances, the cases were held at the scheduled time by other judges because of the emergency nature of these cases and the need to protect our families from domestic violence.

Due to this necessary last minute rescheduling of judges to hear these cases, there was some disruption of our planned civil and criminal trials as well as other Orphans/Miscellaneous court proceedings. (Board Exhibit 18).

Judge Lokuta's quick response to this memo offered no denial or explanation of her conduct described in Judge Augello's memo which reported another instance of disregard for her fellow judges and for the orderly administration of justice in that courthouse. Nor did it offer an apology for the disruption caused throughout the court that day. Her reply to Judge Augello was:

I note with interest your attached Memo of 7/1/96 regarding PFA cases scheduled 6/13/96 and 6/27/96.

I consider your Memo nugatory for four reasons:

1. You are not the President Judge.

2. You did not hear the PFA cases on those particular days.

3. You have no authority to question my ability to take leave.

4. You have no authority to monitor my attendance.

(Board Exhibit 18).[35]

The evidence is clear and convincing that, beginning during the term of Judge Toole (1991–1996) and continuing through the term of Judge Conahan (2002–2006), Respondent was unduly insubordinate, uncooperative, and disruptive of the authority and direction of the president judges as set out at length above. We find that the Board has established by clear and convincing evidence that this conduct is a violation of:

1. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper ad-

ministration of justice as charged in Count 6;

2. Canon 3B.(1) of the Code of Judicial Conduct; and

3. Canon 3A.(5) of the Code of Judicial Conduct as charged in Count 3.

■■■ As to 1. and 2. above: conduct which prejudices the proper administration of justice and conduct which obstructs the performance of the administrative responsibilities of other judges and court officials. We hold that by the evidence described above the Board has carried its burden of establishing these violations. The evidence is so clear and convincing that no elaboration is called for.

■■■ As to 3. Canon 3A.(5) of the Code of Judicial Conduct: Failure to dispose promptly of the business of the court.

We have said in an earlier case on this subject:

It is not open to question that prompt and expeditious disposition of the cases which come before him or her is among the duties of a judge. This Court has stated that it is "a fundamental obligation [of] a jurist in this Commonwealth to render prompt justice." *In re Fischer,* 657 A.2d 535, 537 (Pa.Ct.Jud. Disc.1995).

*See, also, In re Shaffer,* 885 A.2d 1153, 1158 (Pa.Ct.Jud.Disc.2005).

There is ample evidence in this record to establish violation of Canon 3A.(5). Judge Toole gave one example where 17 cases had to be taken from Respondent because of inaction and assigned to the other judges. (N.T. 254). Judge Conahan testi-

---

**35.** Judge Augello is the president judge with whom Respondent said she had "a wonderful five years" (N.T. 3051–52). That "he was a kind and honorable individual that understood that I was a colleague and I should be afforded the emoluments of this office and he gave them to me." (N.T. 3040–41). However

that may be, when, during its investigation, the Board requested Respondent to give it the names of anyone she wanted the Board to interview, she gave the Board 100 names; but Judge Augello's name was not one of them. (N.T. 3052–53).

fied he had to reassign 50 civil cases of Respondent's because "the cases weren't moving." (N.T. 465). But the seriousness of the situation is made manifest in Judge Conahan's responses to the following questions of the Court:

> JUDGE SPRAGUE: ... I think the bottom line question is: In your capacity as President Judge, was Judge Lokuta a problem in the administration of the Courts in Luzerne County?

> A. Judge, it would have been better for me if she never showed up for work.

> . . . .

> JUDGE SPRAGUE: And the question and answers that I hear lead me to a question. I will repeat it. Was Judge Lokuta a problem in your capacity to you as the President Judge in the administration of the Courts in Luzerne County?

> A. She was.

> JUDGE SPRAGUE: And explain why you say she was.

> A. Well, in addition to the matters that I just outlined here, everything that— the relationship I had was confrontational. Any assignments that I made never seemed to be finished, whether they were equity, civil cases. Constantly monitoring the Court to move things on. Letters I would get from lawyers, either she recused herself from matters or lawyers who couldn't appear in front of her, it was constant daily meetings with the Court Administrators to juggle things around to get the work load done.

> In addition, I had two Senior Law Judges assigned to handle some of the Courts.

> JUDGE SPRAGUE: When you said before that it would have been better for you if she didn't even show up, what did you mean by that?

> A. I would have taken the Court and assigned it to the remaining Judges, everything. The work would have got done. (N.T. 470–71).

We find that the Board has established violation of Canon 3A.(5) by clear and convincing evidence.

### H. *MISUSE OF COURT EMPLOYEES*

#### *Findings of Fact*

70. Rebecca Ann Sammon was a legal intern in Respondent's office in the summers of 2002 and 2003, and Judith M. Flaherty served as Respondent's law clerk from April 1999 through March 2001. At the time of her service Sammon was a law student. Flaherty was a recent law school graduate and this position with Respondent was her first job as a lawyer. (N.T. 1236–37 Sammon; N.T. 1408–12 Flaherty).

71. During the summers of 2002 and 2003, Sammon's duties included sending out letters of condolence to Respondent's personal acquaintances, as well as performing legal research in connection with whether Respondent had a cause of action against anybody to remedy what she considered as interference with her function as a common pleas judge. (N.T. 1241–44 Sammon).

72. On numerous occasions compromising *hundreds* of hours Respondent diverted the services of Flaherty for her personal benefit. (N.T. 1415–16 Flaherty).

73. These services diverted at Respondent's direction included: companionship for an ill and elderly family member; grocery shopping, yard work, home maintenance and cleaning, organizing, wrapping, and packaging antiques and collectibles. (N.T. 1436–41 Flaherty).

74. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follow occurred as described in the testi-

mony at the times and with the frequency as related by the witnesses.

*Discussion*

 We set down here samples of the testimony which leads us to make Findings of Fact Nos. 70–73.

Regarding the summer of 2003 when she worked for Respondent, Rebecca Sammon testified as follows:

Q. And during that second summer, what did you do as her intern?

A. Legal research. I would, you know, work on some cases. I would research some—you know, research laws, write memos. I would also do—Just about every morning there would be at the desk that I sat at some newspapers. And in the section where the obituaries were she would circle obituaries, and I would type sympathy notes. She had me create a template the previous summer to use for it so that when I wasn't there other people could do it as well. And that was the most consistent thing I would do. I would do that just about every day.

Q. And who were these obituaries for?

A. Just people I guess that she knew or people that she knew someone that was related to them or, you know, just someone that she grew up with or a relative or something like that.

Q. And what other kind of things did she have you do?

A. I know that she had me—The first year I was there—I'm sorry, I don't mean to go back—but she had me research into a complaint with the AOPC regarding some treatment and how she felt that it was—felt like maybe she was being mistreated.

. . . .

Q. How often were you working on that project?

A. I was told that it was to take—it was the utmost important and that I was, you know, to do that—I did a lot of work on it. I was in correspondence with one of the—I don't know. She—She worked for the AOPC. I was in correspondence with her. The judge asked me to contact her. And I was to look into different matters regarding documenting different things that were happening back and forth with the AOPC, researching different issues, like for one issues with the sheriff, issues with, you know, different things that were going on. (N.T. 1241–44).

Judith Flaherty testified:

Q. And what was the position you were hired for?

A. I was hired for tipstaff/law clerk position.

Q. And was it explained to you what your duties would entail?

A. Well, basically how I would be, you know, assisting, you know, the judge and the staff. Judge Lokuta—I did explain, you know, I was a young attorney, it was my first job out of law school, so I didn't have any experience. But it sounded like a good position. You know, Judge Lokuta said she did pride herself, you know, in being a mentor and liked bringing on young attorneys, you know, and mentoring them. So I thought it would be a good opportunity for me, you know, as an attorney.

Q. And after you went to work for Judge Lokuta, did you get mentorship?

A. No.

....

Q. How much time did you spend working in Judge Lokuta's chambers and/or court?

A. During the course of the day, probably like a half to 60 percent of the day over my duration there. And then towards the end, like the last month, I really wasn't at the courthouse at all. I basically was up at her home in Dupont.

Q. Your schedule for a week, what would that have been, Monday through Friday?

A. Monday through Friday. (N.T. 1411–16).

Ms. Flaherty testified that gradually the bulk of her work time was spent away from the courthouse at the Respondent's home.

Q. Why were you at Judge Lokuta's home?

A. I was there to do tasks for her.

Q. Please explain that to the Court.

....

A. I would do things—I would be asked to do things like sit with Julie, her mother, or help with yard work like clearing up the yard, brush in the yard, inside help pack or pack like collectibles and antiques, pack them in storage containers downstairs, and put them away nice, straighten things up. Also upstairs the same thing in certain rooms, just straighten items up and, you know, make sure it's nice and neat and go through the stuff for her.

BY MR. PUSKAS:

Q. When did this begin that you started going to her home, Judge Lokuta's home?

A. Probably about a month after I started, around that time, if I could recall, probably about a month. It wasn't long after I started.

Q. How did it come about?

A. ... So what started to be was can you run to Wegman's and pick up maybe some bread, you know, some tomatoes, some other items, and take it up. That started at the end of the day. And then that went into, can you help like with the yard work, you know, cleaning up some brush, some stuff that she needed taken out, rocks that she had there, stuff like that.

And at first it started—it was after hours. But then what happened is it started to happen during county time where, you know, can you go to my house and, you know, sit with Julie for, you know, a few hours if Barbara was coming in a little bit later or I need you to go up and, you know, with these antiques and what she'd call te-hotchke, I need you to bubble wrap the antiques and put them together in storage containers and store them nice and neatly so that they didn't get damaged.

So I'd be up there, you know, for a few hours at a time, and many times it carried over between county time and work time. And what happened is this would go over the course of the time there. I started—basically was in the downstairs a lot like straightening up the items that were downstairs, packaging them away in containers, putting them, you know, up where they were nice and neat.

And then what happened is towards the end of my employment after Julie had passed away, the judge was having the house appraised, and so she needed it straightened up. And what happened is she asked me if I'd go up

to Dupont. And I went up to Dupont. What I was doing is basically focusing in two rooms in the upstairs, like straightening them up, cleaning them up, you know, putting like—straightening the clothes, any items like organizing them, you know, making sure everything was nice and neat.

Q. And when were you doing that?

A. That was during county time like during the hours of 8:30 and 4:30 at the end. Basically the whole month of February I was up in Dupont. And I know there was a trial going on down at the courthouse, and the judge was presiding over that. But I was up in Dupont.

JUDGE SPRAGUE: Can I ask a question. When you go to work each day, do you sign in and sign out or do you—

A. No, we wouldn't sign in or sign out.

JUDGE SPRAGUE: Thank you.

A. You're welcome.

BY MR. PUSKAS:

Q. If you can, how much time were you spending at Judge Lokuta's home during these tasks?

A. What it turned into was probably like the morning usually I was at work. And then if it wasn't something with the court—or the judge wasn't there yet and she called in, she usually would speak to Susan. Susan usually took her calls. And she'd say, I need Judy to come up to Dupont, you know, can you tell her to stop at Sam's maybe, for example, pick up a container or a few containers. You know, she needed me like to do some storage, storing items for her and also maybe stop at Wegman's, bring some stuff up, you know, for the house.

What happened is then usually I would—it would be more of the afternoon that I was there and go into the early evening. And then what happened is sometimes I would be at court, you know, if there was a trial going on. And then she didn't need me like to stay there. She'd be like, I'm fine here, I need you to go up to Dupont.

What happened is, as I said, as, you know, Julie progressed worse like with her condition and after she passed away, what happened is it actually it turned into more of being in Dupont. Like I said, that last month was in Dupont during time—during county time.

Also over the course of that, I would sit with Julie, you know, if Julie was, you know, at home because she was in Little Flower Manor, and she was in General Hospital during that period of time over the last few months of her life.

JUDGE SPRAGUE: Did you protest to Judge Lokuta about being asked or directed to do these personal matters?

A. I didn't, Your Honor, because I was intimidated. A lot of times what would happen is after coming off a day like where you're being yelled at, and, you know, you're like I don't know what I can do right here. I'm thinking maybe for a little bit of time it will take the stress off. I'm new. She's a judge. What do I say? You know, I'm thinking, just try to get through it, you know, bide your time, make the best of it as you can, try to find another job. I didn't have any other employment,

I really was like—I didn't know what to do. I'm like if I say no, what's that going to do, is it going to

make it worse. And I was scared. I was intimidated. And I just thought, you know, try to make the best of it, maybe somehow this will turn around and maybe it will get better, you know, maybe this is just, you know, a short thing.

But it just—I realized that I wasn't going to learn anything more there as an attorney. I really—I wasn't given any really—probably a couple opportunities at the most to really do something that way. And I thought, you know, it's time for me to get out of here and move on. I left without a job and—That's what happened. (N.T. 1436–42).

Ms. Flaherty was cross-examined about this subject and her testimony then was:

Q. And do you recall telling the Board that that first floor area was filled with stored items to the point where you couldn't even walk in rooms, correct?

A. Yes, in rooms, yes.

Q. So the only part of the house that would have required housecleaning was the second floor?

A. Well, no, because what it was with the downstairs was that there was stuff all over the place that she wanted straightened out, she wanted put in containers, she wanted put on shelves or put in an orderly fashion, because if you walked in there, I mean, things—There were shopping bags like in the back bedroom, all different types of stuff, food, collectibles whatever on the bed. There was stuff on the floor. There was no rhyme or reason to it.

Q. Well, my question went to, given the fact that these rooms were so filled—You described them as having items piled 3 to 4 feet off the floor. Do you recall that?

A. Yes.

Q. And you described that you literally could not walk through the rooms. Do you recall that?

A. It was tough to walk through, yes.

Q. So certainly given that status of the rooms, those rooms were not rooms that were cleaned, correct? You couldn't get down on your hands and knees to clean?

A. Oh, no, you couldn't, not there, no.

Q. And yet do you recall telling the Board that you got down on your hands and knees scrubbing the floor?

A. Upstairs. After Julie had passed away, what happened is those rooms upstairs were starting to get dirty, to get cluttered. And she had asked me if I would straighten it up, and I agreed to straighten it up and, you know, to wash the floor, to scrub the floor.

And she actually had mentioned that it's better to do it on your hands and knees. And I thought, well, I'll do it on my hands and knees because I don't want to get her mad. You know, I'll do what I have to do—inside I'm thinking this—and I'll straighten it up, and, you know, it will make her happy. (N.T. 1450–52).

■ We find that Respondent's conduct described in the testimony set out above with respect to Judith Flaherty is clear and convincing evidence of violation of:

1. Article V, Section 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2.

Respondent's use of court employees to do personal work is repugnant to this

Court and an affront to every judge and judicial employee within the Commonwealth. It is utterly disheartening from the perspective of the taxpayers and citizenry served by the Luzerne County Court of Common Pleas. Despite Respondent's best efforts, she could not downplay to this Court the misappropriation of Judith Flaherty's services as inadvertent or inconsequential. To the contrary, the scope of the misappropriation is broad, bold and impossible to overlook.

Judith Flaherty who was manipulated by the Respondent was a young woman, freshly graduated from law school who had not yet held a legal position or worked for a judge. She was intimidated by the Respondent. As described *supra*, good days at work for her were days when she was not within the path of Respondent's wrath. When she began her employment, she did not know what was expected of her, and would have been hard pressed, in any event, to challenge the directives of the Respondent—even if (as quoted from the Notes of Testimony above) it meant scrubbing the floor of Respondent's house on hands and knees.

By any standard heretofore imposed by this Court, the extensive use of court personnel to carry out the personal business and chores of a judge at the judge's residence and elsewhere, is so extreme as to constitute conduct which brings the judicial office into disrepute. *See In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996) and other cases cited *supra*. Furthermore, we

daresay that the reasonable expectations of the public would include the expectation that a judge would not require her law clerk to spend her time raking the judge's yard, bubble wrapping the judge's things or scrubbing the judge's floors.

 We find that the Board has not established by clear and convincing evidence that Respondent's conduct in assigning Rebecca Sammon to send out letters of condolence and to look into the possibility of a legal remedy for interference with her judicial responsibilities was so extreme as to be such that brings the judicial office into disrepute.[36]

## I. *THE VIOLET O'BRIEN CASE*

### *Findings of Fact*

75. *Violet O'Brien and Eugene O'Brien v. Nesbitt Memorial Hospital Henry Alexanderian, M.D. and the Wyoming Valley Health System, Inc.* was a medical malpractice case which was filed in Luzerne County Court of Common Pleas in 1995. Its docket number was 3577–C of 1995.

76. The plaintiffs were represented by Thomas and Michael Foley of Foley, McLane, Foley, McDonald & McGregor of Scranton, Pennsylvania.

77. During May and June 2001 the defendants filed Motions for Partial Summary Judgment and for Preclusion of Testimony of plaintiffs' expert witness. The Motions were assigned to Respondent for

---

**36.** We mention that in *In re Berkhimer,* 877 A.2d 579, 595 (Pa.Ct.Jud.Disc.2005), we held that the Board had established that Berkhimer's use of his court employees to send out similar letters was an "ongoing political campaign ... to improve his prospects for re-election" and as such was a violation of Rule 3B. of the Rules Governing Standards of Conduct of District Justices which provides that:

A district justice shall not use or permit the use of the premises established for the dis-

position of his magisterial business for any other occupation, business, profession or gainful pursuit.

There is no comparable provision in the Code of Judicial Conduct. In *Berkhimer*, there was no finding that Respondent's conduct was so extreme so as to bring the judicial office into disrepute nor did the Board make such a charge.

disposition. On August 17, 2001 Respondent entered an Order granting the Motions. (See Board Exhibits 1 and 2).

78. On August 21, 2001, plaintiffs filed with Respondent a "Motion for Recusation" of Respondent and for the vacation of the Order entered by Respondent on August 17, 2001. (Board Exhibit 1). In this Motion plaintiffs set forth two "Circumstances" which they alleged required Respondent to recuse. On October 10, 2001 plaintiffs filed a Supplemental Motion requesting the same relief in which they set forth five "Supplemental Circumstances" alleged to require recusal. (Board Exhibit 2). Thereafter, plaintiffs allegedly filed another Supplemental Motion in which five "Supplemental Circumstances" are set forth. (Board Exhibit 3). The "Circumstances" set forth in this Supplemental Motion are largely the same as the Circumstances listed in the first Supplemental Motion. Board Exhibit 3 is undated and no date of filing appears on the docket. (Exhibit R–1098). There is no evidence in this record that it was ever filed.

79. The docket (Exhibit R–1098) indicates that the defendants in the case filed responses to the allegations in plaintiffs' Motion and Supplemental Motion for Recusation. The docket entries show these were filed on August 27, 2001 and October 30, 2001. However, these responses are not part of this record.

80. The docket entries establish that on September 12, 2001, Respondent ordered the parties to submit briefs on the subject of her recusal and scheduled argument on the question for November 27, 2001. There is nothing in this record which establishes whether briefs were filed or whether the argument took place.

81. In early 2002 Respondent asked Ted Krohn, her senior law clerk at the time, to review the Violet O'Brien file and draft an opinion for her consideration on the Motion for Recusal. Krohn reviewed the file on several occasions, and, before commencing with the draft, told Respondent that he didn't know how he could draft an opinion denying the recusal. Upon hearing that, Respondent said to Krohn "I want you to cut him [plaintiffs' lawyer, Foley] a new asshole," Krohn replied that he could not draft the opinion "in the regard that you've requested." (N.T. 36–37, 139, 3626 Krohn).

82. Krohn had no further connection with the Violet O'Brien case. (N.T. 36–37, 139 Krohn).

83. Sometime shortly thereafter, Respondent asked Girard Mecadon, her junior law clerk, to write a memorandum in connection with the Violet O'Brien opinion on the recusal issue. (N.T. 904–05 Mecadon; N.T. 37 Krohn).

84. Mecadon wrote a lengthy memorandum to Respondent on the "Violet O'Brien Recusal" on February 13, 2002. (N.T. 905 Mecadon, Exhibit R–354). In the memo Mecadon set out reasons why Respondent could deny the Motion. (Exhibit R–354).

85. On February 20, 2002 Respondent denied the Motion for Recusal. (Exhibits R–669 and 1098).[37]

---

**37.** Both Respondent and Gushanas contradicted Krohn and testified that Krohn wrote the opinion. (N.T. 2874 Lokuta; N.T.2026 Gushanas). Resolution of this issue is not limited to examination of the testimony of Krohn v. Respondent and Gushanas. Two other circumstances attend our decision to credit Krohn's version. One is that, having been told by Krohn that denying the recusal motion would be wrong and that he didn't think he could write an opinion doing that, it is unlikely—highly unlikely, we think—that, notwithstanding that, Respondent would insist that Krohn write the opinion and that Krohn actually would (did) write it. The other consideration is if, after his exchange with

## Discussion

There are two distinct issues for us to address here.

One is whether Respondent's failure and refusal to recuse is a violation of Canon 3C.(1)(a) of the Code of Judicial Conduct. This violation is specifically charged by the Board in Count 5.

The other issue is whether Respondent's remark in response to Krohn's advice that he didn't know how he could draft an opinion denying the recusal, i.e., that she wanted him (Krohn) to cut him (Foley) "a new asshole," was conduct which subjects Respondent to discipline under Counts 2, 4 and 6 of the Board's Complaint.

 We will discuss Count 5 first which charges a violation of 3C.(1)(a) of the Code of Judicial Conduct.

Canon 3C.(1)(a) provides:

(1) Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where:

(a) they have a personal bias or prejudice concerning a party . . .

We note at the outset that the canon speaks of bias "concerning a party," and, in this case, Respondent's bias, if any, is not asserted to concern a *party* but rather the *party's lawyer*. We hold, however, that, in this case, this judge's bias against this lawyer was such that it undoubtedly affected his clients' case. We do not hold that in *every* case bias against a lawyer will *necessarily* be transferred to the client so that disqualification would be required. However, we do observe that this commonly will be the case. Any lawyer with a few years experience in courtrooms knows

that, for the only way a judge can "hurt" a lawyer, if so inclined, is to hurt the client. After all, it's not the lawyer's case—it's the client's case; and lawyers who ask a judge to recuse because of bias toward them are not doing so to protect themselves, but to protect their clients.

We have never addressed this question nor has our Supreme Court. We have never been quick to turn to other jurisdictions, nevertheless we find a case decided in the Fourth District Court of Appeal of Florida which deals squarely with the question in a thoughtful and well considered opinion.

In that case the question was whether disqualification of the judge was required where he stated at a pre-trial proceeding that one of the lawyers "should not be in this case." The lawyer's client, Dr. Hayslip, moved for recusal. The governing Florida statute, like our Canon 3C.(1)(a), referred only to prejudice against a "party" as requiring recusal.

In holding that disqualification of the judge was necessary the Court of Appeal said:

The only remaining question is whether the alleged remarks, which were directed at defense counsel rather than his client, could reasonably justify the client's fear that he would not receive a fair trial at the hands of the respondent judge.

\* \* \* \*

Though a client and his counsel are separate entities, they share a common bond forged by the attorney-client relationship and tempered in the rigors of litigation. Most clients find the courtroom to be an unfamiliar and, in some

Respondent, Krohn continued to be involved in the case and wrote the opinion, what is Mecadon doing writing a long memorandum

to Respondent on February 13, 2002 making a case for denying the Motion (which Respondent did one week later)?

instances, uncomfortable atmosphere and so it is not unusual that they entrust themselves into their counsel's care and view their interests as one. Thus, it is understandable that a client would become concerned and fearful upon learning that the trial judge has an antipathy toward his lawyer and has expressed the opinion that the client's counsel "should not be in this case."

*Hayslip v. Douglas,* 400 So.2d 553 (Fla. App.1981).

The case before us offers a perfect example of this—Respondent's "venom" (N.T. 152 Krohn) was aimed at Foley but it was the O'Briens who were the casualties. Respondent's bias toward Foley may have been responsible for her determination to cut Foley "a new asshole" but it resulted in a ruling against the O'Briens. We hold that Canon 3C.(1)(a) applies in this case because Respondent's bias against Foley was equivalent to bias against his clients in this case, for that was the inevitable consequence.[38] Thus, the absence of reference to a party's lawyer in Canon 3C.(1)(a), in no way diminishes the applicability of the canon to this case.

 We address now the question of whether the evidence in this case estab-lishes a violation of Canon 3C.(1)(a) of the Code of Judicial Conduct, so we must determine whether the evidence introduced at the trial establishes that Respondent's "impartiality might reasonably be questioned."

Evidence on the point is contained in Board Exhibits 1 and 2, i.e., the allegations in plaintiffs' Motion for Recusation and the Supplemental Motion. These Motions set forth the reasons—the so-called "Circumstances"—which assertedly required recusal. These "Circumstances" include the following reasons alleged to require recusal:

1. The week before the Motion for Recusation was filed, Respondent had granted partial summary judgment against plaintiffs based on the credentialing file of defendant, Dr. Alexanderian. This file had been sought by plaintiffs in discovery five years earlier but defendants sought a Protective Order to prevent its discovery. The matter came before Respondent and on June 25, 1996 (Exhibit R–1098) Respondent granted the protective order based on her *in camera* review of the credentialing file. Thus, Respondent granted a summary judgment based on a document plaintiffs had never seen.[39]

---

**38.** This conclusion appears to be in harmony with the provisions of subsections (b), (c) and (d) of Canon 3D.(1) which specify certain circumstances where disqualification is *mandatory.* These circumstances include cases where the judge's impartiality might reasonably be questioned because the judge's relationship with a *lawyer* in the case is such that the judge's impartiality might reasonably be questioned as being *in favor* of the lawyer. See, in particular, Canon 3D.(1)(d)(ii).

**39.** Respondent made much of the fact that plaintiffs did not file the Motion for Recusal until five years after Respondent had entered the Order denying discovery of the credentialing file, and not until after the entry of the adverse ruling, i.e, the Order granting defendants' Motion for Summary Judgment. Nor-mally this is a factor weighing strongly against recusal. *See, Commonwealth v. Pappas,* 845 A.2d 829 (Pa.Super.2004); *Commonwealth v. Stafford,* 749 A.2d 489 (Pa.Super.2000); *Ware v. United States Fidelity & Guaranty Company,* 395 Pa.Super. 501, 577 A.2d 902 (1990); *Goodheart v. Casey,* 523 Pa. 188, 565 A.2d 757 (1989); *Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 489 A.2d 1291 (1985). In advancing this point, Respondent was asked:

Q. How long was that case pending at the time that the motion for recusal was filed?
A. Five years.
Q. And how long had you been involved in the case at the time the motion for recusal was filed?

2. Plaintiffs' lawyer Thomas Foley was the husband of Jill Miller, Esquire who had testified in an earlier Judicial Conduct Board investigation of Respondent—and

Foley had served as his wife's lawyer in those proceedings.

3. Respondent had asked Jill Miller to give Nancy Alexanderian (Dr. Alexanderi-

A. Five years. (N.T. 2863).

The Court, interested in why the case had been around so long, inquired:

JUDGE O'TOOLE: Were the lawyers not ready to try it for some period of time? (N.T. 2864).

Respondent answered: Your Honor, I didn't get any additional involvement in that matter until 2001. They didn't have individual calendar or assignments to any specific judge. (N.T. 2864).

The Court then asked: Just so I'm clear then, the answer to the questions asked by the Court and your answers, you had said earlier that the case had been in front of you for five years, then there was a motion for recusal.

I take it that you meant that it commenced at one point five years earlier, but it had not been in front of you for those whole five years, but at one point when it later came up in front of you, there was then a motion for recusal.

Would that be correct?

THE WITNESS: That would be accurate. And thank you for the correction, Your Honor. (N.T. 2864–65).

The docket (Exhibit R–1098) shows that during the five years orders had been entered on various pre-trial matters in the case by Judges Stevens (2), Cappelini (1), Augello (3), Mundy (4) and Conahan (4). There was no occasion for plaintiffs to ask Respondent to recuse until she was assigned the Motion for Summary Judgment.

We point out, however, that, although there may have been no occasion for Foley to move for recusal during those five years, once the Motion for Summary Judgment was assigned to Respondent, there *was* occasion to move for recusal, for, all the reasons for recusal— all the "Circumstances" set out in the Motion for Recusal—were known to Foley *before* Respondent ruled on the Motion. By waiting until *after* an adverse ruling was entered Foley was courting the disfavor of the Supreme Court (see cases cited *supra* in this footnote). We believe, however, that there is a critical difference between the cases cited and the case with which we here deal. In all of those cases the courts were deciding *controversies between litigants* and the courts expressed disapproval of the idea of the party "laying in

the grass" to see if he got a favorable ruling on the underlying matter, and then, if he didn't, filing the Motion for Recusal, *see Goodheart v. Casey, supra,* at 199, 565 A.2d at 763 and thus getting "two bites at the apple." But, in those cases, it was the conduct of the party (or his lawyer) which was provoking the disapproval of the court. In those cases the conduct of the judge—whether the judge was violating the Code of Judicial Conduct—*was not an issue.* In the case now before us, that *is the issue.* Indeed it is not the function; nor is it within the authority of the appellate courts, in deciding controversies between litigants, to decide whether a judge has violated the canon of the Code of Judicial Conduct requiring recusal in certain circumstances— or any other Canon. *Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 489 A.2d 1291 (1985); *In re Zupsic,* 893 A.2d 875, 890–95 (Pa.Ct.Jud.Disc. 2005). That is the constitutional function of this Court subject to review by the Supreme Court. Pa. Const. Art. V, § 18.

Consequently, Foley's conduct—Foley's decision to "lay in the grass" is not at issue here; it is Respondent's conduct which is at issue here. The responsibility to act in accordance with the Code of Judicial Conduct, to act so as to not violate any of the canons, including Canon 3C.(1)(a), is upon *the judges.* (We are constrained to note that it is not the responsibility nor the prerogative of president judges to "recuse" other judges. *See, Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority, supra.* The testimony in this case indicates that President Judges Toole and Conahan think it is. (N.T. 330–31 Toole; N.T. 508–10 Conahan)). It is not the responsibility of the bar to police compliance with the Code of Judicial Conduct. Canon 3C.(1)(a) does not require recusal only "Upon Motion filed by a party...." It provides "Judges shall disqualify themselves...." So, here, inasmuch as Respondent was as aware as was Foley of all the "Circumstances" set out in his Motion for Recusation before it was filed, the question of whether the canon required Respondent to recuse, is in no way affected by when Foley filed his Motion—or whether he filed it at all.

an's daughter) a job which Miller did not do.

4. Miller represented Respondent in a personal injury action and they had a dispute over the distribution of the settlement proceeds. [Apparently] Respondent was requiring Miller to pay part of her fee to Respondent's law clerk as a "forwarding fee."

While we might consider one or more of these alleged reasons sufficient to call for recusal, and that refusal to recuse in these circumstances amounted to a violation of Canon 3C.(1)(a), we are not satisfied that the Board has established that by clear and convincing evidence based on these alleged reasons.

The allegations in the Motions are sketchy. We are not even sure that our understanding of them as set forth above is entirely accurate. We have heard no testimony on the subject. Foley didn't testify. Miller didn't testify. Answers were filed to the allegations which may well have controverted some of the allegations. We recognize that these Answers were not made part of this record and, thus, we are at liberty to accept the allegations in the Motions as true inasmuch as they (Board Exhibits 1 and 2) were received into this record without objection. Nevertheless, we would not be comfortable finding a violation of Canon 3C.(1)(a) based on those allegations. The evidence is not clear and convincing.

Thus, we find that the Board did not prove that the "Circumstances" alleged by *Foley* established by clear and convincing evidence that Respondent's "impartiality might reasonably be questioned" requiring her disqualification under Canon 3C.(1)(a). However, in this case, we have other evidence on the point.

 In this case, we have Krohn's testimony of Respondent's instructions to him that he was to use the opinion he was about to prepare on the Plaintiffs' Motion for Recusation to "cut [the plaintiffs' lawyer] a new asshole." One is hard pressed to imagine a more explicit and undisguised expression of antipathy. Delivered, as it was, with such malevolence that Krohn said:

> I'll never forget to my dying day. The venom in her voice, the look on her face, when she said, I want you to cut him a new asshole. That's an exact quote. It's not fictitious. It's not made up from my mind. It actually occurred.... (N.T. 152–53).

Thus it is established beyond any doubt Respondent's personal bias against Foley was such that her "impartiality might reasonably be questioned." Respondent's words to Krohn amount to an announcement *by her* that she is not *impartial.*

The issue here (as in all recusal cases) *is not* whether the judge decided the case correctly, or not.

The issue *is not why* the judge decided the case as he/she did.

The issue is whether the judge should have recused *before* he/she decided the case.

The issue is, the test is, in the words of the canon, "whether [her] impartiality might reasonably be questioned."

If Mr. or Mrs. O'Brien (or their lawyer) heard, or found out about, Respondent's declaration, and the circumstances under which it was made, can it be imagined that they would not have instantly questioned Respondent's impartiality? And, can it be imagined that it could seriously be contended that it would not have been eminently reasonable for them to do so?

This case is rare because rarely is the evidence of impartiality produced out of the mouth of the judge, i.e., by direct

evidence. Usually the evidence comes from the surrounding circumstances, i.e., circumstantial evidence. See, e.g., the case most recently decided by this Court, *In re Zupsic,* 893 A.2d 875, 890–95 (2005); and *Judicial Inquiry and Review Board v. Fink,* 516 Pa. 208, 532 A.2d 358 (1987), which is a case which came to the Supreme Court through the constitutionally pre-scribed mechanism for enforcement of Canon 3C.(1).

In *Fink,* the Respondent was elected to office in 1977 after an acrimonious cam-paign in which he defeated the incumbent, Judge Patterson. In 1982, when Judge Patterson's son was brought before the Respondent on drug related charges, the defendant requested Respondent's recusal. Respondent denied the request stating he had no bad feelings about the defendant's father and that "The holy ghost came down on my shoulder and cleansed me of all those feelings." The Supreme Court held that Respondent's failure to recuse was a violation of Canon 3C.(1)(a) for, in these circumstances, his impartiality "might reasonably be questioned."

We certainly agree with the Supreme Court that in those circumstances—ac-cording to that circumstantial evidence—Judge Fink's impartiality might reason-ably have been questioned; but the evi-dence in that case is far from as clear and convincing as the direct evidence of the questionableness of the impartiality of this Respondent in this record.

In the same vein, we think attention to the specific circumstances in which dis-qualification is *compulsory* under the can-on helps to put the evidence on the point in this case in perspective. We refer to sub-sections (b), (c) and (d) of Section C.(1) of the canon. For example, in those sections disqualification is required in circum-stances where:

> "[the judge] served as a lawyer in the matter in controversy, or a lawyer with whom [the judge] previously practiced law served during such association as a lawyer concerning the matter." (C.(1)(b));
>
> The judge or his (or her) spouse has a third cousin who (or has a third cousin whose spouse) is "an officer, director or trustee of a party; [or] who is acting as a lawyer in the proceeding." (C.(1)(d)(i) and (ii)).[40]

Disqualification is *required* in the cir-cumstances described in subsections (b), (c) and (d) because the Supreme Court considers that in those circumstances *it is established* that the judge's "impartiality might reasonably be questioned." We be-lieve the evidence of Respondent's impar-tiality in this case establishes more clearly and more convincingly the reasonableness of questioning her impartiality than in the circumstances described in subsections (b), (c) and (d) of Canon 3C.(1).

This self-proclamation of partiality makes it unnecessary for us to undertake to evaluate the reasons for recusal ad-vanced by the O'Briens in an effort to determine whether those "Circumstances" were such that her "impartiality might reasonably be questioned."

We address briefly the inability of our dissenting colleagues to believe that the Respondent said what Ted Krohn said she had said to him about writing the opinion in the Violet O'Brien case—as well as in the Bonner case. We certainly respect their careful and conscientious approach to fact-finding; but we do not understand their hesitation to believe Krohn's testimo-ny about these encounters with Respon-dent. We mention that Krohn testified

---

**40.** See, also, the Note after subsection (1)(d)(ii) of Canon 3C.

about many aspects of Respondent's conduct—not just about O'Brien and Bonner. He was Respondent's senior law clerk for over four years and we believe he was a credible witness in respect to all his testimony. In fact, Respondent often referred to him admiringly as her "Clarence Darrow." Krohn does not appear to have had any "axe to grind" with Respondent. He did not initiate this investigation. He did not file a complaint with the Board. He answered the questions of the Board's investigator and testified at the trial and we have no misgivings about the credibility of his testimony.

We hold that the Board has established by clear and convincing evidence that Respondent's failure to recuse in the Violet O'Brien case was a violation of Canon 3C.(1)(a) of the Code of Judicial Conduct.

■ We turn now to the other charges related to the Violet O'Brien case and find that Respondent's conduct in the case as related in the testimony of her law clerk, Mr. Ted Krohn, set out above is clear and convincing evidence of violation of:

1. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2;

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper administration of justice as charged in Count 6; and

3. Canon 2A. of the Code of Judicial Conduct as charged in Count 4.

We will discuss these findings in the order listed above.

1. We find that Respondent's resolve to decide the plaintiffs' Motion for Recusation so as to satisfy her personal bias against plaintiffs' lawyer is so extreme as to satisfy the standard set out in the cases cited

heretofore in this Opinion. We refer to *In re Smith, supra, In re Cicchetti, supra. In re Trkula, supra.* We also find that the reasonable expectations of the public would not include the expectation that a judge would decide a matter on the basis of personal antipathy for one of the lawyers. *See, Smith, Cicchetti, Trkula* and other cases cited *supra.*

■ 2. Our holding in *In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996) requires a finding that Respondent's conduct discussed here was such that prejudices the proper administration of justice.

In that case we held that:

Conduct which prejudices the proper administration of justice ... is conduct which obstructs or interferes with those activities which enable the systematic operation of the courts. The term "systematic operation" encompasses not only the procedures adopted by courts which aid in functioning, but also the standards of conduct expected of judicial officers in the performance of the work of the courts. Hence, when a judicial officer's conduct departs from the standard expected of judges and has the effect of obstructing or interfering with the systematic operation or normal functions of the court, his conduct *will have affected* the proper administration of the courts.

*Smith, supra,* at 1237 (emphasis the Court's).

There is certainly no question that when Respondent told Mr. Krohn to cut Mr. Foley "a new asshole" in the opinion he was supposed to draft on the recusal motion, she was "interfering with the systematic operation or normal functions of the court" and as we said in *Smith,* at 1237 "[such] conduct *will have affected the proper administration of justice.*" (emphasis the Court's). *See, also, In re Zupsic,* 893 A.2d 875, 889 (Pa.Ct.Jud.Disc.2005).

Again, we said in *Smith* and quoted in Zupsic:

> A judicial officer who engages in conduct which prejudices the proper administration of justice would have the added element of a mental state in which he or she not only knew that the conduct at issue consisted of some neglect or impropriety, *but also acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice, for example, by affecting a specific outcome.*

*Smith, supra*, at 1238, *Zupsic, supra*, at 889 (emphasis the Court's).

It is not open to question that when Respondent told Krohn to "cut him [Foley] a new asshole," Respondent's only purpose was to "[affect] a specific outcome."[41] Nor is there any question that Respondent intended that her instruction to Krohn would have a deleterious effect on the administration of justice and intended that it would prejudice the rights of Mr. and Mrs. O'Brien to have the Motion decided on its merits.

We hold that Respondent's conduct was such that prejudices the proper administration of justice.

3. Canon 2 of the Code of Judicial Conduct provides in pertinent part:

> A. Judges should respect and comply with the law and should conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. B. Judges should not allow their family, social, or other relationships to influence their judicial conduct or judgment. They should not lend the prestige of their office to advance the private interests of others; nor should they convey or knowingly permit others to convey the impression that they are in a special

position to influence the judge. Judges should not testify voluntarily as a character witness.

*In re Cicchetti, supra,* we were required to decide whether a judge's sexual harassment of a courthouse employee was a violation of Canon 2. In that process we carefully evaluated the breadth of the intended application of this Canon. We said:

> Canon 2 ... [is] directed at conduct which would impugn or detract from ... the integrity and impartiality of the judiciary. "Integrity" must be read *in pari materia* with ... "impartiality" in Canon 2 ..., Both of these words [and Canon 2] exhort judges to carefully preserve all appearance of evenhandedness, of not favoring or appearing to favor either side in a case, of being and appearing free from influence.

*In re Cicchetti, supra,* at 313. In that opinion we continued:

> Canon 2 in general is directed towards conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially.

*Id.* We concluded that Canon 2 did not proscribe the conduct (sexual harassment) there involved. The Supreme Court affirmed the decision in *Cicchetti* and specifically approved our definition of the scope of the canon's application. The Supreme Court held:

> Canon 2 similarly addresses the judicial decision-making process and seeks to avoid the appearance of influence over judicial activities. Appellee is not subject to censure for a violation of Canon 2 based on his conduct toward Ms. Brueggman because it was independent of his decision-making duties.

*In re Cicchetti,* 560 Pa. 183, 201, 743 A.2d 431, 441 (2000).

---

41. Which, when Krohn refused to cooperate, she accomplished herself.

 In obvious contrast, when this Respondent was telling Mr. Krohn how to make the decision she was acting in the "decision-making process." Moreover, Respondent's conduct was antipathetic to the exhortations of the canon for judges "to carefully preserve all appearance of even-handedness" and "of not favoring either side in a case." *In re Cicchetti.* 697 A.2d at 313. We hold that Respondent's decision to decide the Violet O'Brien case so that Mr. Foley would be provided with a new asshole is precisely the conduct towards which Canon 2 is directed, i.e., "conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially."

## J. THE BONNER CASE

### Findings of Fact

86. In April of 2003 Respondent conducted a non-jury trial in a declaratory judgment action brought by State Farm Fire and Casualty Co. against Neil and Carmella Bonner. The issue in the case was whether State Farm, under an insurance policy it had issued to the defendants, was entitled to a judgment declaring that it had no duty to defend or indemnify defendants in connection with liability for a death which had occurred on their property. (N.T. 78–80 Krohn, Board Exhibit 28).

87. Respondent's law clerk, Ted Krohn, attended the trial. (N.T. 80, 3609 Krohn).

88. After conclusion of the trial, Krohn and Respondent discussed the case in chambers in regard to doing an opinion. (N.T. 80, 3604, 3609 Krohn). In that discussion Krohn made it known to Respondent that, from what he had heard in court, the facts in the case weighed heavily in favor of the insurance company. Respondent replied that she wanted to find in favor of the Bonners and against the insurance company. Krohn replied that he didn't know if he would be able to draft

such an opinion because the evidence was "pretty clear-cut." Respondent told Krohn that she was going to decide in favor of the Bonners because they were a somewhat prominent Italian family in the Hazleton area who had supported Respondent politically, or words to that effect. (N.T. 80, 82, 3609–12, 3615–17, 3640–41 Krohn).

89. Krohn left Respondent's employ shortly thereafter and did not draft any opinion in the case. (N.T. 3612 Krohn).

90. On May 28, 2003, Respondent entered an adjudication in favor of the defendants and against the insurance company ordering that State Farm was obligated to provide defense and indemnity under the insurance policy. (Board Exhibit 28).

### Discussion

Before discussing the efficacy of the above facts as establishing any violation of the Code of Judicial Conduct or the Constitution, we address two matters raised by Respondent.

 The First Matter. The Board's Complaint filed in this case contains no allegations relating to Finding of Fact Nos. 86–90. During the trial we permitted the Board to amend the Complaint to include them and to produce evidence relating to them. Respondent has objected to the order permitting amendment and to the admission of evidence relating to the amendment. Respondent claims that by those rulings she has been denied due process because these allegations were not in the Complaint. While there is no question that the Complaint made no mention of "the Bonner case," we hold that our rulings to permit the amendment and receive the evidence did not infringe or diminish Respondent's right to due process.

Respondent's objection is that she is prejudiced by the admission of this evi-

dence because she had no notice of it; she is "surprised" by it; and her ability to defend against it is compromised.

That, however, is not the case here because she did have notice of it. She is not surprised by it; and her ability to defend against it is not compromised.

On three separate occasions, long before the trial commenced, Respondent received notice of Krohn's allegations of her conduct in the Bonner case.

1. She was notified on June 21, 2006 in the Board's Supplemental Notice of Investigation. This notice was specific and detailed and entirely consistent with the testimony presented at trial.

2. She was notified on August 25, 2006 when she was asked about it at her deposition. (Exhibit R–641). This notice was specific and detailed and entirely consistent with the testimony presented at trial.

3. She was notified on December 20, 2006 when the Board furnished Respondent with the Report of Interview of Mr. Krohn in pre-trial discovery. This Report was specific and detailed and entirely consistent with the testimony presented at trial.[42]

So, Respondent did receive notice and was not surprised by this evidence—she knew all about it for well over a year before the trial started.

Respondent, however, maintains she *was* surprised because it wasn't in the Complaint. This is, of course, true; and this Court seriously considered Respondent's position. As a matter of fact, we initially ruled to exclude the evidence. After further consideration we reversed that ruling and permitted it to come in. There were several reasons for this.

1. Respondent's position is that whenever no mention of an event is made in a Complaint and evidence about the event is sought to be introduced, there will *always* be surprise. That may be true; but that doesn't mean that the evidence can (should) never be admitted. That doesn't mean that Motions to Amend a Complaint to Conform to the Evidence can (should) never be granted.[43]

Rule 1033 of the Pennsylvania Rules of Civil Procedure governs amendments of pleadings.[44] That Rule provides:

> A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, correct the name of a party or amend his pleading. The amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense. An amendment may be made to conform the pleading to the evidence offered or admitted.

---

**42.** In the interview it is reported that Krohn "guessed" the name of the family to be "Baltrami or possibly Lombardo." Of course, we now know that this was wrong—the name of the family is Bonner. But this is all irrelevant. The name of the case in no way bears on the question here at hand; i.e., whether Respondent told Krohn that she wanted the case decided in favor of the defendant—policy holder because he (she) (they) had supported her politically. Krohn's "guessing" only served to sidetrack the Board in its attempts to find the file.

**43.** Quite the contrary, these Motions are well known in our jurisprudence. They are not uncommonly filed and it is not uncommon for them to be granted.

**44.** We are careful to note that while the Rules of Civil Procedure do not *govern* procedure in this Court, they are often promulgated to deal with questions we face. In such cases we do not hesitate to refer to them for guidance.

■■■■ Generally, amendments to pleadings are to be liberally allowed, absent prejudice to the nonmoving party. *Weaver v. Franklin County*, 918 A.2d 194 (Pa.Cmwlth.2007), *appeal denied*, 593 Pa. 751, 931 A.2d 660 (2007); *Chaney v. Meadville Medical Center*, 912 A.2d 300 (Pa.Super.2006); *see, also, Unified Sportsmen of Pennsylvania v. Pennsylvania Game Comm'n*, 903 A.2d 117 (Pa.Cmwlth.2006). Amendments to pleadings are permitted at any time, including before, during, and after trial. *Horowitz v. Universal Underwriters Ins. Co.*, 397 Pa.Super. 473, 580 A.2d 395 (1990). Motion to amend pleading is addressed to sound discretion of trial court, and trial court's determination is not to be disturbed on appeal absent abuse of discretion, *Sejpal v. Corson, Mitchell, Tomhave & McKinley, M.D.'S.*, 445 Pa.Super. 427, 665 A.2d 1198 (1995).

Prejudice is the key element; "surprise" without prejudice is no ground for excluding the evidence. "Surprise" without prejudice to the right to due process is no ground for excluding the evidence. Respondent's right to due process was not damaged because she had notice of what Krohn was saying about the Bonner case for well over a year before the Board sought to introduce that evidence.

2. Respondent's ability to defend was not prejudiced or compromised by our ruling to admit the evidence. As it was, Krohn testified as to what she said to him about the Bonner case. She denied it.[45] If reference to the Bonner case had been in the Complaint, Krohn's testimony would have been the same. And she would have denied it. Nothing would have been different.

We affirm our ruling to permit the Board to amend its Complaint to conform to the evidence of Respondent's conduct in the Bonner case.

■■■■ The Second Matter. Much was made over Krohn's (and the Board's) inability to identify the Bonner case by name and Respondent had objected to the admission of Krohn's testimony about the case because, Respondent claims, that testimony is tainted because his eventual identification of the case by name was accomplished by Krohn's violation of a sequestration order entered by this Court at the beginning of the trial.

■■■■ First, the only reason the identification of the case by name ever became an issue is because Respondent was maintaining, from the first time she heard of Krohn's allegations through the first week of trial, that the case "never existed," "is totally a fiction" and "never happened." [46] However, identifying a case by name is not a condition for the admission of testimony that a judge was ordering that the decision in a case before him (or her) be made in favor of a party because the party had supported him (or her) in an election. So, inability to identify the Bonner case by name was not an impediment to admission of Krohn's testimony.

Second, Krohn's eventual identification of the Bonner case by name was not accomplished by violation of the Court's sequestration order.

Krohn testified that the way it happened was as follows:

Q. Now, Mr. Krohn, would you explain to the Court how you came to identify that case?

A. After my testimony initially, I was going to dinner that evening at the hotel where I was staying, at the Courtyard at Marriott, and there

---

**45.** N.T. 3791–95 Lokuta.

**46.** Statements by Respondent's counsel (N.T. 81).

were three other people there who also, I believe, had testified in the case.[47] And they asked me how it went.

And I said I thought it went very well, except for there was a case that I just couldn't put my finger on that I was involved in. And I said I just couldn't recall the name of the case.

And one of the gentlemen asked me—I don't know whether it was Mr. Sharkey or Michael Onderko, who I believe was a law clerk to Judge Augello—not a law clerk, but a tipstaff, or a gentleman by the name of—I can't even think of his name. He worked for the jury board. And asked me, you know, about—he said, what kind of a case?

And I said, I don't remember, but, I said, I do remember it was a drowning involving a family and some sort of a recreational group in Hazleton.

And all three of them said, oh, you're talking about the Bonner case. And at that point, it rang a bell.

When I got back to Luzerne County a few days later, I went to the prothonotary's office and checked. (N.T. 3605–06 Krohn).[48]

 Respondent contends that Krohn's exchange with the other witnesses in the hotel was a violation of the sequestration order.

The sequestration order was:

JUDGE SPRAGUE: All witnesses will be sequestered. It's up to counsel to see that all their witnesses are sequestered. This is a continuing obligation of all counsel. (N.T. 23).

Rule 615 of the Pennsylvania Rules of Evidence governs sequestration of witnesses. It states in pertinent part:

At the request of a party or on its own motion, the court may order witnesses sequestered so that they cannot learn of the testimony of other witnesses.

Pa.R.E.615.

It is instantly apparent that Krohn did not "learn of" the testimony of any of the three gentlemen he encountered in the

---

**47.** They hadn't. They testified later—about totally unrelated matters.

**48.** Krohn further testified (on January 16, 2008):

Q. All right. Now, as part of—you had mentioned that you went to the Prothonotary and you examined their file?
A. No. I examined the docket sheet. I had asked for the file and was told by one of the clerks in the prothonotary's office *that the actual prothonotary's file was with Judge Lokuta.* But I was able to access the dockets, which remain in the prothonotary's office. (Emphasis added.) (N.T. 3607 Krohn).
This was a "few days" after September 24, 2007, the date on which Krohn had first testified. After that he told the Board the name of the case and the Board told the Respondent on November 19, 2007. On January 9, 2008, in her response to the Board's Motion for Reconsideration (of our Order excluding

Krohn's testimony), Respondent objected to any change in that Order because "Respondent will be prejudiced by Krohn's testimony *because she did not receive notice of the Bonner case until November 19, 2007, less than three weeks before the second phase of the trial*" (which began on December 10, 2007). (Emphasis added.) Yet, if a few days after September 24, 2007 the file was in Judge Lokuta's office as Krohn said he was told by the Prothonotary, then Respondent's representation in January 2008 that she didn't find out that the Bonner case was the "Bonner case" until she was told by the Board on November 19, 2007, is false. Moreover, if it is true that that representation is false, then it must be seriously considered that there was never a time when Respondent was unable to identify the Bonner case as the "Bonner case."
We recognize that what Krohn said he was told in the prothonotary's office is hearsay but it came in without objection; and we see no reason to believe Krohn made it up.

hotel after he testified on September 24, 2007. Their testimony was not even discussed. Krohn told the three gentlemen that he couldn't remember the name of a case. If, for the sake of argument it could be considered that thereby the three gentlemen "learn[ed] of" Krohn's testimony, it is of no moment and was no violation of the sequestration order because what they learned from Krohn had no connection whatsoever with their testimony. They weren't there to testify about the Bonner case. Sharkey was there to testify about what it was like to be court administrator in Luzerne County in those days. The other two, Onderko and Refowich, were there to testify about the Adonizio incident.

Our Supreme Court has stated:

> The purpose of sequestration of witnesses is to reduce the possibility that a witness may, from what he hears in the courtroom, improperly mold his testimony to fit some plan not riveted to the standards of truth.[49]

*Commonwealth v. Smith,* 424 Pa. 9, 225 A.2d 691, 694 (1967).

Even if the words of the Supreme Court are extended to apply to what a witness hears *outside* the courtroom, suggestion that Krohn's actions were in conflict with the purpose of sequestration stated by the Supreme Court, is undeserving of consideration.

Thus Krohn did not violate the sequestration order.

We address now the question whether Respondent's instructions to Krohn that he draft an opinion "in favor of the Bonners"[50] because this was a family who had supported her politically was a violation of any of the precepts of the Code of Judicial Conduct or the Constitution. We find that Respondent's conduct as related in the testimony of her law clerk, Mr. Ted Krohn, set out in Findings of Fact Nos. 86–90, is clear and convincing evidence of violation of:

1. Canon 3C.(1)(a) of the Code of Judicial Conduct as charged in Count 5;

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2;

3. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper administration of justice as charged in Count 6; and

4. Canon 2A. of the Code of Judicial Conduct as charged in Count 4.

We will discuss these findings in the order listed above.

 Canon 3C.(1)(a) is the canon which requires judges to disqualify themselves in any proceeding in which "their impartiality might reasonably be questioned"—"where

---

**49.** If Krohn had any "plan" it was to establish the truth. He had been called a liar by Respondent who was insisting that the Bonner case "never existed," and was "a fiction," and so on, and that, therefore, Krohn was making it all up. Krohn's plan, therefore, was to prove that it did exist—which was the truth. Moreover, this Court essentially challenged him to do just that. The Court said:

JUDGE SPRAGUE: I must say to counsel … the Court's going to want, at some point as

we go along, evidence that there is such a case. (N.T. 82–83).
When Krohn was being excused on that first day of trial the Court asked:
JUDGE SPRAGUE: May this witness be excused?
MR. PUSKAS: Yes, Your Honor.
JUDGE SPRAGUE: Subject to your proving there is such a case, the witness is excused with the thanks of the Court. (N.T. 170–71).

**50.** (N.T. 3612 Krohn).

they have a personal bias or prejudice concerning a party."

Respondent's conduct in the Bonner case is the mirror image of her conduct in the Violet O'Brien case. The conduct is the same, the violation is the same; the only difference is that in the Violet O'Brien case Respondent's prejudice was directed *against* a party and in the Bonner case it was directed *in favor* of a party. In both cases there was a self proclamation by Respondent that she was prejudiced including the reason why. As in the O'Brien case this establishes that Respondent's personal bias was such that her "impartiality might reasonably be questioned."

Thus, we hold that the Board has established by clear and convincing evidence that Respondent's failure to recuse in the Bonner case was a violation of Canon 3C.(1)(a).

As to 2. 3. and 4. For the reasons set forth in our Discussion of the Violet O'Brien case we find that the Board has established by clear and convincing evidence that Respondent's conduct in the Bonner case was a violation of:

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 2,

3. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that prejudices the proper administration of justice as charged in Count 6, and

4. Canon 2A. of the Code of Judicial Conduct as charged in Count 4.

## K. *RESPONDENT'S DEFENSE*

### *Conspiracy*

As we have seen, Respondent testified that she believed the five witnesses who corroborated Mr. Adonizio's version of the Adonizio incident and contradicted her version, were lying. Later, she testified that all 30 witnesses who testified against her were lying. The Court, curious, asked Respondent:

> JUDGE SPRAGUE; You've heard all of these witnesses—I'm jumping ahead and I apologize, Mr. Sinatra.
>
> But you've heard—as you said, you've sat here, you've listened. And you have listened intently and watched each and every witness.
>
> You've heard a whole stream of witnesses describing you in the most unflattering terms, as screaming, yelling. I don't have to repeat it all.
>
> But is there any common connection between all these people that you see, for them all to be saying what they're saying?
>
> THE WITNESS: They all serve at the benefit of the president judge. They're all employed by Luzerne County. They are a very cliquish environment. (N.T. 2462–63).

Still curious, the Court further inquired of Respondent:

> JUDGE SPRAGUE: I'm sorry to interrupt you, but what does that have to do with the accusations made here, in your view?
>
> THE WITNESS: Well, I think that there's this motive.
>
> JUDGE SPRAGUE: You think there's what?
>
> THE WITNESS: A motive. There's an exacting—I'm exacting. I try to be, in my courtroom. Maybe in the standards as to bookkeeping of my own office—
>
> JUDGE SPRAGUE: Do you think there's a conspiracy by all these people to get you?
>
> THE WITNESS: I think that as a maverick judge, I've never been welcomed. I think that there is a desire

to have me removed as an independent judge on the court, Eleventh Judicial District.

And my response to you would be, yes, Your Honor. I believe, many times, in conspiracy theories. I know that you have at an earlier date, but—and I'm not trying to be glib.

I believe that there's a concerted effort to make sure that Ann Lokuta is no longer a judge sitting in the Eleventh Judicial District.

JUDGE SPRAGUE: And is it your thought that this is a conspiracy by people higher up on the chain, and the others that have testified, may be willing pawns in that?

I'm trying to understand that.

THE WITNESS: I think that, yes. I think that one could give a logical nexus to that analysis.

I think that these people serve at the leisure of the president judge. All of these people are under the direct control of the president judge. (N.T. 2466–68).

 We give no credence to Respondent's perception—conclusion—that the 30 witnesses called by the Board are so terrorized by, or at least so beholden to, the president judge that each one decided to come to court, take the witness stand, swear an oath to tell the truth, and then tell lie after lie after lie—all in order to "get" Judge Lokuta.

First, we assess these witnesses as truthful and their testimony as truthful; and we do not believe these witnesses would commit perjury because the president judge wanted them to—even if he did.

Second, Respondent was very clear about her conviction that the witnesses were lying and about the reason for it. On cross-examination Respondent was asked:

Q. Judge Lokuta, do you recall, in your testimony on direct, that you agreed when Judge Sprague asked if you believed that the conspiracy is by people higher up the chain with willing pawns below them?

A. I believe that the power elite is directing this, yes.

Q. All right. In fact, Judge Lokuta, you testified, I think, that these people serve at the pleasure of the president judge, all of these people are under the direct control of the president judge.

A. Do you recall that testimony?

Q. Yes, I do recall that testimony. (N.T. 2992–93).

In fact, many of these witnesses were not employed by the Luzerne County Common Pleas Court at the time of their testimony and thus, were not "under the direct control" of the president judge or serving at "his leisure." This list includes: Murtha–Cowley, Cronin, Sallemi, Krohn, Sammon, Flaherty, Youngclaus, Stankus, Violi, Mecadon and Kostelaba. When this was brought to her attention, Respondent's explanations were often tortured and always attenuated. We set forth some examples of her explanations.

On Virginia Murtha–Cowley (employed by the Pennsylvania State Education Association):

Q. Judge Lokuta, did assistant public defender Virginia Cowley not welcome you because you are a maverick judge?

A. Virginia Murtha–Cowley did not welcome me because I was a maverick judge, because she wanted to be part of the group because she wants to be a judge in the Eleventh Judicial District. And she wants to be accepted by the other judges.

When she testifies against Ann Lokuta, she extends acceptance.

JUDGE SPRAGUE: So the answer is, yes, you believe that with respect to that individual, part of her opposition to you in testimony is influenced by your being a maverick judge; is that correct?

THE WITNESS: Yes, Your Honor. (N.T. 2991).

On Barry Stankus (the elected sheriff of Luzerne County) [51]:

Q. Do you believe Barry Stankus is a part of a conspiracy against you, Judge Lokuta?

. . . .

A. Yes, I do.

Q. How does he fit into a conspiracy?

A. Because there were problems with the budgeting working through the courts and when prisoners could be transported or not. And these are matters that would be worked out through meetings with the sheriff and the president judge.

Q. So is it your contention that now-former Sheriff Barry Stankus, when he came before this panel and testified, he did so untruthfully because of budgeting concerns?

MR. SINATRA: I'm going to object to the form of the question.

JUDGE SPRAGUE: Overruled.

A. I didn't say that he testified untruthfully. First of all, you're attributing that to me. I didn't say that. So I'm not responding to that question as asked. That's not what I've ever said.

I heard—and perhaps I can comment on the sheriff's testimony. I heard him say very little that was damaging to Judge Lokuta.

. . . .

BY MR. PUSKAS:

Q. Judge Lokuta, you have acknowledged that you believe Barry Stankus is part of a conspiracy. I asked you why you felt that way. You mentioned it had to do with budgeting, which involved the president judge.

When I asked you whether or not he came before this panel and testified untruthfully, then you said you never said he testified untruthfully—

MR. SINATRA: Objection.

. . . .

JUDGE SPRAGUE: Objection overruled. The last question was, you never said that he testified untruthfully, correct?

A. Correct, I never said he testified that way.

BY MR. PUSKUS:

Q. So what is Barry Stankus' conspiratorial action in this matter?

MR. SINATRA: Objection to the form of the question.

JUDGE SPRAGUE: Overruled.

A. Well, it depends on how one defines conspiracy. You could have a cog within a cog or a wheel within a wheel. You could have all different branches coming out. You're just saying that this is one concentric circle. You can have a totality of conspirators. This might be—

JUDGE SPRAGUE: Excuse me, Judge Lokuta. I think the question—Counsel, if I am incorrect, you correct me—I believe the question is, having

---

**51.** At the time of his testimony, Mr. Stankus was no longer the sheriff, having been defeated in the November 2007 election.

stated that this individual is part of a conspiracy, what do you believe is his part of the conspiracy. That is the question.

A. (Continuing) Initially, Mr. Stankus was having problems in terms of budgeting, in terms of problems with the court, where he would have his prisoners transported.

And I know that that was worked out during the time period with Judge Conahan. Judge Olszewski and I had some problems in that time frame, and I think there was an exhibit.

So I believe that there is a desire to align with the president judge. And I believe that from that, Mr. Stankus, because he's no longer the sheriff, has control over certain of his employees that could come and testify. (N.T. 3007–11).

On Jill Moran (the elected prothonotary of Luzerne County):

BY MR. PUSKAS:

Q. Would you agree with me, Judge Lokuta, that Jill Moran, as the elected prothonotary of Luzerne County, does not serve at the pleasure of the president judge?

A. I'll agree with you that she does not. She's an elected official row officer.

Q. Do you believe that Jill Moran is part of a conspiracy against you?

A. Yes, I do.

Q. How does Jill Moran fit into this notion of conspiracy?

A. I believe Jill Moran directed certain clerks to testify against me. And I know that overtures were made of other clerks who would not testify.

Q. When you say "directed," do you mean she ordered other clerks to testify against you?

A. No. I believe that she solicited their cooperation. (N.T. 3014–15).

On Ted Krohn (Respondent's former law clerk, now in private practice):

Q. Judge Lokuta, do you recall that you testified that your former senior law clerk, Ted Krohn, was someone you endearingly called Clarence Darrow?

A. Yes, at the time, I did call him that.

Q. Do you agree that you testified you considered him to be like a father to you and you had a great deal of respect for the man?

A. I did say that, yes.

Q. Would you agree with me that as your senior law clerk, he served at your pleasure, not the pleasure of the president judge, correct?

A. Correct.

Q. All right. And once he left your employ, he worked for himself in his own private practice, correct?

A. I don't know that he went back to private practice. I think he's working on a land development now, but I'm not sure.

Q. He does not work in any capacity for the county?

A. I don't know that. I haven't checked.

. . . .

BY MR. PUSKAS:

Q. Do you believe Ted Krohn is part of a conspiracy against you, Judge Lokuta?

A. Yes, I do.

Q. How does Ted Krohn fit into this notion of conspiracy?

A. I haven't figured that one out exactly . . . . (N.T. 3015–16, 3018).

On Ingrid Cronin (employed in the public defender's office of the United States

District Court for the Middle District of Pennsylvania):

Q. Now, Judge Lokuta, do you recall Ingrid Cronin testified she ceased working as an assistant district attorney in August of 2004. She now works as an assistant federal public defender?

A. Yes.

Q. All right. So Ingrid Cronin came before this panel and testified, she had no job in the Luzerne County court system, correct?

A. Correct.

Q. How do you place Ingrid Cronin in the conspiracy?

A. Ingrid Cronin was working through the DA's office. She was very close with other members of the court.

But I think Ingrid Cronin's testimony actually helped me, because she said that she's seen other court reporters being—

JUDGE SPRAGUE: Judge Lokuta, again, you do have a tendency to start making some sort of speech.

The question was, how do you see this individual named Cronin being part of the conspiracy. If your answer is, I don't see that person as part of the conspiracy—

THE WITNESS: Thank you.

JUDGE SPRAGUE:—then just say so.

A. (Continuing) I don't see Ingrid Cronin as part of this conspiracy.[52] (N.T. 3004–05).

On Rebecca Sammon (employed by the House of Representatives of the Commonwealth of Pennsylvania):

BY MR. PUSKAS: [Reading from Respondent's earlier testimony]:

"JUDGE SPRAGUE: Could I ask you again, getting back to my original question, under whose influence do you believe she would be or was under?"

This is referencing Rebecca Sammon.

"THE WITNESS: I believe that she came under the influence of Susan Weber. Susan Weber was a wonderful saleswoman. She sold me on the belief that she would come back, would try to work hard, and she never did, Your Honor."

"JUDGE SPRAGUE: All right. Thank you."

Do you agree that this was your testimony, Judge Lokuta?

A. That was as read, my testimony.

. . . .

Q. Is it your contention nonetheless, that Rebecca Sammon came before this panel and testified untruthfully under oath because of some spell cast over her by Susan Weber?

A. I think that there's—it isn't a spell cast, so I wouldn't say a spell cast. I think she's caught up in what has been this dynamic. And she's friendly with these people.

Q. Well, why would she turn her back on super-duper Maureen and you because Susan Weber was, to quote your testimony, a wonderful saleswoman?

A. You're asking me to put a motive to what this woman is doing. I can't do that. I heard her testify. I—I don't know what's going on in her life. I don't know who she's friendly with now.

---

52. Thus Respondent is saying that Cronin testified truthfully, or that, even though she wasn't part of the conspiracy, she lied anyhow—for some other unrevealed reason.

Q. Well, Judge Lokuta, if you can't put a motive to Rebecca Sammon, why are you linking her to a conspiracy against you?

A. I think that's an unfair characterization. Judge Sprague asked me a question, if I could try to show where this conspiracy was. And I said that she would file—fall under the heading of being friendly with Susan Weber.

JUDGE SPRAGUE: I think your response was, as I recall, without being read back, that she was under the influence.

So, I think the question is, in view of the last answer that you gave, why would you say she testified as she did under the influence. When as I hear the question and your previous answers, you're saying you can't account, you don't know why she would have so testified.

THE WITNESS: Well, Your Honor, it might be—it might be that it's not limited to Susan Weber. It might be that she's caught under the influence of the JCB.

We heard her response where she actually uses the words that Mr. Puskas told her, that she wasn't going to bum the bridges. Maybe she's—

JUDGE SPRAGUE: Excuse me, Judge. Are you suggesting by that, that, in your view, the Judicial Conduct Board put words in her mouth to testify against you, words that the witness had not said on her own?

THE WITNESS: No. I'm suggesting that Ms. Rebecca Sammon is a young impressionable woman who might have internalized hearing those words and adopted them as her own.

I think that Rebecca—and I believe I testified that she had some problems. She does have some emotional problems. And I think that she's easily swayed. (N.T. 2977–80).

On cross-examination, Respondent argued with counsel on the question of whether the president judge had control over the hiring and firing of assistant district attorneys until the Court asked:

JUDGE SPRAGUE: The question, Judge Lokuta, is whether you agree with Mr. Puskas that the people appointed to the district attorney's office do not serve at the pleasure of the president judge.

THE WITNESS: That is correct, they do not.

JUDGE SPRAGUE: That's all he asked you. (N.T. 3002).

Counsel then inquired:

BY MR. PUSKAS:

Q. So if Assistant District Attorney Nancy Violi's job has nothing to do with serving at the pleasure of the president judge, how does she fit into a conspiracy against you, Judge Lokuta?

A. Well, Nancy Violi does have certain—strike that. I'm sorry.

When you're an assistant district attorney, your rapport with the president judge can determine if you are going to be assigned to certain courts on a routine basis. So there is an input there through the president judge.

So you would want to ingratiate yourself with the president judge if, for instance, you wanted to have treatment court, which is this new court developed for individuals who are suffering with drug addiction.

So the president judge does have some input. And I believe that as an assistant district attorney, you would want to endear yourself with a presi-

dent judge of the Eleventh Judicial District.

Q. So you're saying that ADA Nancy Violi was trying to ingratiate herself with the president judge?

A. Yes. And I believe that's when she went to him and complained to me. And he told Attorney Violi to go to you and file a complaint or give a statement.

And it's not Violi. It's Smacchi. You saw the same name on one of the exhibits this afternoon. She's married to Attorney Smacchi. (N.T. 3002–04).

Explaining how and why this conspiracy was initiated and how it gathered in all those people, Respondent testified:

Q. But, Judge Lokuta, you would acknowledge we're not just talking about two president judges. We're talking about other court departments and the individuals working in those departments, and, in fact, even your own staff?

A. Yes, we are. But I believe in the trickle-down theory. If respect does not come from your colleagues, everyone else thinks that it's okay not to show respect.

And there is this free-for-all mentality which has been engendered now, because they know that if you marginalize Ann Lokuta, it's okay. If Ann Lokuta asked, where is a file, you don't have to call her back. If Mr. Sharkey gets repeat letter after letter inquiry, inquiry after inquiry, of a legitimate nature, it's okay to just thumb your nose and not respond to Ann Lokuta, because Ann Lokuta is powerless.

And I think this is the perception. It is not that I have not attempted to reach out to these people. I am telling you, from the day that I got elected, I had an energy that was un-

believable. I have an ability that's unbelievable.

I have not been able to use that because each and every time, I have been thwarted, first by the president judge, the first president judge, and now by Judge Conahan.

I am not treated like any other judge in that county, whether it's because these administrative orders just have to keep being hammered at me. There is no interaction with me. My calls just go unreceived.

It has not been because of my not trying. I keep reaching out. I can't have them hold and accept me. I've tried. I have no control over how these people treat me. I have tried over and over to try to treat them in a deferential fashion. I have not been met with kind—or in kind, excuse me. (N.T. 3038–40).

Respondent has testified that she was never "well-received" by the "power elite" because she is a "maverick judge," and because she is an "independent judge." She has testified that, because she wasn't well received, a "conspiracy" was conceived and organized with the main impetus coming from Judge Conahan, who so intimidated the 30 Board witnesses, that one and all gave false testimony. Respondent's testimony proffered to justify her explanation of the mass perjury she sees here occurring, is so fanciful and convoluted that it carries no weight whatsoever. Including Respondent's testimony, this Court has not been presented with, nor has it otherwise become aware of, a shred of evidence of collusion, conspiracy, or the like.

### The Eye Doctor

██ Some of the Board's witnesses testified that when Respondent was in one of her bad moods, not only did she raise

her voice, not only did she publicly berate whoever it was who then occupied her attention, but she would grimace, scowl or glare at them. To explain this Respondent brought in an eye doctor, Nicholas Barna, M.D., who testified that these facial expressions which were being described were being caused by cataracts. (N.T. 1121). He related his observations of Respondent while she was reading the "chart" in his office in the spring of 2005:

A. ... She was grimacing. She was staring, kind of leaning forward in the chair which I always joke with the patients that's cheating because you're actually getting closer to the chart in order to try to see it.

And she was going through these facial machinations of squinting and grimacing and, you know, frowning and so forth in order to try to read the chart better. She—I could tell she was upset that she wasn't seeing like she thought she should. (N.T. 1124).

Counsel then asked the doctor:

Q. Can you be a little bit of a mimic and show the Court what you saw when you were examining her and she began to grimace and as you say—

A. Sure.

Q. —she began to squint and frown?

A. The squinting is, you know—What happens when you squint is you create a pinhole effect so that you're— It actually helps the eye to get some of the light rays back to the retina in a more straight line fashion to help the eye to focus.

Patients with cataracts or other refractive errors oftentimes will squint.

There's a lot of staring, a lot of blinking, a lot of forehead movement and just staring to try to form a clear image.

MR. SINATRA: Would the record show that as he did that, as the doctor stared and squinted, his face made a kind of a grimacing smile. (N.T. 1125).[53]

If eye problems were indeed causing Respondent to grimace, squint, frown and glare as Dr. Barna testified, the grimacing, the squinting, the frowning and the glaring would be occurring irrespective of the day of the week and irrespective of what kind of a mood she was in. This, however, was not the case. This became apparent in the testimony of Maura Cusick, a court clerk. Ms. Cusick had compared working in Respondent's courtroom to the movie the Wizard of Oz. "You never knew whether you're going to get the good judge or you're going to get the wicked judge." (N.T. 1149). At the conclusion of Ms. Cusick's direct examination, which had immediately followed Dr. Barna's testimony, the Court asked her:

JUDGE SPRAGUE: I have a question. You referred to the judge as the good judge and wicked judge.

A. Correct,

JUDGE SPRAGUE: And I'm just interested, when the judge was the wicked judge, were there facial expressions at that time that were different or the same as the facial expressions when she was the good judge?

A. Very different.

JUDGE SPRAGUE: And could you tell us what you mean? What would be the facial expressions when the

**53.** Dr. Barna testified that he did "cataract surgery" on Respondent in April 2005 and that: "She did well with respect to her cata- ract surgery. She had uncomplicated surgery and had a very good result," "She had a little bit of ... edge glare." (N.T. 1132–33).

good judge, and what would be the facial expressions when the bad—the wicked judge?

A. Well, coming on the bench in the morning, if this was a good day, she'd say good morning to all, how is everyone this morning, please be seated. The wicked judge would just come on the bench and court is in session and start, let's begin, very, very, let's begin, all right, call your first case.

JUDGE SPRAGUE: Well, those are words, but what about the facial expression?

A. Stern, just looking at you like, oh boy, this is going to be a bad day.

JUDGE SPRAGUE: And when the good judge what would the facial expression be?

A. Come out very happy, smiling. (N.T. 1164–65).

In our view this testimony thoroughly discredits Respondent's attempt to show that these "facial machinations" were involuntary; and establishes on the contrary that the grimacing, the frowning, the glaring, etc., were but additional, accompanying manifestations of her anger, impatience and discourtesy.

## L. *LEGAL ISSUES RAISED BY RESPONDENT*

### 1. *Judicial Conduct Board Rule 31*

Respondent moved to dismiss the Complaint alleging the Board violated its Rule 31 (J.C.B.R.P. No. 31) and cites our opinion in *In re DeLeon,* 902 A.2d 1027 (Pa.Ct. Jud.Disc.2006) in support of her motion. Rule 31 provides:

**RULE 31. DISPOSITION OF COMPLAINT.**

(A) Except as provided in paragraph (C), within 180 days of the Board's receipt of the Judicial Officer's written response pursuant to Rule 30(B)(2)(c) or written response to any subsequent letter requesting information by the Board, the Board shall:

(1) dismiss the complaint upon a finding that there is no existing probable cause to file formal charges;

(2) dismiss the complaint with the issuance of a letter of counsel upon a determination that, even if the alleged conduct occurred, it was not conduct which requires that formal charges be filed, provided that the Judicial Officer:

(a) consents in writing;

(b) stipulates that the letter of counsel may be used during proceedings involving new complaints against the Judicial Officer; and

(c) agrees to and satisfies any conditions required by the Board; or

(3) authorize the filing of formal charges with the Court of Judicial Discipline.

(B) If the Board dismisses a complaint following a full investigation, Chief Counsel shall promptly notify the Judicial Officer and the complainant.

(C) Exceptions.

(1) The Board may continue a full investigation of a matter beyond the 180–day period set forth in paragraph (A) upon a good faith belief that further investigation is necessary.

(2) The Board may defer disposition of a complaint pursuant to paragraph (A) upon discovery or receipt of additional, corollary, or cognate allegations which may necessitate an investigation.

(3) The receipt of the Judicial Officer's written response to any Rule 30(B) notice or supplemental or investigatory letter is a necessary prerequisite to the tolling and calculation of

the 180–day period set forth in paragraph (A). Thus, the 180–day time period is wholly inapplicable if the Judicial Officer fails to file a written response and the investigation will continue to conclusion.

In *In re DeLeon, supra,* we stated:

The Board's rule-making power derives directly from the Constitution:

The Board shall . . . establish and promulgate its own rules of procedure.

Pa. Const., Art. V, § 18(a)(6). It is pursuant to this constitutional authority that the Board established and promulgated its Rule 31.

In similar fashion this Court receives its rule-making power from the Constitution:

The court shall adopt rules to govern the conduct of proceedings before the court.

Pa. Const., Art. V, § 18(b)(4). It is pursuant to this constitutional authority that this Court adopted Rule 411(D)(3). That rule provides:

(D) The Judicial Officer may challenge the validity of the charges on any legal ground including:

\* \* \* \*

(3) that the Board violated the proceedings governing it.

C.J.D.R.P. No. 411(D)(3).

*Id.* at 1028–29.

■■■ In *In re Hasay,* 546 Pa. 481, 686 A.2d 809 (1996), the Supreme Court affirmed our holding that the Court of Judicial Discipline—contrary to what the Board was asserting—did have the constitutional authority to review the Board's compliance with its own rules of procedure. *In re Hasay, supra,* at 493–95, 686

A.2d at 816–17. *See, also, In re Cicchetti,* 697 A.2d 297, 308–09 (Pa.Ct.Jud.Disc. 1997), aff'd, 560 Pa. 183, 743 A.2d 431 (2000). Thus, our review of the Board's compliance—or non-compliance—with its Rule 31 proceeds upon solid authority.

We point out that the *DeLeon* case bears no resemblance to this case; we hold that the Board did comply with Rule 31; and we will deny the motion.

In *DeLeon* we stated that our examination of the question of compliance with Rule 31 would be focused on whether or not the Board had conducted its investigation with diligence. We said:

It is a given that the intention of Rule 31 is to require that the Board conduct its investigations with some expedition, that it not dawdle along all the while leaving the judicial officer under investigation to wonder whether he will be facing formal charges or not. It follows that this requirement cannot be met, nor this goal achieved, without the concomitant requirement that the Board proceed with diligence in conducting its investigations.

*In re DeLeon* at 1031.

In the *DeLeon* case the Board *admitted* that it did not act with diligence in its investigation and *admitted* that it had violated Rule 31. We there noted that the Board's concession was "based upon and limited to, the facts of this case" and that, likewise, our decision was so based and so limited. In the *DeLeon* case, it was obvious that the Board did not act with diligence; in this case, it is obvious that it did.

In *DeLeon* we noted that the Board's investigation extended over a period of 2½ years [54] and that, except for one interview in August 2004 and Respondent's deposition in October 2005, the Board *did nothing* for a period of 1½ years. We pointed

---

54. That is, from the receipt of Respondent's response to the Notice of Investigation (when

the 180-day clock begins to run) to authorization of the filing of a Complaint in this Court.

out that this delay was not only lengthy but was unexplained.

■ In this case the total time from the Board's receipt of Respondent's response to the Notice of Investigation to the authorization of the filing of the Complaint (May 2005 to October 2006) was 17 months—less than 1½ years. However, six months of that time (October 2005 to April 2006) was spent in an effort to get Respondent to agree to psychiatric and psychological examinations.[55] This six-month "delay" can in no way be attributed to lack of diligence by the Board—quite the opposite; we see this effort by the Board as designed for the benefit of the Respondent—an effort to find a benign explanation for the behavior which was being reported to it.

Another three months was added to the investigation because of Respondent's resistance to giving a deposition. The Board was required to serve her with a subpoena on May 17, 2006 to which she responded by filing a Motion to Quash the Subpoena. After the Motion to Quash was denied on August 17, 2006, the deposition finally took place on August 25, 2006.

The facts establish that the Board conducted this investigation with diligence. *DeLeon* has no application here. The Board has acted in compliance with its Rule 31 and the Motion to Dismiss for non-compliance with that Rule is denied.

### 2. *"Statute of Limitations"*

Some of the testimony in this case relates to events which are alleged to have taken place as long ago as the 1990s. It

came into the record over Respondent's objections based on "the statute of limitations."[56]

■ At the outset of this discussion we make it clear that "statutory limitations periods are not directly applied to disciplinary proceedings." *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997), citing *Wilhelm's Case,* 269 Pa. 416, 420–21, 112 A. 560 (1921). *See, also, The Florida Bar v. McCain,* 361 So.2d 700 (Fla.1978) and cases cited therein. There is no statute which places limits on the time within which charges must be brought in this Court.

There are, however, two time related constraints on what evidence the Board may present in this Court.

One is a constraint the Board placed upon itself in its Rule of Procedure 15.

The other is the concept of fundamental fairness by which, *In re Cicchetti,* at 306, this Court said it would be guided.

■ We will discuss Rule 15 first. It provides:

RULE 15. TIME LIMITATIONS

Except where the Board determines otherwise for good cause, the Board shall not consider complaints arising from acts or omissions occurring more than four years prior to the date of the complaint, provided, however, that when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.

---

55. Initially the Board sought to have Respondent examined by practitioners of its choice; Respondent declined and eventually agreed to be examined by a psychiatrist and psychologist of her choice.

56. Respondent made this objection repeatedly even as to testimony of events occurring only a short time before the trial. We will address the legitimacy of all of these objections and the consequent propriety of the admission of this testimony.

Preliminarily, we mention that it appears that Respondent misconstrues Rule 15.

As we pointed out in *In re Zupsic,* 893 A.2d 875 (Pa.Ct.Jud.Disc.2005):

Rule 15 does not address the lapse of time between the occurrence of acts or omissions of a judicial officer and the filing of the Complaint in this Court, but rather, the time which intervenes between the occurrence of the acts or omissions and the receipt of the complaint by the Judicial Conduct Board. This is clear. The word "complaint" appears frequently in the Judicial Conduct Board's Rules of Procedure, and review of these Rules leaves no question that in every instance the reference is to a "complaint" filed by a "complainant" with the Board. See, e.g. Rules 10, 11, 16, 17, 18, 25, 26, 27, 28, 30, 31. By contrast, whenever the Rules refer to a Complaint filed by the Board in this Court the term "Board Complaint" is used, see, e.g. Rules 13, 34. Moreover, Rule 1 provides definitions of the two terms as follows:

Board Complaint is the document setting forth the formal charges and filed by the Board to initiate proceedings in the Court of Judicial Discipline.

Complaint means a document setting forth information alleging conduct within the jurisdiction of the Judicial Conduct Board pursuant to Pa. Const. Art. V, § 18.

*Id.* at 885.

The record in this case establishes that Susan Weber filed a Complaint with the Board on April 27, 2004, and thereupon the Board initiated its investigation. This the Board is constitutionally authorized to do. Pa. Const. Art. V, § 18(a)(7) provides:

The board shall receive and investigate complaints regarding judicial conduct filed by individuals or initiated by the board....

In the course of its investigation, the Board interviewed dozens of individuals who described numerous events involving various types of misconduct by Respondent occurring with frequency in every year commencing in the 1990s. In this circumstance we refer to the proviso of Rule 15 which states:

... provided, however, that when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.

In *In re Cicchetti, supra,* we said:

Since the enactment of the Civil Rights Act, federal courts have frequently been called upon to determine whether, under Title VII of that Act, 42 U.S.C. § 2000e–6(e), a "pattern or practice" of discriminatory conduct existed. The United States Supreme Court has held that a "pattern and practice" requires "something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1855 n. 16, 52 L.Ed.2d 396 (1977).

*Id.* at 309.

The evidence of judicial misconduct in this record is not of "isolated" or "sporadic" incidents. The evidence in this record describes misconduct which was "repeated" and "routine."

If the proviso in Rule 15 does not apply in this case, it will not apply in any case, for the record in this case contains nothing *except* evidence of a "pattern of recurring judicial misconduct." Since much, if not most, of the judicial misconduct in this record occurred within the four years be-

fore Susan Weber's complaint and the initiation of the Board's investigation in April 2004,[57] certainly the "last episode" did; and, thus, under the rule, the Board was authorized to "consider all prior acts or omissions related to such an alleged pattern of conduct." And, so, the Board did consider prior acts and omissions of Respondent and did offer them in evidence. This evidence was not excluded by the "four-year rule" of Rule 15 and was properly admitted under the specific authority of the rule as a "pattern of recurring judicial misconduct."

In *In re Cicchetti, supra,* we held that the concept of fundamental fairness militated against our consideration in that case of two incidents of alleged sexual harassment—one occurring 20, and the other 13 years, before any complaint was made.

The facts in the *Cicchetti* case which dictated our decision in that case are not present in this case, and in that case, there was no "pattern of recurring judicial misconduct."

In *Cicchetti, supra,* the witnesses, Debra Hay and Mary Beth Hostert, each described a single encounter with Respondent—which was brief, private, sexual in nature and eight years removed in time one from the other. Moreover, there was only one other incident of a similar nature involving Respondent established to have occurred over the 20 year period. We held that:

> The allegations by Hay and Hostert are thus too remote in time, and too brief in occurrence, to sustain any possibility of

being linked in a common pattern to any other conduct by respondent.

*In re Cicchetti,* 697 A.2d 297, 309 (Pa.Ct. Jud.Disc.1997).

In the case before us, the opposite is true; and we have held that in this case the Board has established by clear and convincing evidence a pattern of recurring judicial misconduct, rendering admissible evidence of conduct occurring more than four years before it was reported to the Board.

 We hold that no concept of fairness shall operate to exclude evidence of "repeated" and "routine" misconduct which is established to be part of a "pattern of recurring judicial misconduct" under Judicial Conduct Board Rule 15. If it is fair to admit it under Rule 15, it is fair to admit it.

### 3. *Laches*

Respondent asserted the affirmative defense of laches in her Omnibus Motion and Trial Memorandum.[58] Our Supreme Court has provided much guidance in regard to the breadth and scope of the equitable doctrine of laches. Most recently, in *Weinberg v. State Board of Examiners,* 509 Pa. 143, 148, 501 A.2d 239, 242 (1985), the Supreme Court, quoting from its unanimous decision in *Class of Two Hundred Admin. Faculty Members of State Colleges in Commonwealth v. Scanlon,* 502 Pa. 275, 279, 466 A.2d 103, 105 (1983), stated:

> "The application of the equitable doctrine of laches does not depend upon the fact that a definite time has elapsed

---

**57.** A not inconsiderable amount of judicial misconduct occurred even after that date. See, e.g., N.T. 573–76 Coll; N.T. 713–22 Salemi; N.T. 966–68 Stankus; N.T. 1194–96, 1200–03 Moran; N.T. 1364–73 Moyer; N.T. 3309–31 Conahan; Board Exhibit No. 21; Board Exhibit No. 22; Board Exhibit No. 23.

**58.** It was premature to raise the defense in the Omnibus Motion and in a Memorandum filed before trial because there were no facts in the record to establish the essential elements of the defense, viz. lack of diligence causing undue delay in turn causing prejudice to the Respondent.

since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." *Wilson v. King of Prussia Ent., Inc.*, 422 Pa. 128, 133, 221 A.2d 123, 126 (1966); accord, *In Re Estate of Marushak*, 488 Pa. 607, 413 A.2d 649 (1980); *Leedom v. Thomas*, 473 Pa. 193, 373 A.2d 1329 (1977); *Holiday Lounge, Inc. v. Shaler Ent., Corp.*, 441 Pa. 201, 272 A.2d 175 (1971); *Siegel v. Engstrom*, 427 Pa. 381, 235 A.2d 365 (1967); *Truver v. Kennedy*, 425 Pa. 294, 229 A.2d 468 (1967). The prejudice required is established where, for example, witnesses die or become unavailable, records are lost or destroyed, and changes in position occur due to the anticipation that a party will not pursue a particular claim. *Kay v. Kay*, 460 Pa. 680, 685, 334 A.2d 585, 587 (1975); *see also Alker v. Philadelphia National Bank*, 372 Pa. 327, 93 A.2d 699 (1953).

Thus, it is clear that the application of the defense of laches requires not only an unjustified delay, but also that the opposing party's position or rights be prejudiced as a result of that delay. *Leedom v. Thomas, supra. See also* 2 J. Pomeroy, Equity Jurisprudence § 419d, at 177 (5th ed.1941). Moreover, "[t]he question of laches is factual and is determined by examining the circumstances of each case." *Leedom v. Thomas, supra*, 473 Pa. at 200–201, 373 A.2d at 1332, and cases cited therein.

In *Weinberg* the Supreme Court went on to point out:

Furthermore, the defense of laches is an affirmative defense and the burden of proving laches is, therefore, on the defendant/respondent. *See, e.g., Jackson v. State Real Estate Commission*, 72 Pa.Cmwlth. 539, 456 A.2d 1169 (1983); *Harrington v. Commonwealth Department of State*, 58 Pa.Cmwlth. 137, 427 A.2d 719 (1981); *Ullo v. State Board of Nurse Examiners*, 41 Pa.Cmwlth. 204, 398 A.2d 764 (1979).

*Weinberg, supra*, at 148–49, 501 A.2d at 242.

Accordingly, in *Lyness v. Commonwealth of Pennsylvania, State Board of Medicine*, 127 Pa.Cmwlth. 225, 561 A.2d 362, 371 (1989), the Commonwealth Court held that laches may bar those proceedings "if Lyness proved that he was prejudiced" by the undue delay and quoted the Supreme Court's declaration in *Weinberg* that:

... the question of laches is factual and is determined by examining the circumstances of each case.[59]

*Id.* 509 Pa. at 148, 501 A.2d at 242. *See, also, Sprague v. Casey*, 520 Pa. 38, 550 A.2d 184 (1988); *Richland Township Planning Commission v. Bobiak*, 122 Pa. Cmwlth. 624, 552 A.2d 1143 (1989).

 It is, therefore, this Court's responsibility to examine the record in order to determine if there is evidence to prove:

1. that "the complaining party [was] guilty of want of due diligence in failing to institute his action," *and*

2. that Respondent was prejudiced thereby. *Weinberg, supra.*

**59.** It has been argued that the equitable defense of laches is not available against the Commonwealth. This argument has been rejected by the Supreme Court which has held that it is available against the Commonwealth but that the court "will require a stronger showing by a defendant who attempts to apply the doctrine against the Commonwealth than ... against an individual." *Weinberg*, 509 Pa. at 150, 501 A.2d at 243. Thus, a stronger showing must be made in cases brought by the Judicial Conduct Board.

Initially, we note that there is no evidence that the Judicial Conduct Board was guilty of lack of diligence or caused any undue delay in the case. The evidence establishes the opposite: the Board received Susan Weber's complaint on April 27, 2004 (N.T. 1471–72 Weber) and proceeded immediately with its investigation which it conducted expeditiously. See, Board Exhibit 29 and our discussion of Judicial Conduct Board Rule 31, *supra*. So, if the Supreme Court in *Class of Two Hundred Admin. Faculty Members of State Colleges in Commonwealth, supra,* and *Weinberg, supra,* was defining "complaining party" as the Licensing Board which apparently it was because the Board was the party which had "instituted [its] action," our inquiry on due diligence or undue delay need go no further.

However, in *Lyness v. Commonwealth State Board of Medicine,* 127 Pa.Cmwlth. 225, 561 A.2d 362 (1989), the Commonwealth Court related that:

Lyness does not allege that the Board lacked due diligence in commencing the disciplinary proceedings. Instead, he contends that the proceedings should be barred due to the lack of due diligence exhibited by all but one of the alleged victims who failed to report the incidents to the Board until years after they were alleged to have occurred.

*Lyness, supra,* at 240, 561 A.2d at 370. Since there were no Pennsylvania cases so holding, Lyness relied on a New Hampshire case (*Appeal of Plantier,* 126 N.H. 500, 494 A.2d 270 (1985)). The Commonwealth Court acknowledged that:

... whether the requisite lack of due diligence must be attributable to the Board or whether it may be attributable to a non-Commonwealth party is a matter of first impression in this Commonwealth.

And held that:

We are persuaded that in applying the equitable doctrine of laches in a disciplinary proceeding, the requirement of undue delay may be fulfilled by proving that a *victim* unjustifiably delayed in reporting an incident to the Board.

*Lyness, supra,* at 241, 561 A.2d at 370 (emphasis added).

In the case now before us, although the Board was not responsible for any undue delay, some of the events described in the testimony occurred in the 1990s. Judge Toole testified, for example, that in 1993 Respondent was not shouldering her fair share of the caseload. (N.T. 244–46 Toole). Lisa Tratthen, one of the court reporters, testified about an occasion in "the mid–1990s" when she was having difficulty keeping up with Respondent who was speaking "way too fast," and that, when she asked Respondent to "please slow down," Respondent spoke even faster. (N.T. 754–56 Tratthen).

We do not equate these witnesses with the "victims" referred to by the Commonwealth Court in the *Lyness* case. Nor do we consider complaints such as Judge Toole's and Lisa Tratthen's by themselves to be "reportable" to the Judicial Conduct Board as the Commonwealth Court considered the complaints of the "victims" in *Lyness* to be reportable to the Board of Medicine. The reason for this is readily seen: the victims in *Lyness* were alleging they were assaulted and raped—victims of crimes—truly "victims" in the elementary sense of the word. These incidents in *Lyness*—these rapes and assaults—these crimes—were eminently reportable for failure to do so raises the question of whether the rapes and assaults in fact took place. *See, Commonwealth v. Lane,* 521 Pa. 390, 398, 555 A.2d 1246, 1250 (1989) where the Supreme Court of Pennsylvania in a case involving a charge of rape and indecent assault, held:

The lack of a prompt complaint by a victim of a crime, although not dispositive of the merits of the case, may justifiably produce a doubt as to whether the offense indeed occurred, or whether it was a recent fabrication by the complaining witness.

It has long been recognized that the victim of a crime naturally would be expected to complain of the offense at the first safe opportunity. *See, Commonwealth v. Dillon,* 592 Pa. 351, 360, 925 A.2d 131, 137 (2007); *Commonwealth v. Snoke,* 525 Pa. 295, 580 A.2d 295 (1990); *Commonwealth v. Lane, supra.* This is a principle of the common law which has been codified in Pennsylvania with respect to sexual offenses. Title 18 Pa.C.S. § 3105 provides:

> Prompt reporting to public authority is not required in a prosecution under this chapter: Provided, however, that nothing in this section shall be construed to prohibit a defendant from introducing evidence of the complainant's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence.

In *Dillon, supra,* the Pennsylvania Supreme Court stated:

> ... evidence concerning the timeliness of a complaint is contemplated both by statute (Section 3105 of the Crimes Code) and by the principle recognizing that a witness may be impeached if he or she remained silent on an occasion where it would have been natural to have spoken.

We do not regard events such as related by Judge Toole and Lisa Tratthen as "oc-casion[s] where it would have been natural to have spoken." We would not expect Judge Toole to complain of his dissatisfaction with Respondent's industry to the Judicial Conduct Board. We would expect that he would complain to her about it; which is what he did. We would not expect Lisa Tratthen to run to the Judicial Conduct Board to report the occasion where Respondent spoke faster after being asked to please slow down. It is not the individual incidents [60] which constitute the violations in this case; it is the accumulation of incidents which does so.

Thus we find that there was no lack of due diligence by the complaining party in this case for the witnesses who testified about events in the 1990s were not "victims" as the Commonwealth Court held the individual complainants to be in *Lyness,* which accounted for that court's decision in that case.

 Next, we must examine the record to see if Respondent has placed evidence therein which establishes that she was prejudiced by any undue delay.[61] Such examination reveals that there is no evidence in this record that Respondent was prejudiced by any undue delay.

The only reference to prejudice made by this Respondent came in her direct testimony when she was asked:

> Q. Judge Lokuta, can you tell this Court how, if at all, you have been prejudiced in the delay of bringing of these proceedings? (N.T. 2891).

In response, Respondent named three individuals, of whom, she said, two had died (George Gushanas and I. Raymond

---

**60.** In contrast to the individual incidents in *Lyness.*

**61.** Since we have already held that there was no undue delay, it is really not necessary for us to address the question of prejudice, inas-much as, for laches to apply, Respondent must establish both. Nevertheless, we will do so for we believe it is propitious to point out the conspicuous absence in this record of any evidence of prejudice to Respondent.

Kremer) and one (Louise Bednarski) "was unable to have cognitive powers," who would have [presumably] testified in her behalf; and the loss of whose testimony caused prejudice to her [presumably]. (N.T. 2891–92). There is no evidence, however, that the loss of this presumptive testimony caused Respondent prejudice.

Gushanas (who died in 2005), she says, "assisted . . . in household tasks," "helped change some locks at [her] house" and "did the household chores with me." (N.T. 2891); Bednarski (who became incompetent at some unknown date), Respondent says, "lived next door to me and helped me out throughout all the years." (N.T, 2891). There is no evidence that the inability of these witnesses to testify was prejudicial to Respondent. There is no evidence of what they would have testified about. We can speculate that if called, these two witnesses would be asked whether, at the times they were helping with household chores or changing locks, or [perhaps] at other times when they were "watching" Respondent's home [if they were], they did not see Respondent's law clerk, Judith Flaherty, performing numerous personal tasks for Respondent both inside and outside the house on county time. But there is no evidence in this record that this is what they would have been asked and this is how they would have testified. In any event, the absence of such testimony from the speculated record does not prejudice Respondent because it in no way contradicts Flaherty—even if it were true, which we are willing to speculate it would be, nor would it diminish her credibility in the slightest.

The other witness whose death prevented him from testifying was Judge I. Raymond Kremer of the Common Pleas Court of Philadelphia County, who, Respondent said, "was referred to me as the contact through the State Trial Conference of Pennsylvania State Trial Judges, who I relied upon for ethical advice, including how I could write personal notes using my own stationery and postage stamps, and a variety of questions that would come up, he died in 1999." (N.T. 2891). Respondent had also mentioned Judge Kremer earlier and testified that she had spoken with him on the telephone and met with him once regarding her "jurisdictional rights" and "a variety of ethical questions." (N.T. 2318). She also said she spoke to Judge Kremer about "interference with [her] docket," and about "the president judge telling me I would have to take his call no matter what," and about the president judge requiring her "to give him my reasons why I was recusing myself." (N.T. 2321–22). According to Respondent, then, the only thing Judge Kremer could have testified about was what he told her in conversations he had with her which testimony would have added nothing, for this Court is quite familiar with Respondent's many grievances, including those she mentioned she had discussed with Judge Kremer. Moreover, Judge Kremer died in 1998, and this investigation didn't start until 2004. It is, thus, obvious that it was no lack of diligence on the part of the Board which caused undue delay which allowed Judge Kremer to die before this trial commenced.

We find that Respondent has not carried her burden of establishing the affirmative defense of laches and certainly has not made the "stronger showing" required when the defense is asserted against the Commonwealth.

### 4. *Respondent's Proffer*

██ Respondent advised the Court of her intention to call Charles Coslett as a witness and made the following offer of proof:

MR. SINATRA: Mr. Coslett is a long-time, distinguished member of the Luzerne County Bar who will testify to many appearances in front of Her Honor. And there was—from his perspective, she has treated him and all litigants and parties in front of her with dignity and respect. (N.T. 1689).

Counsel further stated that he proposed to call other lawyers "who can address the same." These lawyers were identified as: Joseph Giovannini, Timothy Polishan, Charles Ross, Cheryl Sobeski–Reedy and Jerry Cohen. (N.T. 1690–91).

The Court's ruling on the admissibility of this testimony was:

JUDGE SPRAGUE: Let me make it clear, Counsel, so that we can be governed accordingly.

The Court has ruled [62] that any witnesses that you desire to call that deal with the specific incidents or matters that had been brought and testified to by the Board, you are free to call any and all witnesses you desire on those matters.

And to call any witnesses that just deal in general with Judge Lokuta, which does not specifically deal with the incident or events brought forth by the Board, will be inadmissible. (N.T. 1690).

The Court further ruled:

JUDGE SPRAGUE: And let me also make clear, Counsel, the ruling of the Court, as I said, does not preclude your calling any witnesses, including those witnesses, if they are to just testify as to good reputation and character traits. (N.T. 1691).[63]

This proffered testimony is irrelevant. This is not a close question: the Board has never contended that Respondent was guilty of misconduct every day or every hour of every day since she has held judicial office. If the evidence is that a judge misbehaved on Monday, testimony that the judge did not misbehave on Tuesday is certainly irrelevant. If Respondent's offer of proof had included the representation that the testimony of these named witnesses—or any witness—would refute, or contradict, or in any way address the evidence presented by the Board, the testimony would have been admitted. In fact, Respondent did present witnesses whose testimony did address the evidence presented by the Board and that testimony is part of this record.

We find that the ruling of the Court was correct and we affirm it.

### III. CONCLUSIONS OF LAW

1. The Respondent's conduct set out in Findings of Fact Nos. 3–13 is:

(a) a violation of Canon 3A.(3) of the Code of Judicial Conduct, and

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

2. The Respondent's conduct set out in Findings of Fact Nos. 15–32 is:

(a) a violation of Canon 3A.(3) of the Code of Judicial Conduct,

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(c) such that prejudices the proper administration of justice, a violation of

---

**62.** The Court had advised counsel how it would rule on the question when it was raised at the pre-trial conference.

**63.** Respondent never did call these named witnesses—or any witness—to so testify.

Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(d) a violation of Canon 3B.(1) of the Code of Judicial Conduct.

3. The Respondent's conduct set out in Findings of Fact Nos. 34–36 is:

(a) a violation of Canon 3A.(3) of the Code of Judicial Conduct,

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(c) such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(d) a violation of Canon 3B.(1) of the Code of Judicial Conduct.

4. The Respondent's conduct set out in Finding of Fact No. 38 is:

(a) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(b) a violation of Canon 3B.(1) of the Code of Judicial Conduct.

5. The Respondent's conduct set out in Findings of Fact Nos. 40–64 is:

(a) a violation of Canon 3A.(3) of the Code of Judicial Conduct, and

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

6. The Respondent's conduct set out in Findings of Fact Nos. 65–68 is:

(a) a violation of Canon 3 A.(5) of the Code of Judicial Conduct,

(b) such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(c) a violation of Canon 3B.(1) of the Code of Judicial Conduct.

7. The Respondent's conduct set out in Findings of Fact Nos. 70–73 is:

(a) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

8. The Respondent's conduct set out in Findings of Fact Nos. 75–85 is:

(a) a violation of Canon 3C.(1)(a) of the Code of Judicial Conduct,

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(c) such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(d) a violation of Canon 2A. of the Code of Judicial Conduct.

9. The Respondent's conduct set out in Findings of Fact Nos. 86–90 is:

(a) a violation of Canon 3C.(1)(a) of the Code of Judicial Conduct,

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(c) such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(d) a violation of Canon 2A. of the Code of Judicial Conduct.

10. The Judicial Conduct Board acted in compliance with its Rule 31.

11. The Judicial Conduct Board acted in compliance with its Rule 15 and the notion of fundamental fairness discussed by this Court in *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) does not exclude any of the evidence introduced by the Judicial Conduct Board in this case.

12. Respondent has failed to establish that the affirmative defense of laches is applicable in this case because she did not establish lack of diligence caused undue delay which in turn caused prejudice to the Respondent.

13. The Respondent's offer to introduce the testimony of several lawyers that Respondent acted with courtesy and professionalism on certain occasions when they were in her courtroom, but which did not relate in any way to the conduct which was the basis of the charges made by the Judicial Conduct Board or which was the subject of the testimony presented by the Board, was irrelevant and was properly excluded.

14. For the reasons set forth in Conclusions of Law Nos. 1–9, Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

LAMB, MUSMANNO, BUCCI, KURTZ, J.J., join.

O'TOOLE and STREIB, JJ., join the Majority Opinion in all respects except as to Sections I. and J. Judges O'TOOLE and STREIB dissent from the conclusions of the Majority Opinion as to those Sections and file a Concurring and Dissenting Statement.

JUDGE, J., did not participate in the consideration of disposition of this case.

## ORDER

AND NOW, this 9th day of December, 2008, it is ORDERED that Respondent, Ann H. Lokuta, is hereby removed from her office as Judge of the 11th Judicial District, Court of Common Pleas of Luzerne County, Pennsylvania, and it is further ORDERED that said Respondent is hereafter prohibited from holding any judicial office in the Commonwealth.

## CONCURRING AND DISSENTING STATEMENT BY Judge STREIB.

While I join in the majority of the Court's Opinion, I dissent from Sections I. and J. of the Majority Opinion. I did not find the witness Theodore Krohn to be credible. (While my fellow judges may have read the transcript of these proceedings, most were not present during the hearing to observe the witness or his testimony. Two of the three judges who were present found the witness to lack credibility on these two issues.) It is for the lack of credibility that I dissent on both issues.

However, regarding Section I., *THE VIOLET O'BRIEN CASE,* on the finding of a violation of Counts 2, 4 and 6, even if the statement allegedly made by Judge Lokuta to the effect that the law clerk was to "cut him a new asshole," referring to a party's attorney were proven, the statement is no more than an off-hand, albeit unprofessional, comment made privately to a member of her staff in a moment of anger. This statement alone does not prove by clear and convincing evidence that Judge Lokuta held a bias or prejudice which would prevent her from fairly adjudicating the case.

Judges are human, have human emotions, and may make comments amongst themselves or their staff about lawyers and litigants while nevertheless fairly deciding cases. The Majority Opinion imposes an unreasonable standard upon judges in their private communications with each other and their personal staff. It is not the stuff that either recusal or disciplinary actions are made of.[1]

---

**1.** The case cited by the Majority Opinion, *Hayslip v. Douglas,* 400 So.2d 553 (Fla.App. 1981) in support of the conclusion that Canon 3C.(1)(a) is applicable to this case is not anal-

As to Section J., *THE BONNER CASE,* even if the statement alleged by the witness to the effect of the Respondent wanting to rule in favor of an influential family in the area were true, the Board did not charge the Respondent with a violation of the Code of Judicial Conduct in its Complaint, but raised the matter for the first time at trial. I, therefore, find the Board's assertion to be untimely and improper. Indeed, the Board itself offered this evidence not as a specific count, but rather to show a pattern of behavior. At the conclusion of all the Board's evidence, this supposed pattern was allegedly found, at best, in the two incidents described in Sections I. and J. of the Majority Opinion. I would find that the Board did not prove by clear and convincing evidence a pattern of behavior.

It is for these reasons alone that I dissent from the Court's Opinion.

O'TOOLE, J., joins this Concurring and Dissenting Statement.

ogous to the instant factual situation. That case involved a public outburst in the courtroom in front of a party which clearly indicated to the party and all present in the courtroom, that there was, at minimum, an appearance which might lead a reasonable person to think there was a bias to such a degree that a fair hearing was impossible. There was no such public statement or conduct in this case. Therefore, I do not believe Canon 3C.(1)(a) is applicable, however, in a factual situation similar to the one in *Hayslip*. I concur with the rationale of the Majority Opinion.